# EXHIBIT 24

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 89997 / September 25, 2020**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20069**

| | |
|---|---|
| **In the Matter of**<br><br>    **Precigen, Inc. (f/k/a**<br>    **Intrexon Corporation),**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease- and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Precigen, Inc. (f/k/a Intrexon Corporation) ("Intrexon" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

1

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that[1]:

### Summary

1.        These proceedings involve inaccurate reports concerning the company's purported success converting relatively inexpensive natural gas into more expensive industrial chemicals using a proprietary methane bioconversion ("MBC") program. On May 10, 2017, Intrexon publicly reported progress in the laboratory converting natural gas into a precursor component of synthetic rubber called "2,3 BDO." Intrexon continued to publicly report the company's progress converting natural gas into 2,3 BDO in August and November 2017, which was important information for investors and analysts at that time.

2.        Intrexon was primarily using significantly more expensive pure methane for the relevant laboratory experiments but was indicating that the results had been achieved using natural gas.   Natural gas differs from pure methane in that it contains chemicals that inhibit the bioconversion process. As a result, the Forms 8-K Intrexon furnished with the Commission on May 10, August 9 and November 9, 2017 were inaccurate under Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 promulgated thereunder.

### Respondent

3.        **Precigen, Inc. (f/k/a Intrexon Corporation)** is a biotechnology company headquartered in Germantown, Maryland. Intrexon's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act. The company's common stock trades on Nasdaq Global Select Market under the ticker symbol "PGEN."

### Facts

**RELEVANT BACKGROUND**

4.        The MBC program was designed to use relatively low cost natural gas as the feedstock for the conversion of methane into higher value chemicals. At the center of the program were methanotrophs, naturally-occurring organisms that consume and metabolize methane, the main component of natural gas, as their energy source. Intrexon intended to genetically engineer the methanotrophs to produce high value chemicals on a commercial scale through a fermentation process using natural gas as the feedstock – something that had never been done before. These chemicals included isobutanol, farnesene, 1,4 butanediol (1,4 BDO), isoprene, isobutyraldehyde and 2,3 BDO. Intrexon focused initially on the production of isobutanol and 1,4 BDO; however, by late 2016, this part of the MBC program had encountered scientific challenges associated with genetically re-engineering the methanotrophs to produce  commercially viable amounts of these chemicals.  As a

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

result, Intrexon refocused its efforts to produce 2,3 BDO from natural gas at commercial levels. Intrexon stated in its May 10, 2017 earnings call that "the 4 molecules actively under development represent a total addressable market exceeding $100 billion per year."

5.      Intrexon's public disclosures included updates on the status of a number of its biotechnology programs, including the MBC program. The updates included in Intrexon's public releases were obtained by the company's investor relations team from the scientific leadership of the MBC program.  Beginning in early 2017, Intrexon began highlighting in its public disclosures increases in "yields" associated with the 2,3 BDO part of the MBC program. Yields were a measure of productivity referred to internally as "titers" and were measured by grams-per-liter (g/l). During the relevant period, Intrexon disclosed publicly yields/titers using pure methane as a feedstock for its laboratory experiments.

6.      Pure methane was purchased in canisters at a cost of approximately $650 per one million British Thermal Units (MMBtu).  At those prices, pure methane was not a commercially viable feedstock. Pure methane differs from natural gas in that it contains no ethane, which was inhibitory to the fermentation process. Natural gas could be purchased from the local utility company at a cost of approximately $3 per MMBtu. At those prices, natural gas could provide a commercially viable feedstock. The problem with natural gas is that it is a composite chemical that contains small percentages of ethane, which again was inhibitory to the fermentation process.  At the time of the laboratory experiments with pure methane as a feedstock, Intrexon's scientists were working on methods to achieve similar yields/titers with natural gas and, while they were optimistic, they had not done so at the time Intrexon made the relevant disclosures.

7.      Yields/titers reported internally from laboratory experiments using natural gas as a feedstock were substantially lower than those disclosed publicly by Intrexon using pure methane during the relevant period.

## MAY 10, 2017 QUARTERLY RELEASE

8.      Intrexon's first quarter of fiscal year 2017 ended March 31. After the close of the market on May 10, 2017, Intrexon reported its results for the first quarter. The company's press release and the accompanying PowerPoint presentation incorporated information on the MBC program including a 30% increase in yields for 2,3 BDO. The press release stated in relevant part, "[t]his yield level produces a positive 'in the money' gross margin based on current natural gas and product prices." That same day, Intrexon furnished copies of the press release and PowerPoint with the Commission as attachments to a Form 8-K.

9.      The May 10, 2017 PowerPoint illustrated the MBC process as follows (at pages 25 and 26):

3



10.     Several analysts issued reports highlighting the purported progress of the MBC program. These included one analyst who described it as a "Game Changing Breakthrough," another who wrote "we continue to view Intrexon's methanotroph bioconversion platform (MBP) which utilizes low cost natural gas (primarily methane) instead of oil to generate high value industrial-scale products as the highest value opportunity for the story," and a third analyst who commented "investors will view the positive updates in the energy segment as upside surprise."  Intrexon failed to disclose that the 2,3 BDO yields were based upon laboratory experiments using pure methane not natural gas as the feedstock, as indicated in the slide above.  Pure methane is not a commercially viable feedstock given its expense.  At the time, scientific hurdles needed to be overcome to increase yields from natural gas.

**SUBSEQUENT QUARTERLY RELEASES**

11.     Intrexon's second quarter of fiscal year 2017 ended June 30. After the close of the market on August 9, 2017, Intrexon reported its results for the second quarter.  The company's press release and the accompanying PowerPoint presentation incorporated additional information on the MBC program including another 30% increase in yields for 2,3 BDO.  The press release characterized these yields as "commercially relevant."

12.     The August 9, 2017 PowerPoint illustrated the MBC process as follows (at page 15):

4



- Observed 30% increase in 2,3 BDO yields on top of 30% increase achieved during the first quarter

- 2,3 BDO test production runs completed in pilot plant

*Intrexon's on-purpose butadiene process anticipated to have COGS sub $1,000 per metric ton*

13. Intrexon's third quarter of fiscal year 2017 ended September 30. After the close of the market on November 9, 2017, Intrexon reported its results for the third quarter. The company's press release and the accompanying PowerPoint presentation incorporated additional information on the MBC program including a 15% increase in yields for 2,3 BDO.

14. The November 9, 2017 PowerPoint illustrated the MBC process as follows (at page 21):



**2,3 BDO (BUTADIENE)**

Market Size: c.$22bn

*Intrexon's on-purpose 2,3 BDO process anticipated to have COGS sub $1,000 per metric ton*

## 2,3 BDO

- Yield increased by 15% during Q3 reaching over 60% of first commercial scale plant target
- Commercial robustness of strain demonstrated with continuous production runs >400 hours
- Purity >99% for 2,3 BDO produced in 500 liter pilot plant
- Site selection for small scale 2,3 BDO plant underway and expect construction to begin in 2018

15. Intrexon failed to disclose during the second and third quarters that 2,3 BDO yields were based upon laboratory experiments using pure methane not natural gas as feedstock and that hurdles needed to be overcome to increase yields from natural gas. Yields/titers reported internally from laboratory experiments using natural gas as a feedstock continued to be substantially lower than those disclosed publicly using pure methane.

16. Intrexon furnished copies of the second and third quarter press releases and PowerPoints with the Commission as attachments to Forms 8-K on August 9 and November 9, 2017 respectively.

17. Intrexon pitched the MBC program privately to numerous potential business partners over the course of 2017 and 2018. A number of these potential partners performed due diligence on the MBC program including reviewing lab results and plans for commercialization. Intrexon has not yet found a partner for the MBC program. Intrexon worked on the feedstock issue with some success throughout 2018 and 2019 but never developed the MBC program to commercial scale.

\*                    \*                    \*

As a result of the conduct described above, Intrexon violated Section 13(a) of the Exchange Act and Rules 13a-11

and 12b-20 promulgated thereunder which require issuers of securities registered pursuant to Section 12 of the Exchange Act to file with the Commission accurate current reports on Forms 8-K.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that**:**

A.        Pursuant to Section 21C of the Exchange Act, Respondent shall cease and desist from committing or causing any violations and any future violations of Sections 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 promulgated thereunder.

B.        Within 21 days of the entry of this Order, Intrexon shall pay a civil money penalty in the amount of $2.5 million to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Payment must be made in one of the following ways:

(1)        Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)        Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)        Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch HQ
Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Intrexon Corporation as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Reid Muoio, Division of Enforcement, Securities and Exchange Commission, Division of Enforcement, Securities and Exchange Commission, 100 F St., N.E., Washington, DC 20549.

C.        Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the

6

deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.


Vanessa A. Countryman
Secretary