NINA F. LOCKER, State Bar No. 123838
JEROME F. BIRN, JR., State Bar No. 128561
LAURIE B. SMILAN, State Bar No. 116740
ANDREW J. FRANTELA, State Bar No. 325278
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: jbirn@wsgr.com
        nlocker@wsgr.com
        lsmilan@wsgr.com
        afrantela@wsgr.com

*Attorneys for Defendants Precigen, Inc.*
*f/k/a Intrexon Corporation, Randal J.*
*Kirk, Rick L. Sterling, and Andrew J. Last*

[Additional Counsel On Signature Page Filing
Joinder for Defendant Robert F. Walsh III]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PRECIGEN SECURITIES LITIGATION | CASE NO.:  5:20-cv-06936-BLF<br><br>CLASS ACTION<br><br>**DEFENDANTS' CORRECTED NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Hearing Date:  April 7, 2022<br>Time:  9:00 a.m.<br>Courtroom: 3, Fifth Floor<br>Judge:  Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ....................................................................................1

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3)) ........................................1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I.  INTRODUCTION ....................................................................................................1

II.  THE EXHIBITS ARE PROPERLY BEFORE THE COURT ...........................................2

III.  STATEMENT OF FACTS ..........................................................................................3

IV.  ARGUMENT ...........................................................................................................5

    A.  The Order Does Not Establish Falsity or Scienter .......................................6

    B.  The Ninth Circuit Recently Rejected Plaintiff's Fraud-by-Implication Theory ...........................................................................7

    C.  The CWs Do Not Show That Any Statement Was False or Made with Scienter ....................................................................9

    D.  Many of the Challenged Statements Are Non-Actionable Puffery, Opinions and/or Forward-Looking Statements Immunized by the PSLRA's Safe Harbor ...........................................14

        1.  Statements of Pride and Optimism are Immaterial as a Matter of Law ..........................................................14

        2.  Forward-Looking Statements Protected by the PSLRA Safe Harbor .......14

        3.  Precigen's Optimistic Opinions are Non-Actionable ..............................16

    E.  Precigen's Disclosures Concerning the SEC Investigation Were Not Misleading ........................................................17

    F.  Defendants Cannot Be Held Liable for Statements They Did Not Make ............18

    G.  Plaintiff Fails to Establish the Requisite "Strong Inference" of Scienter ............18

        1.  Plaintiff Fails to Plead Scienter Under The Core Operations Theory .......19

        2.  The Alleged Facts Actually Undermine Any Inference of Scienter .........21

    H.  Plaintiff Fails to Plead Loss Causation ....................................................22

    I.  Plaintiff Fails to State a Claim for Scheme Liability Under Rule 10b-5(a) or (c) ....................................................24

    J.  Plaintiff Fails to State A Section 20(a) Claim ..........................................24

    K.  Plaintiff Should Not Be Granted Further Leave to Amend .................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bao v. SolarCity Corp.*,
  2015 WL 1906105 (N.D. Cal. Apr. 27, 2015) ...................................................................22

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ...............................................7, 12, 13, 14, 16

*Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) .............................................................................6

*City of Dearborn Heights Act 345 Police & Fire Ret. Syst. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017).................................................................................16, 17, 24

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)...........................................................................................22

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) .......................................................................18, 19

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ..............................................................11, 14

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2021 WL 1091891 (N.D. Cal. Mar. 22, 2021) .........................................................9, 10, 14, 15

*Cozzarelli v. Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008).........................................................................................22

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008).......................................................................................6, 7

*Hampton v. Aqua Metals, Inc.*,
  2020 WL 6710096 (N.D. Cal. Nov. 16, 2020)...............................................12, 14, 15, 16, 18

*Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ...................................................................14

*In re AnaptysBio, Inc. Sec. Litig.*,
  2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ...................................................................11

*In re Cloudera, Inc. Sec. Litig.*,
  2021 WL 2115303 (N.D. Cal. May 25, 2021) ...................................................................15

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) .............................................................................6

*In re Int'l. Rectifier Corp. Sec. Litig.*,
  2008 WL 4555794 (C.D. Cal. May 23, 2008)....................................................................24

*In re Intrexon Corp. Sec. Litig.*,
  2017 WL 732952 (N.D. Cal. Feb. 24, 2017)......................................................................14

ii

*In re Inv. Tech. Grp. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) ...............................................................................18

*In re Lions Gate Entm't Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ..................................................................................18

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020) ..............................................................................24

*In re Nektar Therapeutics*,
    2020 WL 3962004 (N.D. Cal. July 13, 2020) ...................................................................20

*In re Nuvelo, Inc., Sec. Litig.*,
    2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) .......................................................................9

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) .........................................................................................19

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020) ...................................................................10

*In re Regulus Therapeutics Inc. Sec. Litig.*,
    406 F. Supp. 3d 845 (S.D. Cal. 2019) ..............................................................................21

*In re Restoration Robotics, Inc. Sec. Litig.*,
    417 F. Supp. 3d 1242 (N.D. Cal. 2019) ...........................................................................16

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012).......................................................................................9, 21

*In re Teva Sec. Litig.*,
    512 F. Supp. 3d 321 (D. Conn. 2021) ..............................................................................24

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020), *appeal docketed*,
    No. 20-17465 (9th Cir. Dec. 22, 2020) ......................................................................19, 20

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
    522 F. Supp. 3d 660 (N.D. Cal. 2021), *appeal docketed*,
    No. 21-15604 (9th Cir. Apr. 5, 2021).................................................................................10

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021)............................................................................................22

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ........................................................................................................ 18

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)...............................................................................................2

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016)..........................................................................................23

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ......................................................................................22, 23

iii

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
        540 F.3d 1049 (9th Cir. 2008)..................................................................................18, 22

*Middlesex Ret. System v. Quest Software, Inc.*,
        527 F. Supp. 2d 1164 (C.D. Cal. 2007)...............................................................24

*Mulquin v. Nektar Therapeutics*,
        510 F. Supp. 3d 854 (N.D. Cal. 2020) ...........................................................9, 13

*Nguyen v. Endologix, Inc.*,
        962 F.3d 405 (9th Cir. 2020)..................................................................2, 11, 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
        575 U.S. 175 (2015) .............................................................................................16

*Oracle Partners, L.P. v. Concentric Analgesics, Inc.*,
        2021 WL 2322351 (N.D. Cal. June 7, 2021) ........................................................20

*Padnes v. Scios Nova Inc.*,
        1996 WL 539711 (N.D. Cal. Sept. 18, 1996)........................................................9

*Police & Fire Ret. Sys. v. Axogen, Inc.*,
        2021 WL 1060182 (M.D. Fla. Mar. 19, 2021), *appeal docketed*,
        No. 21-11246 (11th Cir. Apr. 15, 2021)................................................................15

*Ponce v. SEC*,
        345 F.3d 722 (9th Cir. 2003)..................................................................................7

*Prodanova v. H.C. Wainwright & Co.*,
        993 F.3d 1097 (9th Cir. 2021)..............................................................18, 19, 20, 21, 22

*Rok v. Identiv, Inc.*,
        2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom.*
        *Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018)..................................23, 24

*S. Ferry LP, No. 2 v. Killinger*,
        542 F.3d 776 (9th Cir. 2008)..................................................................................19

*Veal v. LendingClub Corp.*,
        423 F. Supp. 3d 785 (N.D. Cal. 2019) ..................................................................20

*Webb v. SolarCity Corp.*,
        884 F.3d 844 (9th Cir. 2018)..................................................................................21

*Welgus v. TriNet Grp., Inc.*,
        2017 WL 6466264 (N.D. Cal. Dec. 18, 2017), *aff'd*,
        765 F. App'x 239 (9th Cir. 2019)............................................................................14

*Wochos v. Tesla, Inc.*,
        2019 WL 1332395 (N.D. Cal. Mar. 25, 2019), *aff'd*,
        985 F.3d 1180 (9th Cir. 2021).................................................................................12

*Wochos v. Tesla, Inc.*,
        985 F.3d 1180 (9th Cir. 2021).......................................................................... *passim*

iv

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)......................................................................................................10, 13

## TABLE OF ABBREVIATIONS[1]

| | |
|---|---|
| "¶" or "SAC" or "Complaint" | Second Amended Class Action Complaint, filed September 27, 2021 (ECF No. 88) |
| "1,4 BDO" | 1,4 Butanediol |
| "2,3 BDO" | 2,3 Butanediol |
| "2017 8-Ks" | Forms 8-K filed by the Company with the SEC on May 10, 2017, August 9, 2017, and November 9, 2017 |
| "Birn Decl." | Declaration of Jerome F. Birn, Jr. in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint |
| "Class Period" | May 10, 2017 to September 25, 2020 |
| "CW" or "CWs" | Confidential witness(es) |
| "Defendants" | Collectively, each defendant named in the Complaint |
| "DNA" | Deoxyribonucleic Acid |
| "Exhibit" or "Ex." or "Exs." | Exhibit(s) attached to the Birn Decl. |
| "Individual Defendants" | Randal J. Kirk, Andrew J. Last, Rick L. Sterling, and Robert F. Walsh |
| "MBP" | Methane Bioconversion Platform |
| "Motion" or "Mot." | Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint |
| "Order" | Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order issued by the SEC on September 25, 2020 |
| "Plaintiff" | Lead Plaintiff Raju Shah |
| "Precigen" or "Company" | Precigen, Inc. f/k/a Intrexon Corporation |
| "PSLRA" | Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77z-1 and 78u-4) |
| "SEC" | U.S. Securities and Exchange Commission |

[1] Citations to Form 8-Ks (Exs. 6, 7, 9-10, 12, 18-19, 22, and 28) refer to ECF-designated page numbers. Citations to all other Exhibits refer to the document's internal page numbers.

vi

DEFS' MOT. TO DISMISS
CASE NO. 5:20-cv-06936-BLF

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, on April 7, 2022, at 9:00 a.m., before the Honorable Beth Labson Freeman of the U.S. District Court for the Northern District of California, 280 South 1st Street, San Jose, CA 95113, Fifth Floor, Courtroom 3, Defendants Precigen, Inc. f/k/a Intrexon Corporation, Randal J. Kirk, Rick L. Sterling, and Andrew J. Last will and hereby do move for an order dismissing Plaintiff's Second Amended Class Action Complaint (ECF No. 88) pursuant to Fed. R. Civ. P. 9(b), 12(b)(6), and the Private Securities Litigation Reform Act.

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

Should the Court dismiss Plaintiff's claims under Sections 10(b) and 20(a) of the Securities Exchange Act in the Second Amended Complaint for failure to allege with particularity an actionable misstatement or omission, a strong inference of scienter, and loss causation?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Plaintiff's Second Amended Complaint ("SAC") alleges that all of Precigen's statements during the three-year Class Period discussing the ongoing development of its unique methane bioconversion platform ("MBP") – a developmental program that was one of Precigen's many bioengineering ventures – were misleading because the Company failed to disclose details of its lab testing and economic modeling methodologies. Specifically, while the *goal* of the MBP program was to convert methane from inexpensive natural gas into valuable industrial compounds – a goal that was achieved well before the end of the Class Period – and ultimately to achieve commercialization, much of the early laboratory work, which was focused on optimizing the methanotrophic organism underlying the MBP process, used pure methane as a proxy for methane derived from natural gas. Using pure methane allowed Precigen's scientists to control for the inherent variability in the amount of methane in natural gas samples and, thus, more accurately measure improvements to the methanotrophic organism. In an unadmitted, settled SEC order (the "Order"), *which did not make any assertions of fraud or scienter*, the SEC took the position that although Precigen did not make any affirmative statements about the source of methane, it should have disclosed that it had used pure methane when discussing the results of its early lab tests *in the*

1

*first three quarters of 2017*, *i.e.*, before it also began successful testing with natural gas.

Plaintiff's Complaint relies almost exclusively on the Order as an impermissible and inadequate substitute for the particularized facts required by the PSLRA to establish falsity and a strong inference of scienter. Although the Order (i) is time-limited to the first three quarters of 2017, and (ii) did not assert that Precigen made any affirmative representations about the source of methane used in the lab, or about the MBP's commercial prospects, Plaintiff asks the Court to assume that all of Precigen's disclosures throughout the three year Class Period regarding yields and estimates of commercial viability were misleading. Further, although the Individual Defendants and their affiliated entities invested *more than $180 million* in the Company during the Class Period, Plaintiff asks the Court to infer that Defendants deliberately defrauded investors about the MBP program's results and prospects while watching the value of their own significant investments decline. Finally, Plaintiff asks the Court to infer that the decline in Precigen's stock price over the three-year Class Period was due to the alleged "revelation" that Precigen used pure methane in the lab in one of its many developmental ventures as opposed to the Company's overall deteriorating financial condition borne of funding research for a panoply of promising but not-yet-profitable biotechnology ventures that led to (1) "going concern" warnings, (2) an accumulated deficit approaching $2 billion, (3) the divestiture of most of Precigen's many non-core, non-health related businesses, and, as a last resort, (4) the suspension of the MBP program just as it was moving towards small-scale commercial production. Precigen's corporate-wide financial deterioration is a far more plausible explanation for Precigen's stock price decline than the statements at issue. Defendants' significant investments, losses, and lack of personal stock sales further refute any inference of scienter. Because Plaintiff's theory of fraud "does not make a whole lot of sense," the SAC should be dismissed without further leave to amend. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).

## II.    THE EXHIBITS ARE PROPERLY BEFORE THE COURT

The Exhibits referenced by Defendants are subject to judicial notice (Exs. 1-36), and/or are incorporated by reference into the Complaint (Exs. 2-4, 5-14, 18-24, 26-29, 36). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). *See* Birn Decl. ¶¶ 1-36.

DEFS' MOT. TO DISMISS
CASE NO. 5:20-cv-06936-BLF

### III.     STATEMENT OF FACTS

Precigen develops platforms of cell and gene therapy designed to enable the production of new and improved biotherapeutics. During the Class Period, it also had a number of non-core initiatives related to food crops, livestock, and energy and chemical products. Ex. 1 at 5; Ex. 2 at 6; Ex. 3 at 6; Ex. 4 at 6. One of those initiatives was Precigen's MBP program. Ex. 1 at 9; Ex. 2 at 10-11; Ex. 3 at 10; Ex. 4 at 27. At the center of the MBP program is the methanotroph bacteria, a "unique organism [that] consumes inexpensive methane as its energy source." Ex. 5 at 8; *see also* Ex. 6 at 37. Precigen scientists engineered the naturally-occurring methanotroph's DNA to enable the bioconversion of methane to produce commercially valuable products, *e.g.*, isobutanol for gasoline blending, 2,3 Butanediol ("2,3 BDO") for synthetic rubber, and 1,4 Butanediol ("1,4 BDO") for polyester. Ex. 1 at 9; Ex. 2 at 10-11; Ex. 3 at 10; *see also* Ex. 4 at 27. The aggregate addressable market for these compounds was estimated to represent over $100 billion annually. *See* Ex. 6 at 38; Ex. 5 at 8; Ex. 7 at 29; Ex. 8 at 6; Ex. 9 at 34; Ex. 2 at 6; Ex. 10 at 15; Ex. 11 at 5; Ex. 12 at 18; Ex. 13 at 5.

Precigen's first step in the MBP development process was the optimization of the methanotroph. Ex. 14 at 9; Ex. 10 at 6; Ex. 11 at 6. This involved an iterative process of genetic editing, followed by laboratory testing, leading to further genetic edits designed to achieve DNA sequences that would maximize yields. Ex. 1 at 6; Ex. 2 at 7-8; Ex. 3 at 7. Precigen's goal was to use methane derived from inexpensive natural gas – which is mostly methane (*see* Ex. 15 at 3;Ex. 16 at 1)  – as the feedstock to produce the targeted compounds. Early lab testing used pure methane, which allowed Precigen's scientists to control for variability in the chemical composition of natural gas samples and more accurately assess the effect of improvements to the base methanotrophic organism on end-product yields on an apples-to-apples basis. Plaintiff does not allege that lab testing with pure methane instead of methane derived from natural gas deviated from good scientific practice. After the yields from Precigen's early lab testing suggested potential commercial viability under its internal financial model, Precigen moved to scale up testing and production-related engineering with natural gas at a larger scale in its pilot plant (Ex. 6 at 37; Ex. 5 at 8; Ex. 8 at 6-7; Ex. 14 at 7) while also continuing testing using both

3

DEFS' MOT. TO DISMISS
CASE NO. 5:20-CV-06936-BLF

methane and natural gas to further improve the organism. Ex. 7 at 30; Ex. 8 at 6-7; Ex. 9 at 35; Ex. 14 at 7.

Plaintiff alleges that ethane in natural gas produces acetate which can inhibit the methane bioconversion process. ¶¶ 26, 52. The SAC, however, pleads no particularized facts disputing that processes to resolve the production of acetate existed and had been successfully used in the industry for decades. Ex. 17 at 1, 38 ("[N]atural gas contains different concentrations of ethane (2.7-20.0%)" which results in "acetate . . . accumulat[ing] in the production plant. *One solution to overcome toxic levels. . . is to establish a stable mixed culture with heterotrophic bacteria,"* a process used by Norferm/Dupont). By May 2018, Precigen had improved on these processes, reengineering its proprietary organism to metabolize *both* methane and ethane, resulting in natural gas yields that exceeded those achieved with pure methane. Ex. 18 at 22; Ex. 11 at 6.

By the start of the Class Period in May 2017, laboratory yields for two compounds, 2,3 BDO and isobutyraldehyde, suggested potential commercial viability if production could be replicated at scale. Ex. 6 at 6; Ex. 5 at 8; ¶ 35. In May, August, and November 2017, Precigen disclosed these yields and announced that it was moving forward with development of 2,3 BDO at a pilot plant (Ex. 6 at 6; Ex. 7 at 30; Ex. 8 at 6-7; Ex. 9 at 34-35; Ex. 14 at 7; ¶¶ 4, 35-36, 117-118, 122-123, 127-131, 133-137), while making clear to investors that "additional yield improvements and scaling milestones must be met" to attain commercial viability. Ex. 6 at 6.

After the move to the pilot plant, in November 2018, Precigen *for the first time* specified that it was producing 2,3 BDO "from **natural gas**," noting it had achieved "roughly 50% of the theoretical target yield." Ex. 12 at 5 (emphasis added); ¶¶ 152-155; *see also* Ex. 13 at 5. In February 2019, Precigen announced it was "produc[ing] 2,3 BDO from natural gas" at 80% of its target for a small-scale commercial operation. Ex. 19 at 5. Unfortunately, Precigen also announced that decreased revenue and increased research and development expenses across its *many* biotechnology programs had resulted in an accumulated deficit of $1.3 billion, raising "substantial doubt about its ability to continue as a going concern." *Id.* at 8; Ex. 20 at 5; Ex. 3 at 25. By the following year, the corporate deficit had increased to $1.7 billion. Ex. 4 at 30.

In January 2020, Precigen announced that to preserve cash it would focus on its core

4

health care initiatives and had divested all but two of its most promising non-health ventures (including the MBP program). *Id.* at 7, 26-29. In May 2020, as a result of the pandemic and the challenging state of the energy sector, Precigen announced "the difficult but necessary decision" to suspend the MBP program to further minimize expense, later taking an impairment charge. ¶ 86 (Ex. 21 at 5); ¶ 88 (Ex. 22 at 6; Ex. 23 at 28).

In September 2020, Precigen entered into a settlement Order with the SEC concerning three 8-Ks filed in May, August, and November 2017 (Exs. 6, 7, and 9) (the "2017 8-Ks") reporting 2,3 BDO yields. Ex. 24. The SEC believed the 2017 8-Ks' disclosures did not sufficiently identify the source of methane used in lab testing during the first three quarters of 2017 before testing began with natural gas. *Id.* at 2. By its terms, the Order: (1) applies "[s]olely for the purpose of [SEC] proceedings;" (2) notes Precigen did not admit any of the SEC's assertions; (3) relates only to statements about 2,3 BDO yields in the 2017 8-Ks; (4) does not assert Precigen made affirmative representations about its methane source or methods; and (5) makes no allegations of fraud as to any statement nor scienter as to any Individual Defendant, none of whom are mentioned. *Id.*

## IV.   ARGUMENT

Plaintiff claims that all of Defendants' statements about the MBP program throughout the more-than-three-year Class Period were misleading (and made with scienter) because Defendants did not disclose that: (1) MBP yields were achieved with pure methane, not methane from natural gas, (2) yields achieved with natural gas were lower than with pure methane, and (3) none of the compounds derived from the MBP program were "in-the-money," i.e., potentially commercially viable if the cost of pure methane was used in the calculation and/or unless Precigen "cherry-picked" data inputs from different experiments rather than overall testing results. ¶¶ 40, 60-61, 116, 124, 126, 132, 138, 140, 146, 151, 157, 159, 162. Plaintiff also claims Precigen had a duty to disclose the SEC investigation earlier than it did. ¶ 83. Plaintiff's allegations fail to meet the PSLRA's heightened pleading standards and should be dismissed.

DEFS' MOT. TO DISMISS
CASE NO. 5:20-CV-06936-BLF

**A.   The Order Does Not Establish Falsity or Scienter**

*Plaintiff May Not Rely on the Order to Establish Facts:* Unadmitted "[s]tatements made by the SEC in settlement documents are . . . 'untested assertions by litigants,'" (*In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1017 n.4 (N.D. Cal. 2020) (citation omitted)), "are not 'findings' upon which Plaintiffs may rely," (*Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012)), and are "not sufficient to meet the pleading requirements of the PSLRA." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748-49 (9th Cir. 2008).

*The Scope of the Order is Limited:* The Order relates only to the 2017 8-Ks (not any other statements) and only to stated "yields for 2,3 BDO" (not any other target compounds), and only claims that the source of the methane used to obtain the 2,3 BDO yields should have been made clear, while not asserting that any affirmative representations about the source of methane were made or disputing the accuracy of the actual yields themselves. Ex. 24 at 2-5. Neither the Order nor Plaintiff dispute that Precigen successfully tested MBP on natural gas in and after mid-2017 and accurately reported test yields in all of 2017 and after, specifying those based on natural gas.

*The Order and the Cited Disclosures Contradict Plaintiff's Claims:* The Order reflects that "[a]t the time of the laboratory experiments with pure methane as a feedstock" Precigen's "scientists were working on methods to achieve similar yields/titers with natural gas and, while they were optimistic, they had not done so *at the time [of] the relevant disclosures*," *i.e.*, when the 2017 8-Ks were filed in May, August, and November 2017. Ex. 24 at 2, 3, 5 (emphasis added). The clear implication of this time-limited recital, and the fact that the SEC did not challenge any later disclosures despite its then-ongoing investigation, is that Precigen *subsequently did* achieve similar yields/titers with natural gas as its later disclosures confirm. By November 2017 (not coincidently the end-date of the disclosures challenged in the Order), Precigen had begun testing 2,3 BDO in its pilot plant *using natural gas*. Ex. 8 at 6-7; Ex. 14 at 7. In November 2018, Precigen announced that 2,3 BDO yields "from natural gas" reached 50% of its target yield for small-scale commercialization. Ex. 12 at 5; ¶¶ 152-155; *see also* Ex. 13 at 5. By February 2019, yields "from natural gas" had increased to 80% of that goal, prompting site selection and design for such a plant. ¶ 158 (citing Ex. 19 at 5).

6

DEFS' MOT. TO DISMISS
CASE NO. 5:20-CV-06936-BLF

The SAC provides *no* factual allegations contradicting these achievements, subsequent to the period addressed in the Order, *with natural gas*. Merely "repeat[ing] allegations related to events occurring earlier in time [in a bioconversion development process] do[es] not provide 'specific facts demonstrating that the [subsequent] statements . . . [as development progressed] were false or misleading when made.'" *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *11 (N.D. Cal. Mar. 24, 2014). Moreover, neither the Order nor the SAC point to any affirmative representations claiming that yields were based on natural gas **prior to November 2018**, even though testing with natural gas in the pilot facility had begun a year before.

*The Order Made No Assertions of Fraud or Scienter:* The Order does not assert that the 2017 8-Ks (much less any other statements) were fraudulent or that any Individual Defendant acted with scienter. The Order only alleges non-scienter-based violations of Section 13(a) of the Exchange Act (Ex. 24 at 2). *Ponce v. SEC*, 345 F.3d 722, 737 n.10 (9th Cir. 2003). Thus, the Order's recitals, which do not meet the PSLRA's pleading requirements (*Glazer*, 549 F.3d at 748), cannot establish scienter or fraud.

**B.   The Ninth Circuit Recently Rejected Plaintiff's Fraud-by-Implication Theory**

At most, the Order suggests that the 2017 8-Ks – which, again, made *no* affirmative representations about the source of methane used in lab testing – could have led investors to fill in the blanks and assume that the accurately stated yields were achieved using natural gas. The Ninth Circuit has rejected such "misleading-by-implication" theories as insufficient to state a claim for securities fraud. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1187, 1193 (9th Cir. 2021).

In *Tesla*, plaintiffs claimed they were misled to believe that Tesla had begun manufacturing its new Model 3 on an automated assembly line – its ultimate goal – when, in fact, during the start-up phase of production, cars were still being "banged out by hand." *Id.* The Ninth Circuit rejected the assertion that Elon Musk's accurate statements that Tesla had installed "manufacturing equipment" and was delivering "production" cars falsely implied that it had "begun installation of *automated* equipment." *Id.* The Court noted: "Plaintiffs' brief rewrites th[e challenged] statement as if it asserted that Tesla had 'begun installation of automated equipment in the first quarter.' . . . But that is not what the statement says—it simply confirms

7

that some unspecified 'manufacturing' equipment had been installed at the Tesla facilities, and the complaint does not plead any facts to establish that *that* representation was false." *Id.*; *see also id.* at 1194. Because the *Tesla* plaintiffs did not plead facts showing that *no* "manufacturing equipment" had been installed, that cars had not been produced and delivered, or that Tesla's production goals were known to be impossible, the Ninth Circuit affirmed dismissal for failure to plead facts demonstrating "'the reason or reasons why'" Musk's literally true and accurate statements were false and misleading as the PSLRA requires. *Id.* at 1193.

This case is just like *Tesla.* Here, Plaintiff does not dispute that the MBP platform converted methane to 2,3 BDO and other products, that the stated yields were accurate, or that applying those yields to natural gas prices put the compounds "in the money," *i.e.*, produced positive gross margins making them potentially commercially viable. *E.g.*, ¶ 118; *see also* ¶ 36; Ex. 6 at 6. Instead, as in *Tesla*, Plaintiff claims that investors may have made assumptions about the *methods* Defendants used to achieve the accurately stated outputs, *i.e.*, that Tesla's cars were being made on an automated production line and that Precigen's laboratory yields were achieved with methane derived from natural gas. However, just as the plaintiffs in *Tesla* could not point to any affirmative statement that production was already automated*,* Plaintiff here does not and cannot contend that Precigen ever affirmatively represented that the methane used in its lab was derived from natural gas – except by mischaracterizing Defendants' actual statements. Thus, while Plaintiff alleges the 2017 8-Ks state that the MBP program had achieved "the profitable use of low cost natural gas," (¶¶ 36, 119) a review of the attached presentations shows that "that is not what the statement says." *Tesla*, 985 F.3d at 1193. Instead, Precigen only claimed that MBP technology "*enables* the profitable use of low cost natural gas," not that natural gas was used in the lab. Similarly, Precigen only stated that extrapolating from these laboratory "yield level[s] produces a positive 'in the money' gross margin based on current natural gas and product prices," caveating those forecasts with cautions that "additional yield improvements and scaling milestones must be met" (Ex. 6 at 6) and that "scientific . . . and scale-up risks . . . could create delays . . . and . . . alter our economic model" (Ex. 5 at 8), *not* that the compounds were already "in the money" (¶¶ 118, 119). Because Precigen made no affirmative representation

8

about the inputs or methods, scientific or economic, used to make this forecast about potential commercial viability, it had no duty to disclose such details. *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2021 WL 1091891, at *16, *19 (N.D. Cal. Mar. 22, 2021).

These principles are particularly applicable in the context of scientific experimentation because "researchers may well differ with respect to what constitutes acceptable testing procedures, as well as how best to interpret data." *Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996), *cited with approval in In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 879 (9th Cir. 2012). Thus, "[t]he securities laws do not 'require that companies who report information from [scientific research] include exhaustive disclosures of procedures used, including alternatives that were not utilized and various opinions with respect to the effects of these choices on the interpretation of the outcome data." *In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *11 (N.D. Cal. Dec. 4, 2008). Instead, where, as here, "'Plaintiff[s] do[] not allege that Defendants misrepresented their . . . methodology, analysis, and conclusions, but instead criticize[] . . . [the] methodology employed by Defendants, [as being at odds with what investors may have "assumed," they do] not adequately plead falsity with respect to [the reported scientific] results.'" *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 860, 868 (N.D. Cal. 2020) (quoting *Rigel*, 697 F.3d at 879).

In sum, the fact that Precigen did not *affirmatively claim* that its lab testing used methane derived from natural gas until November 2018, well after such testing began, and the fact that Plaintiff does not allege that the stated *yields* from such testing were false, "poses an impassable barrier to Plaintiff." *Oracle*, 2021 WL 1091891, at *19.

**C.   The CWs Do Not Show That Any Statement Was False or Made with Scienter**

Other than the Order, Plaintiff offers only self-described "backroom chatter" and speculation from former employees of the MBP division – researchers, engineers, and scientists – none of whom reported to and only one whom even allegedly once spoke to any of the Individual Defendants. ¶¶ 49, 51, 53, 57, 68, 73, 75. None of the CWs claim knowledge of or involvement with the challenged disclosures, the "techno-economic model" allegedly used to assess commercial viability, or any Defendant's state of mind. Thus, none of CW allegations

9

"pass the two hurdles [necessary] to satisfy the PSLRA pleading requirements:" (1) none are "described with sufficient particularity to establish their reliability and personal knowledge" and (2) their reports are not "indicative of scienter." *Oracle,* 2021 WL 1091891, at *3 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)).

*First*, none of the CWs claim to have had *any* interaction with Last or Sterling; two merely allege being at "town hall" meetings with Walsh which Kirk also "sporadically" attended (¶¶ 66, 68, 70-72, 74 & n.4), *but* neither provide any details as to the dates or content of these meetings. Mere attendance at meetings or generalized allegations that developmental "challenges" were "very apparent and discussed throughout the [MBP] organization" (¶¶ 47, 55, 75), or reported to a divisional supervisor (Yeh) (¶¶ 48, 50-51, 53, 55-58, 64-65, 67, 73-74) amount to no more than speculation about what the Individual Defendants might have known – which cannot satisfy the PSLRA's rigorous standard for pleading scienter. *Zucco,* 552 F.3d at 998; *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 522 F. Supp. 3d 660, 675-66 (N.D. Cal. 2021); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *16–17 (N.D. Cal. July 21, 2020). Here, the only alleged direct communication with any Defendant *undermines* any inference of scienter: CW4 reports that Kirk "responded approvingly" to CW4's "recommend[ation] that the Company invest in a 20,000-liter facility" (¶ 66) suggesting that both believed the MBP program's success justified progression to, and significant investment in, a commercial plant.

*Second*, the CW allegations are not "indicative of scienter" because none of the CWs point to any specific data that was at odds with any disclosure. ¶¶ 58-59, 62, 64, 69; *NVIDIA*, 522 F. Supp. 3d at 675-66. Mere access to data from the lab information system or the techno-economic model or otherwise, (and, here, the allegations of "access" are not specific to any individual) (¶¶ 23, 64) creates no inference of scienter. *NVIDIA*, 522 F. Supp. 3d at 678. Instead, Plaintiff must "tie . . . *specific* [data]" "to *particular* statements so as to plausibly show that the [*specific*] Defendant who made each *specified* statement knowingly or recklessly spoke falsely." *Id.* at 674-75 (emphasis added); *see also Zucco*, 552 F.3d at 998. None of these requisite specifics are pled. Absent specific facts at odds with specific disclosures, the fact that Walsh was a scientist who "led" the MBP program (¶ 21), spoke about its results (¶¶ 36, 150), and allegedly

10

kept Kirk and the other defendants "regularly apprised," (¶ 95) does not give rise to a strong inference of scienter. *In re AnaptysBio, Inc. Sec. Litig.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021) (no inference of scienter based on defendants' status and scientific expertise).

Instead of specific data, the CWs provide only broad allegations of "challenges," "roadblocks," "difficulties" and "struggles" (¶¶ 50, 52, 56, 65, 71), which are insufficiently detailed, untethered in time, and lump together every issue affecting every compound over the course of a complex multi-year development process, ignoring that such issues were overcome and, as Precigen repeatedly disclosed, often affected compounds other than the target product, 2,3 BDO. Ex. 25 at 9, 12 ("promiscuous enzyme" delayed isobutanol development while 2,3 BDO progressed); *see also* Ex. 5 at 8, 13, 17; Ex. 8 at 6, 16; Ex. 14 at 7, 9; Ex. 26 at 15; Ex. 27 at 6; ¶ 142; *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *42 (N.D. Cal. Dec. 17, 2019) ("CW reports must be specific in their time references" and sufficiently detailed "to support that each alleged misstatement was false when made."). The few seemingly specific allegations about "challenges" merely describe issues endemic to the bioconversion process. The "challenge" described by CW1 – "get[ting] the relevant bacteria to respond to natural gas the same way they responded to pure methane" (¶ 50) – merely describes the very purpose of the *successful* natural gas testing, which ultimately produced *increased* yields, and began shortly after CW1 left the Company. *Endologix*, 962 F.3d at 416 (rejecting allegations from CW who left shortly after class period). Similarly, CW3's observation that "the use of natural gas as a feedstock in the bioconversion process created acetate, which materially reduced the feedstock's productivity," (¶ 55) was well known to any industrial biochemist using natural gas feedstock, as was the decades-old metabolic solution to neutralize the ethane which resulted in acetate. Ex. 17 at 1, 38. Indeed, Precigen developed a more elegant process, engineering its own methanotroph to metabolize both methane and ethane, thereby eliminating the deleterious by-production of acetate and actually *increasing* yields as compared to established methods long before CW3 joined the Company in mid-2019. ¶ 53; *see* Ex. 18 at 22; Ex. 11 at 6. The CWs offer no particularized facts disputing that Precigen had solutions for these challenges. Thus, to the extent these or other "challenges" existed, Plaintiff fails to plead facts

11

demonstrating scienter, *i.e.*, that any Defendant did not believe that they could be overcome. *Tesla*, 985 F.3d at 1194 (rejecting CW allegations that start up production issues could not be overcome where no facts alleged to show Musk accepted the CW's views); *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *14 (N.D. Cal. Nov. 16, 2020) (CW allegations "do[] not provide any facts concerning [the defendants'] belief as to whether issues [in a new production process], to the extent they existed, would be material or significant.").

Similar deficiencies afflict the CWs' assertions about the MBP program's alleged failure to meet internal target rates or goals. CW2 ¶ 52; CW 3 ¶ 55; CW5 ¶¶ 69, 71; CW6 ¶ 74. The "[f]ederal securities laws do not punish companies for failing to achieve their targets[,]" particularly where, as here, Plaintiff does not allege that internal goals or targets were ever shared with investors. *Wochos v. Tesla, Inc.*, 2019 WL 1332395, at *5 (N.D. Cal. Mar. 25, 2019), *aff'd*, 985 F.3d 1180 (9th Cir. 2021); *see also Amyris*, 2014 WL 1285175, at *10-11. Nor do the CWs' assertions that commercialization was not achieved (CW3 ¶ 56) or was years away (CW5 ¶ 75) – which are not tied to any particular "challenge" – demonstrate scienter or fraud. It is undisputed that Precigen ultimately achieved yields using natural gas that exceeded those achieved with pure methane (Ex. 11 at 6; Ex. 10 at 15; Ex. 13 at 5; Ex. 12 at 5; Ex. 19 at 5) and that the MBP program was proceeding towards commercialization (Ex. 12 at 5; Ex. 13 at 5; Ex. 19 at 5). The CWs' views about production and commercialization timelines or prospects "fail[s] to plead facts showing that Defendants adopted the . . . timeline for production [or commercialization] on which these employees' pessimism was based," or that they "*shared* th[e employees'] gloomy view" that production or commercialization "goal[s] were *impossible* to achieve." *Tesla,* 985 F.3d at 1194. The fact, viewed in hindsight, "[t]hat the Company did not ultimately complete the transition to commercialization or successfully commence commercial production . . . does not, by itself, make any of its [earlier] statements that it was transitioning to commercialization false or misleading." *Aqua Metals*, 2020 WL 6710096, at *10.

*Finally*, CW4's challenge to Precigen's opinion that 2,3 BDO was "in the money" is based solely on non-expert speculation. ¶ 63. CW4 was an engineer whose work focused on laboratory testing and pilot plant processes. ¶ 57. CW4 does not claim to have had any

12

responsibility for the techno-economic model Precigen used to assess commercial viability. Rather he alleges that Brian Yeh "develop[ed] and maintain[ed] the company's techno-economic models." ¶ 58. Although CW4 opines that Defendants' "in the money" statements were false (¶ 63) his opinion is based entirely on assertions that are contrary to the very SEC Order upon which Plaintiff relies, are unsubstantiated and well outside his area of expertise, and far too conclusory and ambiguous to satisfy the PSLRA's heightened pleading standard. First, CW4's opinion regarding the "in the money" statements is based on his assertion that (1) "yield" and "titer" were different metrics (¶ 59) and (2) the Company must have "cherry-picked" data from separate experiments to obtain positive results because "titer" and "productivity" (*i.e.*, the time required to make a given amount of product) "fight each other." ¶¶ 60-61. CW4's first assertion is inconsistent with the SEC Order, on which Plaintiff otherwise relies, which concluded that "yields" as publicly reported by Precigen and "titers" were the same metric. Ex. 24 ¶ 5 ("yields were a measure of productivity referred to internally as 'titers.'"). And, absent *facts* showing that productivity varied in the experiments that were the basis for the reported yields, CW4's second assertion that the results must have been cherry-picked is pure speculation. CW4's opinion is also based on his very own definition of the phrase "in the money" requiring an "overall level of profitability" requiring an internal rate of return of 30% (¶¶ 58-60), ignoring that the Company clearly defined the phrase simply as "positive gross margins." Ex. 6 at 6; ¶ 118. Finally, CW4's opinion is based on his assertion that the Company never achieved "satisfactory" or "positive" results, but provides no detail or explanation of what those vague and conclusory terms mean. ¶¶ 59-60. Other courts have rejected almost identical CW allegations, *i.e.*, that management must have been "aware that it would not be able to translate peak yields . . . produced in lab settings, to stable and reliable production at factory scale" and "cherry picked the very best available data from tests at every step of the process," finding that such conclusory allegations "do not 'provide an adequate basis' for CW's beliefs" and, instead, "demonstrate that the confidential witnesses are not reliable." *Amyris*, 2014 WL 1285175, at *18 (quoting *Zucco,* 552 F.3d at 995-96). In any event, internal disagreements about the methodologies underlying reported scientific results do not demonstrate scienter. *Nektar*, 510 F. Supp. 3d at 866. Moreover, while CW4 claims to have

13

expressed concerns to Yeh that Precigen's "in the money" statements were "materially misleading," there are no allegations that Yeh agreed with or relayed CW4's opinion to any of the Individual Defendants. ¶ 65. *Tesla*, 985 F.3d at 1194.

Because none of the CW allegations support falsity or scienter, they must be rejected.

**D. Many of the Challenged Statements Are Non-Actionable Puffery, Opinions and/or Forward-Looking Statements Immunized by the PSLRA's Safe Harbor**

1.    <u>Statements of Pride and Optimism are Immaterial as a Matter of Law</u>

Defendants' vague statements of pride and optimism, describing its MBP program as achieving "breakthrough" (¶ 39) "milestone[s]" (¶ 150), believed to represent "the most valuable biotechnology in history" (¶ 101), or using general superlatives like "solid," "robust," "a leader," "significant," "major," "excit[ing]," or "high-value" to describe the MBP program's progress, its products' potential, or its partnership prospects (¶¶ 29-31, 36, 39, 41-42, 97, 100-101, 122, 125, 128, 130-31, 137, 139, 142, 144-145, 150, 153) are "textbook examples of non-actionable puffery and corporate optimism" (*Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *11 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019) (citations omitted)) which "are subjective and unverifiable assessments and therefore, non-actionable." *Oracle*, 2019 WL 6877195, at *9; *see also In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017) ("we believe we are a leader in the field of synthetic biology"); *Aqua Metals*, 2020 WL 6710096, at *13 ("breakthrough technology," "major milestone"); *Amyris*, 2014 WL 1285175, at *9-10 ("landmark" bioconversion process); *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *12-13 (N.D. Cal. Apr. 27, 2017) ("significant value," "productive discussions," and "progress" with partners). Such "optimistic, subjective assessment[s] . . . [do not] amount[ ] to a securities violation" because "investors do not rely on puffery when making investment decisions." *Oracle*, 2021 WL 1091891, at *11.

2.    <u>Forward-Looking Statements Protected by the PSLRA Safe Harbor</u>

Plaintiff also challenges a host of optimistic forward-looking statements which are couched in caution and, thus, immunized from liability under the PSLRA's safe harbor. *Tesla*,

14

985 F.3d at 1189-92. All of Precigen's plans and projections for commercializing products using its MBP platform (¶¶ 31, 36, 41, 77, 98, 118, 122, 128, 130-131, 135-137, 142, 145, 148, 150, 153, 155, 158) are "unquestionably . . . 'forward-looking statement[s].'" *Id.* at 1192; *Aqua Metals*, 2020 WL 6710096, at *7. *Tesla* also makes clear that statements describing Precigen's product development and production goals as "on track" (¶¶ 31, 98, 142, 148, 153, 155, 158) and projected to be "in the money" (¶¶ 31, 36, 41, 98, 118, 119, 122, 128, 130-131, 135, 137, 145, 150) are also forward-looking because they reflect "an implicit assertion that the goal is achievable based on current circumstances." *Tesla*, 985 F.3d at 1192. Moreover, as *Tesla* makes plain, a forward-looking statement concerning future production goals is not actionable merely because Plaintiff alleges that it rests on "unlikely" "subsidiary premises," *i.e.*, that necessary process improvements – such as increased yields, titers, productivity, and scalability – can be achieved in the future. *Id.* That is because "'the assumptions underlying or relating' to a declared objective'" also fall within the safe harbor. *Id.* Finally, the safe harbor also protects statements estimating addressable markets for the end-products Precigen hoped to produce (¶¶ 39, 101, 120, 121, 125, 139, 149, 160). *Oracle*, 2021 WL 1091891, at *13 ("The size of these markets are enormous, and we think we'll be able to ride that horse, pursue that organic growth and meet our targets."); *In re Cloudera, Inc. Sec. Litig.*, 2021 WL 2115303, at *18 (N.D. Cal. May 25, 2021) (merger would "enlarge addressable market"); *Police & Fire Ret. Sys. v. Axogen, Inc.*, 2021 WL 1060182, at *3-4 (M.D. Fla. Mar. 19, 2021) (addressable market estimates within safe harbor).

Precigen's forward-looking statements were identified as such and were accompanied by specific cautionary language, warning investors, *inter alia,* that the MBP program was in the "early stages" of development and "may not be able to develop and commercialize" its technologies, which "may not perform as expected when applied at commercial scale." Ex. 1 at 4, 30, 32; Ex. 2 at 4, 24, 40-41; Ex. 3 at 4, 25, 42-43; Ex. 4 at 4, 30-32; Ex. 28 at 8; *see also, e.g.*, Ex. 6 at 6 ("additional yield improvements and scaling milestones must be met"); Ex. 5 at 8 ("possible scale-up risks . . . could create delays that push out our time lines and could alter our economic model"); Ex. 1 at 47 (we "may never achieve or maintain profitability"); Ex. 2 at 24 (same); Ex. 3 at 25 (same); Ex. 4 at 30 (same). Because these warnings informed investors of

15

factors that might prevent the successful commercialization of products developed in the MBP program, Precigen's forward-looking statements are exempt from liability. *Aqua Metals*, 2020 WL 6710096, at *6-7 (warnings of risks "associated with the development of a business model that is untried and unproven" and that "there can be no assurance that we will be able to produce . . . in commercial quantities at a cost of production that will provide us with an adequate profit margin" or "replicate the process . . . on a large commercial scale" sufficient under the PSLRA safe harbor (emphasis omitted)); *Amyris*, 2014 WL 1285175, at *4 (same). As the *Tesla* Court stated, where such cautions are provided, "plaintiff cannot defeat that invocation of [the] safe harbor merely by alleging . . . that the company knew that the announced forward-looking objective was unlikely to be achieved." *Tesla*, 985 F.3d at 1190.

### 3.    Precigen's Optimistic Opinions are Non-Actionable

Many of the challenged statements are non-actionable opinions expressing Precigen's "belief" or "estimates" about the results and commercial implications of its laboratory and pilot plant testing. *E.g.*, ¶¶ 31, 39, 98, 101, 120-121, 125, 130, 137, 139, 144, 149, 160. "Courts have repeatedly held 'publicly stated interpretations of the results of [scientific] studies' to be 'opinions' because '[r]easonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions.'" *E.g.*, *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1260 (N.D. Cal. 2019) (citation omitted).

"'[P]ure statement[s] of opinion' [are] generally not actionable." *Tesla*, 985 F.3d at 1196 (citation omitted). Where, as here, Plaintiff does not plead particularized facts demonstrating either that: (1) "the speaker did not hold the belief she professed" (not merely that the belief was unreasonable or even "irrational") or that (2) a "supporting fact" "for an opinion statement is . . . untrue," it can only state a claim based on an opinion by showing that omitted "facts going to the basis" of the opinion render it "misleading [when] reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Syst. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192-94 (2015)). Challenging opinions under *Align's* third "omissions" prong, as Plaintiff attempts here, is "no small task" because "liability is not necessarily

16

established by demonstrating that 'an issuer knows, but fails to disclose, some fact cutting the other way.'" *Align*, 856 F.3d at 615-16. That is particularly true where, as here, (1) the opinion is caveated with disclaimers and cautions, and (2) there are "positive and mitigating [factors] that [the Company] could have found to either balance or outweigh the [omitted] events and circumstances" which are alleged to render the opinion misleading. *Id.* at 616, 618.

Here, none of Precigen's opinions about the actual and potential successes of the MBP program or the commercial viability of its products were rendered false or misleading by virtue of the alleged omissions – *i.e.*, that lab testing yields were achieved with pure methane and the Company's "in the money" opinions were as-yet unrealized extrapolations. That is because, as shown, Precigen (1) (correctly) believed that there were solutions to the challenges involved in achieving similar yields using natural gas at commercial scale (*Align's* "positive and mitigating" factors) and (2) regularly warned investors of potential risks as well as actual setbacks as they occurred (*Align's* directive that opinions be read in context). *Supra*, at 11 n.6 (disclosing the "promiscuous enzyme" issue with isobutanol), 15-16 (risk factors). In such circumstances, opinions, like Precigen's, that "'great progress' was being made" are not actionable unless, unlike here, there had been "no progress at all." *Tesla*, 985 F.3d at 1196; *accord id.* at 1191-94 (forward-looking optimistic opinions about aggressive production goals not actionable where their achievement was not shown to be "impossible" and company warned about the potential risks and actual setbacks that made success unlikely; applying the safe harbor).

**E.   Precigen's Disclosures Concerning the SEC Investigation Were Not Misleading**

Plaintiff also claims that Precigen's statements in its November 2018 Q3 10-Q and FY 2018 10-K that it "may become subject to . . . governmental investigations from time to time" were misleading because the SEC investigation leading to the Order began in October 2018. ¶¶ 45, 116, 156, 157, 161, 162. However, in addition to disclosing that such investigations "may" occur, the Q3 2018 10-Q also categorically stated that "[f]rom time to time, we *are* involved in litigation or legal matters, including governmental investigations." Ex. 29 at 61 (emphasis added). There is no duty to disclose a government investigation absent "some affirmative statement or omission by [an issuer] that suggested it was *not* under any regulatory scrutiny."

17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1071 (9th Cir. 2008). Statements that a company is (not just *may* be) involved in regulatory matters from "time to time" or "periodically" do not give "reasonable investor[s] the impression that [it] was not actively involved in investigations." *In re Inv. Tech. Grp. Sec. Litig.*, 251 F. Supp. 3d 596, 616 (S.D.N.Y. 2017); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016).

**F.   Defendants Cannot Be Held Liable for Statements They Did Not Make**

A defendant can only be held liable under Section 10(b) if he or she "make[s]" a challenged statement, *i.e.*, if he has "ultimate authority" over the statement. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141-42 (2011). Thus, none of the Individual Defendants can be liable for (1) statements made after they left the Company; (2) statements in SEC filings or press releases which they did not sign and are not alleged to have prepared; or (3) any other Defendant's oral statements. *Aqua Metals*, 2020 WL 6710096, at *17-18 (no liability for others' statements in earnings calls or press releases arises from mere attendance at calls). Notably, neither Defendant Last, who left in December 2017 (ten months before the SEC began its investigation) (¶ 22) and made no statements after November 2017 (¶¶ 41, 137) nor Defendant Walsh, who left in November 2019 (¶ 21) and only made two challenged statements, during the May 10, 2017 and August 9, 2018 earnings calls (¶¶ 36, 150), is alleged to have signed or prepared any SEC filings or press releases.

**G.   Plaintiff Fails to Establish the Requisite "Strong Inference" of Scienter**

To meet the PSLRA's "high burden" for pleading the requisite "strong inference" of scienter, "a complaint must allege that the defendant made false or misleading statements" and "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106-08 (9th Cir. 2021). As in *Prodanova*, the Complaint here fails to "meet[] this high burden." *Id.*

As a threshold matter, because "Plaintiff[] ha[s] not adequately pled that Defendants' [statements] were actually false or misleading. . . . it follows that Plaintiff[] ha[s] not adequately pled facts from which one can infer that Defendants knew their statements [were] false or misleading." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1068

18

(N.D. Cal. 2012). As also shown, neither the Order nor the CWs provide facts probative of any Individual Defendants' state of mind in connection with the challenged disclosures and there are no admissions, internal documents, or witnessed meetings to fill the void. As discussed below, Plaintiff's conclusory "core operations" theory (¶ 101), unsupported by any corroborating, much less particularized facts, fails. Instead, Precigen's continued investment in the MBP program, the Individual Defendants' significant additional investments in the Company, and the cautionary language that accompanied the challenged statements, support a far more compelling inference of innocence, not scienter or fraud.

### 1. Plaintiff Fails to Plead Scienter Under The Core Operations Theory

Where, as here, Plaintiff relies on the "core operations" theory of scienter, which "infers that facts critical to a business's 'core operations' . . . are known to a company's key officers" "but does not [provide] additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783-84 (9th Cir. 2008). Absent such particularized facts, a plaintiff can only successfully invoke the core operations doctrine in the "*exceedingly rare circumstances*" where "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter" (*Prodanova*, 993 F.3d at 1111-12) and that its omission rendered their statements "dramatically false." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014). That is not this case – for many reasons.

*First*, the only "fact" offered to support the allegation that the MBP program was a "core operation" is Kirk's enthusiastic statements of support. ¶ 101; *see also* ¶¶ 95-100. This is obviously insufficient and ignores the fact that Precigen had many other business ventures which were far more advanced than the MBP program. *See, e.g.*, Ex. 1 at 6-16; Ex. 2 at 8-16; Ex. 3 at 7-14; *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 889 (N.D. Cal. 2020) (core operations doctrine not applicable where affected business related to "only one component of [the Company's] products").

*Second*, Plaintiff's bare allegation that the MBP program was of "central importance" does not permit an inference that *every* Defendant knew *every* detail about "every piece of

19

information . . . critical to the business's core operations" (*Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 817 (N.D. Cal. 2019)) where, as here, the allegations do not show the MBP program was "core" to Precigen and do not exclude the possibility the Individual Defendants "may not even have been aware of" the omitted fact. *Twitter*, 506 F. Supp. 3d at 889. Kirk's statement that he "spen[t] a lot of time with . . . Walsh" (¶ 95) does not permit a "strong inference" that Kirk (much less Messrs. Last, the COO who left in December 2017 and last spoke in November 2017 (¶¶ 41, 42, 130, 137) or Sterling, the CFO who is mentioned in a single paragraph and is not alleged to have said anything about the MBP program at all (¶ 20)) had access to specific information about the lab testing, much less the source of methane being used in the lab. *Oracle Partners, L.P. v. Concentric Analgesics, Inc.*, 2021 WL 2322351, at *5 (N.D. Cal. June 7, 2021) (rejecting allegation that new drug trial was so "central" to Defendants' success that all senior executives would know all details of interim results); *see also In re Nektar Therapeutics*, 2020 WL 3962004, at *12-13 (N.D. Cal. July 13, 2020) (Defendants' "scientific backgrounds" and "involvement with the . . . program" does not suffice absent "specific admissions . . . of detailed involvement in the minutia of a company's [scientific] operations"). Plaintiff's conclusory assertion that Walsh kept the Individual Defendants apprised "does not provide any particularized facts supporting an inference of scienter" because Plaintiff "offer[s] no information on whether [ Walsh] reported . . . about the details" of the methane used in testing, when or with whom those conversations supposedly occurred, and there are no "admissions by [any other Individual Defendant] that he closely monitored" those particular details. *Prodanova*, 993 F.3d at 1109.

*Finally*, even if any Defendant was *aware* that laboratory testing was being conducted using pure methane, "[k]nowledge of the [disputed information] is insufficient to infer that [Defendants] *acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly*." *Twitter*, 506 F. Supp. 3d at 889 (emphasis added) (citation omitted). Here, there are no allegations that Precigen could not or did not reach the same yields with natural gas as it had for pure methane, or that the assumptions and inputs into the techno-economic model were somehow inappropriate. Instead, "the Court is left to speculate" as to why the source of methane

20

used in the lab or the inputs into the financial model mattered "and thus whether [this] would have been obvious to Defendants" when making the challenged statements. *In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 860 (S.D. Cal. 2019). Thus, "[e]ven assuming, *arguendo*, that Plaintiff adequately pled that all of the defendants had knowledge of the detail[s of the lab testing or economic model], such an allegation does not support a strong inference of scienter" because "the complaint does not allege that Defendants believed that [by] not reporting information concerning [their scientific or forecasting methods] they were making false or misleading statements." *Rigel*, 697 F.3d at 883-84.

### 2.    The Alleged Facts Actually Undermine Any Inference of Scienter

Because "a securities *fraud* lawsuit requires a showing of an intent to defraud investors[,] [m]ere negligence — even head-scratching mistakes — does not amount to fraud. So [where, as here,] the complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in establishing scienter." *Prodanova*, 993 F.3d at 1103; *Endologix*, 962 F.3d at 408, 415 (implausible that executives would knowingly overstate likelihood of FDA approval without selling stock or reaping short-term profits).

Here, not only does the "lack of stock sale[] allegations detract from a scienter finding," the fact that Defendant Kirk and his controlled entities purchased more than $180 million in new shares during the Class Period and all of the Defendants increased their holdings "support[s] an inference of innocence" not scienter. *Webb v. SolarCity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018); Ex. 30; Ex. 31; Ex. 32; Ex. 33; Ex. 34 at 28; Ex. 35 at 15; Ex. 13 at 14. Indeed, in light of the Individual Defendants' significant investments in the Company and the Company's significant investments in the MBP program, Plaintiff's theory of scienter simply "does not make a whole lot of sense." *Endologix*, 962 F.3d at 415-16. Just as in *Endologix*, Plaintiff's "allegations encounter an immediate first-level problem:" why would Defendants continue to spend millions of dollars on the MBP program if they did not sincerely believe it was potentially commercially viable? *Id.* Instead, here, as in *Endologix*, the far more plausible inference is that Defendants genuinely believed in the MBP program's potential. *Id.* at 415 (citing *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) (rejecting "improbable" inference that a

21

company would continue scientific testing it "thought was doomed to failure")); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (rejecting "improbable" inference that company would spend millions testing new drug "if they did not believe their interpretation" of interim results or "thought the [outcome would be] a complete failure")). Defendants' candid risk warnings and disclosures of actual challenges (*e.g.*, Ex. 5 at 8; Ex. 14 at 7) are also inconsistent with any inference of scienter or fraud. *SolarCity*, 884 F.3d at 856. Finally, allegations regarding merger approvals and offerings (¶¶ 103-115) are insufficient to establish motive. *Bao v. SolarCity Corp.*, 2015 WL 1906105, at *4 (N.D. Cal. Apr. 27, 2015).

Considering all the allegations holistically, Plaintiff has not established that an inference of intentional or deliberately reckless conduct is as cogent and as compelling as an inference of nonculpable conduct, requiring dismissal. *Prodanova*, 993 F.3d at 1112-13.

**H.  Plaintiff Fails to Plead Loss Causation**

As a threshold matter, Plaintiff's failure to "plead with particularity and distinguish among the various misstatements and revelations that allegedly caused [the] decrease [in stock price]," "lump[ing] together [all the] alleged misstatements" with all the allegedly corrective disclosures over the three year class period (¶¶ 77-93), alone justifies dismissal. *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407-09 (9th Cir. 2021).

Even more fundamentally, Plaintiff's loss causation theory fails because he does not plausibly allege that the purportedly "corrective" disclosures caused the market to "learn[] of and react[] to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (third alteration in original) (quoting *Metzler*, 540 F.3d at 1063). Here, the allegedly corrective disclosures in February and August 2019 (¶¶ 77-78, 81) and May and August 2020 (¶¶ 86, 88) did not reveal anything new or negative about the MBP program's laboratory or financial modeling methods or its progress towards commercialization using natural gas. For example, the only news about the MBP program in the first allegedly corrective disclosure – Precigen's February 2019 press release and analyst call – is overwhelmingly positive, *i.e.*, that "produc[tion of] 2,3 BDO from natural gas . . . has achieved 80% of the goal for the first small-scale plant operations" and that "[d]etailed

22

engineering design for [the Company's] first-of-a-kind small-scale methane bioconversion facility to 2,3 BDO is currently being bid out." ¶ 158. Instead, the negative news in that announcement was that "there is substantial doubt about [the Company's] ability to continue as a going concern." ¶¶ 77-78 (alteration in SAC). The only negative news about the MBP program in the remaining "corrective disclosures" was that despite its success in converting natural gas into 2,3 BDO, Precigen lacked the cash to get the MBP program across the finish line. *See* Ex. 28 at 5, 6; Ex. 36 at 7; ¶¶ 81-82 (MBP program would be "sp[u]n off" to a new jointly-owned entity to "marshal [Precigen's] assets" and "focus" on health care); Ex. 22 at 5; Ex. 21 at 5; Ex. 4 at 26-27 (MBP program suspended to preserve core health care business as Precigen's overall financial condition continued to deteriorate); Ex. 23 at 28 (now-suspended MBP operations' assets were impaired).

These allegedly corrective disclosures about Precigen's "disappointing [financial situation did] not reveal *any* information from which . . . fraud [relating to the MBP program's lab testing or economic modeling methodologies] might reasonably be inferred." *Loos*, 762 F.3d at 888 (emphasis added). While Plaintiff claims that these announcements were "corrective" because they "effectively disclosed further new information as to just how little the Company's MBP program was worth" because "the state of its MBP development efforts was so poor" (¶ 86) as shown, there are no particularized, creditable facts supporting such conclusions.

Finally, Plaintiff's claims that the "truth" about Precigen's alleged misstatements regarding the MBP program were revealed to the market through (1) the March 2020 disclosure of the SEC investigation (¶¶ 83-85) and (2) the September 2020 disclosure of the Order (¶¶ 91-92) also fail. The Ninth Circuit has squarely held that "[t]he announcement of an [SEC] investigation . . . does not qualify as a corrective disclosure" absent particular facts (*i.e.*, analyst and news reports) demonstrating market speculation that the investigation suggested a prior statement was false, and a "subsequent corrective disclosure *by the defendant*" confirming that speculation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (emphasis added) (citing *Loos*, 762 F.3d at 890); *Rok v. Identiv, Inc.*, 2017 WL 35496, at *20 (N.D. Cal. Jan. 4, 2017) (dismissing claims on loss causation grounds finding that "in *Lloyd*, it was far more clear . . . that the market had already understood the fraud to have been revealed (based on the analysis of Dow Jones, Credit Suisse

23

and other analysts *at the time of the announcement of the SEC subpoena*), and that the corrective disclosure [*by the defendant*] (that its largest borrower could not pay its loans) . . . actually reveal[ed] the 'truth' about an earlier misrepresentation (that there was no serious doubt about the largest borrower)" (emphasis added)), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018). Here, there are no facts showing analysts speculated about the "meaning" of the SEC investigation, *i.e.*, that it related to the source of methane used in the lab testing years before, or that such speculation was confirmed by a later "admission" by Precigen. Thus, Plaintiff cannot establish a viable loss causation theory. *Id.*; *cf. Lloyd*, 811 F.3d at 1210.

## I.   Plaintiff Fails to State a Claim for Scheme Liability Under Rule 10b-5(a) or (c)

To the extent Plaintiff purports to assert scheme liability under Rule 10b-5(a) or (c) (¶¶ 178-180), such claims fail because they are not "premised on deceptive conduct that is independent of misrepresentations or omissions." *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216, (S.D.N.Y. 2020); *see also In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 336-37 (D. Conn. 2021) ("Courts rightly insist that a plaintiff who intends to bring a Rule 10b-5 claim based on both misstatement and scheme liability must do so clearly and specifically" and not merely "'bypass the elements …[of] misstatement liability...by labeling the alleged misconduct a scheme.'").

## J.   Plaintiff Fails to State A Section 20(a) Claim

Because Plaintiff fails to plead a primary violation of the securities laws under Section 10(b), his claim under Section 20(a) must also be dismissed. *Align*, 856 F.3d at 623. The "control" allegations are particularly deficient as to Walsh, only a Senior Vice President, as Plaintiff does not plead any specific allegations that would suggest Walsh had power or control over any other Defendant. *See, e.g., In re Int'l. Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *22 (C.D. Cal. May 23, 2008); *Middlesex Ret. System v. Quest Software, Inc.,* 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007).

## K.   Plaintiff Should Not Be Granted Further Leave to Amend

Given that Plaintiff has had two opportunities to amend its pleadings, the motion to dismiss should be granted without further leave to amend.

24

DATED:  November 3, 2021

WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION

/s/ *Nina F. Locker*
NINA F. LOCKER

*Attorneys for Defendants Precigen, Inc. f/k/a
Intrexon Corporation, Randal J. Kirk, Rick L.
Sterling, and Andrew J. Last*

JOINDER BY DEFENDANT ROBERT F. WALSH III

Defendant Robert F. Walsh III joins in the brief of the other Defendants.

NORTON ROSE FULBRIGHT US LLP

/s/ *Joshua D. Lichtman*
JOSHUA D. LICHTMAN

555 South Flower Street
Forty-First Floor
Los Angeles, CA 90071
Telephone:      (213) 892-9226
Facsimile:      (213) 892 9494
joshua.lichtman@nortonrosefulbright.com

PETER A. STOKES (admitted *pro hac vice*)
98 San Jacinto Boulevard
Suite 1100
Austin, TX 78701
Telephone:      (512) 474-5201
Facsimile:      (512) 536-4598
peter.stokes@nortonrosefulbright.com

*Counsel for Defendant Robert F. Walsh III*

**ATTESTATION PURSUANT TO LOCAL RULE 5-1(h)(3)**

This certifies, pursuant to Local Rule 5-1(h)(3), that all signatories to this document concur in its content and have authorized this filing.

DATED: November 3, 2021

/s/ *Nina F. Locker*
NINA F. LOCKER

25

DEFS' MOT. TO DISMISS
CASE NO. 5:20-cv-06936-BLF