John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
jjasnoch@scott-scott.com

William C. Fredericks (*pro hac vice*)
Thomas L. Laughlin, IV (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
wfredericks@scott-scott.com
tlaughlin@scott-scott.com
jjacobson@scott-scott.com

*Lead Counsel for Lead Plaintiff Raju Shah
and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE PRECIGEN, INC. SECURITIES LITIGATION | Case No. 5:20-cv-06936-BLF <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO (1) DEFENDANTS' MOTION TO DISMISS AND (2) DEFENDANTS' REQUEST FOR JUDICIAL NOTICE** <br><br> Hearing Date: April 7, 2022 <br> Time: 9:00 a.m. <br> Courtroom: 3 – 5th Floor <br> Judge: Hon. Beth Labson Freeman |

**TABLE OF CONTENTS**

COUNTER-STATEMENT OF ISSUES TO BE DECIDED ........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

I.    INTRODUCTION ............................................................................................1

II.   STATEMENT OF FACTS ...............................................................................2

    A.    Precigen and Its MBP Program.............................................................2

    B.    Precigen's False and Misleading Statements.........................................3

    C.    The Truth Gradually Emerges ...............................................................5

III.  ARGUMENT ....................................................................................................8

    A.    Applicable Legal Standards ...................................................................8

    B.    The SAC Adequately Alleges Materially False and Misleading Statements ................................................................................................8

    C.    Defendants' Misstatements and Omissions Were Material and Actionable ............................................................................................10

    D.    The SAC Adequately Alleges A "Strong Inference" of Scienter .............14

        1.    The CW Allegations Support a Strong Inference of Scienter.......15

        2.    The Core Operations Doctrine Supports a Strong Inference of Scienter ................................................................................18

        3.    Scienter Is Well-Pled as to the Undisclosed SEC Inquiry Claims ..................................................................................21

    E.    The SAC Adequately Alleges Loss Causation .........................................21

    F.    The SAC Adequately Alleges §20(a) Control Person Claims...................25

IV.   DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IS OVERBROAD.........................................................................................25

CONCLUSION.............................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. W. Holding Corp.*,
320 F.3d 920, 944 (9th Cir. 2003) ........................................................................................19

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .......................................................................24

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...............................................................................................................10

*Berenson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................................10, 18

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .......................................................................10

*City of Miami Gen. Emps' & Sani. Emps' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ............................................................................9, 18

*Cutler v. Kirchner*,
696 Fed. Appx. 809 (9th Cir. 2017).................................................................................11, 12

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ...........................................................................................8, 20

*Evanston Pol. Pen. Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ....................................................................................8

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................21

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ...................................................................................12

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) ...............................................................................................22

*Gross v. Medaphis Corp.*,
977 F. Supp. 1463 (N.D. Ga. 1997).......................................................................................20

*In re Allied Nev. Gold Corp. Sec. Lit.*,
743 Fed. Appx. 887 (9th Cir. 2018).......................................................................................14

*In re Alphabet, Inc. Sec. Lit.*,
1 F.4th 687 (9th Cir. 2021) ...............................................................................10, 11, 17, 19

*In re Atossa Genetics Inc Sec. Lit.*,
868 F.3d 784 (9th Cir. 2017) ..........................................................................................8, 14

*In re BofI Holding, Inc. Sec. Lit.*,
977 F.3d 781 (9th Cir. 2020) .....................................................................................13, 22, 23

*In re Celera Corp. Sec. Lit.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ...........................................................................12

*In re Centocor, Inc. Sec. Lit. III*,
1998 WL 964184 (E.D. Pa. Dec. 1, 1998)................................................................................20

*In re Daou Sys, Inc..*,
411 F.3d 1006 (9th Cir. 2005) ...........................................................................................22

*In re Datastream Sys., Inc. Sec. Lit.*,
2000 WL 33176025 (D.S.C. Jan. 27, 2000)..............................................................................20

*In re Fannie Mae 2008 Sec. Lit.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012)......................................................................................8

*In re Ibis Tech. Sec. Lit.*,
422 F. Supp. 2d 294 (D. Mass. 2006) .....................................................................................20

*In re MGM Mirage Sec. Lit.*,
2013 WL 5435832 (D. Nev. Sept. 26, 2013).............................................................................12

*In re Montage Tech. Grp. Ltd. Ses. Lit.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2015) ....................................................................................25

*In re OmniVision Techs., Inc. Sec. Lit.*,
937 F. Supp. 2d 1090 (N.D. Cal. 2013) ...................................................................................19

*In re Peregrine Sys., Inc. Sec. Lit.*,
2005 WL 8158825 (S.D. Cal. Mar. 30, 2005) .....................................................................15, 18

*In re Quality Sys., Inc. Sec. Lit.*,
865 F.3d 1130 (9th Cir. 2017) ..........................................................................................11, 12

*In re VeriFone Hold'gs, Inc. Sec. Lit.*,
704 F.3d 694 (9th Cir. 2012) .......................................................................................8, 15, 18

*In re Vivendi Univ., S.A. Sec. Lit.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009).....................................................................................24

iii

*In re WageWorks, Inc. Ses. Lit.*,
   2020 WL 2896547 (N.D. Cal. June 1, 2020) ..............................................................................24

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ....................................................................................................26

*Kyung Cho v. UCBH Hold'gs, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ....................................................................................21

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)......................................................................................................10

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .......................................................................................22, 23, 25

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ....................................................................................................24

*Marucci v. Overland Data, Inc.*,
   1999 WL 1027053 (S.D. Cal. Aug. 2, 1999) .............................................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..............................................................................................................15, 19

*Meyer v. Jinkosolar Hold'gs Co.*,
   761 F.3d 245 (2d Cir. 2014)......................................................................................................14

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ......................................................................................10

*Mulligan v. Impax Labs, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................................12

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ..........................................................................................8

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. Appx. 10 (2d Cir. 2011)..................................................................................................10

*Nguyen v. Radient Pharms. Corp.*,
   2011 WL 5041959 (C.D. Cal. Oct. 20, 2011)............................................................................20

*Novak v. Kasaks*,
   216 F.3d 300 (2nd Cir. 2000).....................................................................................................15

*Rehm v. Eagle Fin. Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) ...........................................................................................17

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ................................................................17, 18

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ........................................9, 16, 18, 22

*Ross v. Career Educ. Corp.*,
    2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)...............................................................17

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .....................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................................15, 21

*Vancouver Alum. Asset Hold'gs Inc. v. Daimler AG*,
    2017 WL 2378369 (C.D. Cal. May 31, 2017) ...........................................................17

*Vanleeuwen v. Keyuan Petro., Inc.*,
    2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014).................................................................8

*Veal v. LendingClub Corp.*,
    2021 WL 4281301 (9th Cir. Sept. 21, 2021) .............................................................19

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .......................................................................................11

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ......................................................................12

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...................................................................................14

**Statutes, Rules, and Regulations**

15 U.S.C.
    §78u-5(c)(1)(B)............................................................................................................12

Federal Rules of Civil Procedure
    Rule 9(b) .....................................................................................................................22
    Rule 12(b)(6)..................................................................................................................8

1934 Act
    §10(b)...................................................................................................................1, 2, 25

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| "¶" or "SAC" | Second Amended Class Action Complaint, filed September 27, 2021 (ECF No. 88) |
| "1934 Act" | Securities Exchange Act of 1934 |
| "Class Period" | May 10, 2017 to September 25, 2020, inclusive |
| "CW" or "CWs" | Confidential Witness(es) |
| "Birn Decl." | Declaration of Jerome F. Birn, Jr. in Support of Defendants' Motion to Dismiss (ECF No. 97) |
| "Defendants" | Collectively, each Defendant named in the SAC |
| "Individual Defendants" | Defendants Randal J. Kirk, Andrew J. Last, Rick L. Sterling, and Robert F. Walsh |
| "MBP" | Methane Bioconversion Platform |
| "Mot." | Defendants' Corrected Motion to Dismiss (ECF No. 96) |
| "Plaintiff" | Lead Plaintiff Raju Shah |
| "Precigen" or "the Company" | Precigen, Inc. f/k/a Intrexon Corporation |
| "PSLRA" | Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§77z-1 and 78u-4) |
| "SEC" | U.S. Securities and Exchange Commission |
| "SEC Order" | September 25, 2020 SEC Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order |

***Note:***   Unless otherwise stated (1) all capitalized terms have the meaning as set forth in the SAC; (2) all emphasis in quoted materials is added; and (3) all internal citations in cited authorities have been omitted.

Lead Plaintiff Raju Shah respectfully submits this opposition to Defendants' motion to dismiss and request for judicial notice.

## COUNTER-STATEMENT OF ISSUES TO BE DECIDED

Whether the SAC pleads materially false and misleading statements and omissions by Defendants as to: (i) the feedstock that Precigen used to achieve its supposed MBP "breakthroughs;" (ii) the stated results of its MBP testing; (iii) having reached "in the money" status as to the MBP's ability to produce certain valuable chemicals; (iv) the Company's ability to generate potentially profitable yield, productivity, and titer outcomes in the same production run?

Whether Defendants materially misled investors by merely warning of possible government investigations, when Defendants knew that the SEC was already actively investigating Defendants' disclosures about the Company's MBP program?

Whether the SAC raises a strong inference that Defendants acted with *scienter*?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff alleges straightforward claims based on Defendants' violation of §10(b) of the 1934 Act. Contrary to Defendants' assertions, this case does not allege mere "fail[ures] to disclose details of [Precigen's] lab testing methodologies." Mot. at 1. Instead, this case involves their knowing (or at least reckless) conduct in misleading investors as to Precigen's alleged successes in using cheap *natural gas* to convert methanotrophic organisms into valuable byproducts, when in fact, (1) these "successes" had been achieved *not* with natural gas (which has various impurities that impair the bioconversion process), but with *vastly* more expensive *pure methane*, and (2) Precigen had *never* achieved results that justified their false claims of having developed a commercially viable, "in the money" method to convert methanotrophs into useful byproducts.

Modern science is capable of astounding feats and can even turn lead into gold. *See* https://www.scientificamerican.com/article/fact-or-fiction-lead-can-be-turned-into-gold. What is *fundamentally* material to investors, however, is whether a given set of "inputs" can be converted into a set of more valuable "outputs" on a commercially viable basis. Defendants' misconduct, including their failure to disclose that Precigen's MBP test results were based on using pure

1

methane rather than cheap natural gas, was thus not a matter of "mere details," but rather a breach of their duty to speak fully and accurately on a matter that went directly to whether and when Precigen's entire MBP enterprise was (or likely would become) commercially viable.

Defendants' scienter arguments also defy credulity (and ignore Plaintiff's CWs) by averring that – though they repeatedly touted the MBP's "successes" – they were somehow unaware of the bases of those results and of Precigen's ongoing failure to meet even its own standards for showing that it could actually produce *any* MBP products on an "in the money" basis. Defendants even try to spin the SEC Consent Order (which found that Precigen *had* concealed "important" information from investors) as of evidence of their lack of scienter. However, the SEC's decision to pursue "only" §13 claims and a fine (rather than §10(b) *fraud* claims) against Defendants is unsurprising given the SEC's limited resources – and given that the Company, which is struggling, has both *shut down* the MBP program and *replaced* the Individual Defendants.

Defendants' loss causation arguments also fail. As the SAC alleges, not only did Precigen shares trade up almost 21% to close at $23.62 on the first day of the Class Period, but they thereafter collapsed to only $3.58 (a staggering decline of roughly *85%)* as the truth concerning the MBP program was gradually revealed, and the consequences of its undisclosed problems materialized. In sum, Defendants' motion should be denied in its totality.

## II.    STATEMENT OF FACTS

### A.    Precigen and Its MBP Program

At all relevant times, Precigen sought to use synthetic biology to create valuable end-products. ¶2. Of particular importance was its *methane bioconversion platform*, which was intended to use low-cost *natural gas* as the "feedstock" to profitably transform certain enzymes ("methanotrophs") into higher-value chemicals, such as isobutanol (used in gasoline blending), isobutyraldehyde (used in making auto parts and LED lighting components), 2,3 Butanediol ("2,3 BDO") (used in making synthetic rubber), and 1,4 Butanediol ("1,4 BDO") (used in making polyester). *Id.* A commercially viable MBP would be hugely lucrative but faced a major hurdle because natural gas – in addition to containing methane, the critical catalyst for bioconversion – also contains impurities (notably ethane) that significantly impair bioconversion. ¶26. By contrast,

2

chemically speaking, *pure methane* is the ideal feedstock, but at a cost of *$650* per million BTUs (compared to just $3 for natural gas), pure methane was not a commercially viable feedstock. ¶5.

The three key metrics in assessing commercial viability of a bioconversion platform (such as Precigen's MBP) are: (1) *yield* (the amount of useful product produced); (2) *productivity* (how quickly the useful product can be made); and (3) *titer* (the concentration of useful product vs. waste byproducts that must be removed). Unfortunately, gains in one metric often come at the expense of another; for example, improved titer tends to come at the expense of productivity, and vice versa. Under the Company's "techno-economic" model, commercial viability required achieving satisfactory results with respect to *each* of these metrics using natural gas as the feedstock. As of the start of the Class Period, although others had tried, no company had succeeded in developing a commercially viable way to utilize low-cost natural gas in the bioconversion process. ¶¶3, 28.

**B.     Precigen's False and Misleading Statements**

On May 10, 2017 (the start of the Class Period), Precigen announced that it had (a) increased its yield for 2,3 BDO by 30% in 1Q 2017 to a level that would allow for "*in the money*" (*i.e.*, commercially viable) production based on "current natural gas and product prices"; (b) "developed disruptive MBP technology that enables the *profitable* use of low cost *natural gas*"); and (c) achieved isobutyraldehyde and 2,3 BDO yields sufficient for "site selection" – a key milestone that meant that Precigen had reached a stage justifying selection of a site to build a commercial MBP production facility. ¶¶35-36, 118-19, 122. Driving home the importance of its purported yield breakthroughs, Defendants also touted the resulting multi-*billion*-dollar revenue opportunity for Precigen and its hiring of investment banks to advise on "strategic and financial options" to exploit its recent MBP advances. *Id.*; *see also* ¶¶120-21, 123. Analysts described the news as an "upside surprise" and, in response, Precigen shares soared 20.7%. ¶¶37-38.

Six weeks later, defendant Last similarly hyped Precigen's MBP as "a very breakthrough platform" for converting "cheap[] natural gas" into high-value chemicals and added that Precigen had hired investment bankers to help "maximize the value" of this "breakthrough." ¶¶39, 125.

On August 9, 2017, Defendants announced further increases in yield for 2,3 BDO, and that it had now "*attain[ed] commercially relevant yields*" for isobutyraldehyde (as well as 2,3 BDO).

¶¶41, 127-28. CEO, defendant Kirk, also crowed that "*we are very much in the money*, with commercially significant yields" on two "multibillion dollar molecules" (referring to 2,3-BDO and isobutyraldehyde). ¶131. Similarly, on November 9, 2017, Defendants again touted their "commercially relevant yields" in 2,3 BDO and isobutyraldehyde, an expected 2018 construction date for a small 2,3 BDO commercial plant, and a stunning 78% yield increase for a third product, isobutanol, resulting in further positive analyst commentary. ¶¶42, 133-37.

Soon after, Precigen raised $86 million in a secondary public offering ("First SPO"). ¶108.

As the SEC Order later found (*infra*, §III.B.), Precigen's public statements from May, August, and November 2017 about the purported success of its MBP program, were "inaccurate" – *i.e.*, false and misleading – because they reported positive results based upon lab tests using *pure methane* while "indicating that the results had been achieved using natural gas [as the feedstock]." ¶¶44, 92. Given the huge price gap between natural gas (at $3 per MMBtu) and pure methane (at $650 per MMBtu) – and Precigen's failure to achieve the stated yields with far cheaper natural gas – Defendants' characterizations of the MBP program as "in the money" were also patently false.

Defendants' fraud, however, did not end in November 2017. To the contrary, in later press releases, public comments, and SEC filings in 2018, they continued to make materially misleading statements about Precigen's MBP program having successfully utilized natural gas as a feedstock to produce commercially viable products. These additional actionably false and misleading statements included those contained in Precigen's March 1, 2018 Annual Report for 2017, as well as in its press releases and slides attached to its Form 8-Ks disclosing its 1Q and 2Q 2018 results (and related earnings call comments) made on May 10 and August 9, respectively. ¶¶141-51. For example, in its 2018 Annual Report, Precigen again touted its efforts to create "highly engineered bacteria that … *utilize specific energy feedstocks, typically pipeline grade natural gas* to synthesize commercial end products," adding that "to date we have proven biological production of six valuable [chemicals]," including isobutanol, 2,3 BDO, and isobutyraldehyde, while estimating that these products "represent greater than a $100 billion [total aggregate market] ['TAM'] opportunity." ¶139. Similarly, in May 2018, Precigen reported that its *2,3 BDO and isobutanol yields were up 25% and 40%, respectively*, "*since last reported*," and (as it had in the

P'S OPP. TO DEFS' MOT. TO DISMISS & REQ. FOR JUDICIAL NOTICE; Case No. 5:20-CV-06936-BLF

past) once again presented slides that focused on "attractive" benefits (notably cost) of using *natural gas* as a feedstock. ¶142. Precigen also again stated that it had "reached profitable yields" for both 2,3 BDO and isobutanol, with defendant Kirk now asserting that isobutanol market alone had an eye-popping TAM of $900 billion. ¶¶144-45. Soon after, Precigen raised $100 million in another stock offering ("Second SPO") and $200 million in a convertible notes offering. ¶110.

On August 9, 2018, while stating that Precigen "continue[s] to engineer the methanotrophic organism to improve the utilization of *natural gas*," Defendants stated that "2, 3 BDO yields are up 22% since last reported," thereby "putting this program *further in the money*." ¶¶148, 150.

On November 8, 2018, in announcing its third quarter results, Defendants did not refer to specific yield improvements from prior quarters, but stated that "in our lead program, 2,3-BDO, we are now producing BDO from natural gas at roughly *50% of the final target yield for our commercial scale facility and well above our target yield to select the site and break ground for a 40,000-ton … commercial plant*." ¶¶152-55. Defendants, thus, effectively reassured investors that Precigen's 2,3 BDO program remained "in the money" (and did nothing to undercut their prior statements touting the alleged commercial viability and "in the money" status of its isobutanol program). In its November 8, 2018 Form 10-Q, after noting a recently concluded SEC inquiry, Defendants also warned investors, for the first time, that "[Precigen] *may* become *subject to* *other … governmental investigations* from time to time in the ordinary course of business." ¶¶45, 156.

Defendants' statements from 2018 were also materially false or misleading because they did not disclose that Precigen (1) had reported yield improvements based its use of *pure methane* (instead of natural gas) as its MBP feedstock; (2) had *failed* to produce MBP products that were "in the money" (*i.e.*, commercially viable), and had yet to succeed in developing any single MBP production method that showed a potentially profitable result across all three key metrics (yield, productivity, and titer) that Precigen's own techno-economic models used to assess commercial viability; and (3) had *not* met its criteria for "break[ing] ground" on a commercial plant.

### C.     The Truth Gradually Emerges

Unfortunately for investors, the nature and extent of Defendants' misrepresentations and omissions concerning Precigen's MBP program only emerged over time.

On February 28, 2019, Defendants disclosed that "[b]ased on [Precigen's] financial position … there is substantial doubt about [its] ability to continue as a going concern" due to concerns that the Company's **funding on hand was "not adequate for operations beyond 12 months**." ¶77. Precigen added that it was "pursuing … options to address the going concern issue," including "asset sales" and "partnering and financing at the individual [program] level" (*id*.) – but its "going concern" news signaled that the "breakthroughs" (which had purportedly led it to hire advisors **in 2017** to exploit strategic options for the MBP) were **not** "breakthroughs" after all.

The next day, March 1, 2019, Precigen's shares fell 36.5%, to $5.06. ¶80. However, the February 28 release also reinforced Defendants' prior statements about commercial viability by stating that its "detailed engineering design" for a 2,3 BDO commercial plant "is currently being bid out." ¶158. Its 2018 Annual Report, filed on March 1, 2019, reiterated the lucrative potential for MBP products based on natural gas, while again warning only of the **possibility** of future government investigations into its conduct. ¶161. Accordingly, the fraud continued.

Further indications that the MBP program was not what it had been cracked up to be emerged after markets closed on August 8, 2019, when Precigen disclosed plans to spin-off its MBP platform, "**together with all its associated technologies and facilities**," to a new company, MBP Titan, and that Precigen expected to significantly reduce its stake in that business over time. ¶81. Investors viewed this as negative news which implied that efforts to develop commercially successful MBP products were further away than Defendants had previously represented. In response, the next day, Precigen shares declined 8.8%, closing at $6.95 per share. ¶82.

On March 2, 2020, after markets had closed, Precigen made a stunning disclosure in its 2019 Annual Report on Form 10-K: **the Company had been under investigation by the SEC since at least October 2018** (*i.e.*, for at least the last 1½ years), in connection with Defendants' public disclosures about the MBP program – and that there could be "no assurance regarding the ultimate outcome of the investigation." ¶83. This shocking news not only confirmed that Defendants likely made material misrepresentations or omissions concerning the MBP, but also revealed that their prior warnings of November 8, 2018 and March 1, 2019 were materially misleading (as they had warned only of **possible** "governmental investigations" despite knowing since at least October

6

2018 that Precigen was *already* under investigation). Understandably, investors reacted with alarm, and Precigen shares fell over 17% the next day to close at $3.24. ¶85.

On May 6, 2020, Precigen issued its 1Q 2020 earnings release. ¶86. While attributing its actions to realigned priorities triggered by the COVID-19 pandemic, the release disclosed that the MBP program was so poor that Precigen had recently "[c]ompleted [a] reduction in force at MBP Titan to focus [our] resources on healthcare." *Id.* Later that day, Precigen's recently appointed new CEO, Helen Sabzevari, disclosed that Precigen had suspended its MBP operations entirely. *Id.*

On August 10, 2020, Precigen disclosed that, in addition to suspending its MBP operations, it had concluded that the value of its MBP assets were "not fully recoverable" and needed to be written down by roughly $12.5 million, and that it was assessing "next steps" for the program's remaining assets. ¶88. In response, one analyst promptly reduced its overall valuation of MBP Titan by *$500 million*, and on August 11, 2020, Precigen's share price fell over 10%. ¶¶89-90.

On September 25, 2020, Precigen announced it had reached a *settlement with the SEC as to statements Defendants had made about the MBP platform*, whereby Precigen (1) *consented to entry of a "cease-and-desist" Order*, barring it from committing "future violations" of rules requiring issuers to file accurate reports with the SEC, and (2) agreed to pay a $2.5 million penalty. ¶91. That day, the SEC also issued its Order, which found that, starting in May 2017, Precigen made "inaccurate" statements about the MBP's "purported success [in] converting relatively inexpensive natural gas into more expensive industrial chemicals." ¶92. For example, the Order found that while Precigen had made progress in 2017 converting *natural gas* into 2,3 BDO – and that this was "important information for investors and analysts" – the Company had:

> *Failed to disclose … that 2,3 BDO yields were based upon laboratory experiments using pure methane not natural gas as feedstock* and that … [yields] reported internally from laboratory experiments using natural gas as a feedstock continued to be *substantially lower* than those disclosed publicly using pure methane. ¶92.

The SEC Order, likely anticipating that a private investor action against Defendants would soon follow, further provided that, in any such action, Precigen "shall not … benefit by offset or reduction of any award of compensatory damages" based on the penalty paid to the SEC. ¶93.

7

## III.    ARGUMENT

### A.    Applicable Legal Standards

On a Rule 12(b)(6) motion, courts must accept as true all well-pled factual allegations and construe them in the light most favorable to the plaintiff. *In re Atossa Genetics Inc. Sec. Lit.*, 868 F.3d 784, 793 (9th Cir. 2017). Although a plaintiff must plead a "strong inference" of defendants' *scienter* (*i.e.*, intentional or reckless misconduct) under the PSLRA, it need not "prove its case at the outset," but must simply allege facts that, after drawing all reasonable inferences in plaintiffs favor, support an inference of fraudulent intent that is at least as plausible as a nonfraudulent one. *See, e.g.*, *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016).

### B.    The SAC Adequately Alleges Materially False and Misleading Statements

The SAC squarely identifies each allegedly actionable statement and explains why it was false or misleading. *See* ¶¶116-62. Defendants, however, assert that the SAC's falsity allegations lack an adequate foundation, that some statements are immaterial "puffery," and that certain other statements are protected "opinions" or "forward-looking" statements. Defendants are wrong.

*The SEC Order and CW Allegations Are Well-Pled*. Courts routinely allow plaintiffs to allege *falsity* based on fact allegations included in SEC or other government complaints or orders. *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966 (N.D. Cal. 2015) (allegations based on SEC cease-and-desist order well-pled); *Evanston Pol. Pens. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019); *In re VeriFone Hold'gs, Inc. Sec. Lit.*, 704 F.3d 694, 707 (9th Cir. 2012); *Vanleeuwen v. Keyuan Petro., Inc.*, 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("nothing improper about utilizing information [from] SEC complaint as evidence to support private claims under the PSLRA"); *In re Fannie Mae 2008 Sec. Lit.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012). At most, Defendants' inapposite cases (Mot. at 6) hold only that *conclusory* allegations from a government *complaint* (as opposed to consent order) may be insufficient to plead a strong inference of defendants' *scienter* (as opposed to falsity), particularly if uncorroborated.

Defendants correctly note that the SEC Order itself expressly challenges only Defendants' statements of May 10, August 9, and November 9, 2017. Plaintiff alleges, however, that Defendants made additional statements in May and August 2018 that Precigen's "yields [were] up

8

since last reported" (¶¶140, 146) – which clearly *also* referenced results based on using pure methane (as those were the only yields previously reported). Thus, those May and August 2018 statements are actionably false and misleading for the same reasons as charged in the SEC Order.

As for the CW allegations, Defendants put their heads in the sand by arguing that the CWs do not support Plaintiff's falsity allegations from either 2017 or after. *Cf*. Mot. at 11 (asserting that CWs "offer no particularized facts" that dispute Defendants' counter-narrative that they had "overcome" and "developed solutions for" the challenges facing the MBP program). For example, as to Defendants' repeated false statements that the MBP had actually developed an "in the money" (*i.e.*, commercially viable) way to produce 2,3 BDO isobutyraldehyde (¶¶122, 131, 135, 144, 150), (a) CW2, an MBP engineer who left Precigen in September 2020, stated that Precigen's efforts were simply ***never*** sufficient to overcome the challenges within the timelines set by it, and ultimately led it to ***terminate the MBP program*** (¶52), (b) CW4 (a senior engineer who oversaw MBP testing from late 2016 to early 2019) described how Precigen ***never*** achieved satisfactory results in the three areas of yield, productivity, and titer to support a finding of profitability under its own techno-economic model, and how for this and other reasons, Defendants' characterizations of the MBP program being in the money were "false" and a "farce" (¶¶57-63), and (c) CW6 (an MBP engineer from 2015 to early 2019 who reported to defendant Walsh's deputy) confirmed not only that the MBP had ***never*** reached commercial viability, but that he and other Precigen scientists held the same "widely shared" belief that even Precigen's internal goal of ***eventually*** showing commercial viability could not be achieved for at least several more years. ¶¶73-75.

Nor can it be credibly disputed that each CW's basis for knowledge of the true state of the MBP (and of the extent to which it had ***not*** "overcome" its commercial viability challenges) is not well-pled. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (crediting CWs' allegations where their "personal knowledge of integration projects and customer feedback comes as a direct result of their positions in Zuora"); *City of Miami Gen. Emps' & Sani. Emps' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1043 (N.D. Cal. 2018) ("*RH*") (CWs adequately described to establish their reliability where employment dates and professional roles are provided).

9

Defendants also do not deny that the SAC adequately alleges that, at the same time it was merely warning of possible future government investigations, Precigen was *already* under investigation by the SEC for its disclosures regarding the MBP. ¶¶157, 162, 164; *In re Alphabet, Inc. Sec. Lit.*, 1 F.4th 687, 703 (9th Cir. 2021) (to merely warn of a risk that has already transpired is misleading); *Berenson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (same).

**C.     Defendants' Misstatements and Omissions Were Material and Actionable**

Defendants' effort to downplay the materiality of their misstatements and omissions also fails. As a threshold matter, materiality is a mixed question of law and fact that is only "rarely" dispositive at the motion to dismiss stage. *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988)).

*The MBP Program Itself Was Material.* First, Defendants try to portray the MBP as being an immaterially small part of Precigen's business (just one of "a number of non-core initiatives"). Mot. at 3. However, the MBP was one of Precigen's most (if not *the* most) important unit, as confirmed by, *inter alia,* the fact that (a) Precigen's quarterly earnings calls and releases were often dominated by discussion of the MBP program (*see Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020)); (b) Defendants repeatedly touted the MBP's more than *$100 billion* "addressable market" (¶¶118, 133, 143, 147 ["MBP Potential" chart); and (c) Precigen shares soared *20.7%* on its first announcement that it had shown that MBP was "in the money," and fell sharply in response to adverse disclosures that *expressly* concerned the MBP (*e.g.*, ¶¶79-80, 81-83, 86-88; *see also Alphabet*, 1 F.4th at 703 (market reaction is probative of materiality); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. Appx. 10, 16 (2d Cir. 2011) (same); *Marucci v. Overland Data, Inc.*, 1999 WL 1027053, at *9 (S.D. Cal. Aug. 2, 1999) (same). Indeed, Kirk described the MBP program as "probably the most valuable biotechnology in history!" ¶101.

Moreover, materiality is, in any event, properly assessed at the business *segment* level. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011). As MBP was the bulk of Precigen's Energy & Fine Chemicals segment (Birn Decl., Ex. 2 at 10-11), Defendants fall *far* short of showing that any statements were immaterial.

*No Misstatements Are Inactionable "Puffery."* Next, Defendants assert that statements

10

describing their [purported] MBP "breakthroughs," achievement of "milestone[s]," and their characterizations of their progress as "solid," "significant," and "high-value," are inactionable "puffery." Mot. at 14. However, 9th Circuit precedent has long held that even "general statements of optimism, ***when taken in context***, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Lit.*, 865 F.3d 1130, 1143 (9th Cir. 2017); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996). For example, although "breakthrough," without more, might arguably be puffery, it is plainly misleading in the context of using it to describe test results based on pure methane when investors understood that the "breakthrough" Precigen sought was to show MBP's commercial viability using ***natural gas***. Moreover, while a statement is puffery only where it is so vague or indefinite that no reasonable investor could find it important, as a matter of law, Defendants' statements either expressly or implicitly represented that the MBP was at least meeting Precigen's own development schedule – which Plaintiff alleges was ***not*** the case. ¶52 (CW3: MBP was never able to overcome development challenges within Precigen's own timelines); ¶62-64 (CW4: MBP did not meet milestones using pure methane, let alone natural gas); ¶72 (CW6: aware of only one occasion where MBP met an internal production or yield target); *see also Alphabet*, 1 F.4th at 700 (statements actionable where they "affirmatively create[d] a plausibly misleading impression of a state of affairs that differed in a material way from [what] actually existed"). Similarly, representations that MBP "breakthroughs" had justified the hiring of investment bankers in 2017 to help exploit the resulting "strategic and financial options" (¶118), were misleading in context. *See, e.g.*, *Cutler v. Kirchner*, 696 Fed. Appx. 809, 814 (9th Cir. 2017) (where defendants asserted that an acquisition would allow the company to "scale up," this was "not the sort of generalized cheerleading that courts have classed as puffery").

*Defendants' Safe Harbor Arguments Are Misplaced.* Next, Defendants assert that "[a]ll of Precigen's plans and projections for commercializing products using its MBP … are 'unquestionably … forward-looking'" (Mot. at 15), and thus protected by the PSLRA safe harbor. However, statements that the MBP had reached a state where it ***had*** shown it was "in the money" and "commercially viable" (subject only to "scaling up" the methods it had used to large-scale

11

production levels), were ***not*** forward-looking, but statements of a ***then-existing*** state-of-affairs. *E.g.*, ¶122 (May 2017 call stating "we've had a greater than 30% increase in [2,3 BDO] yields … which places this valuable chemical commodity in the money based on current natural gas prices"; ¶131 (August 2017 call stating "we ***are*** very much in the money"); ¶98 (Nov. call; same); ¶150 (August 2018 call stating that 2,3-BDO improvements "put[] this program further in the money"); *cf. Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 963-65 (N.D. Cal. 2014) (statement that company is "on track" is not forward-looking as it misrepresents "present or historical fact"); *In re MGM Mirage Sec. Lit.*, 2013 WL 5435832, at *7 (D. Nev. Sept. 26, 2013) (same); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 917-21 (N.D. Cal. 2012). And tellingly, none of the statements at issue were "identified" by Defendants as forward-looking.

Moreover, even if any of the foregoing statements arguably contained some implicit prediction about the future, they are still actionable because they still contain an actionable element of present or historical fact. *Quality Sys.*, 865 F.3d at 1142 ("safe harbor is not designed to protect companies and their officials when they … [misrepresent] current or past facts, and combine that statement with a forward-looking statement"); *Cutler*, 696 Fed. Appx. at 814-15 (same). Likewise, the safe harbor does not apply to statements that contain forward-looking language based on "material omissions or misstatements of historical fact." *In re Celera Corp. Sec. Lit.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013); *Quality Sys.*, 865 F.3d at 1143-44, 1147-48 (statement that a company "anticipates" a positive is actionable for omitting present fact); *see also Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 952 (S.D. Tex. 2021) (statements regarding "future commercial viability" rendered misleading by material misstatements and omissions of current facts). And even a true forward-looking statement is actionable if made with actual knowledge that it is false or misleading. 15 U.S.C. §78u-5(c)(1)(B).

*Defendants' Purported "Cautionary Language" Does Not Protect Them.* Nor can Defendants rely on supposed "cautionary language." Mot. at 20. Specifically, Defendants assert that they adequately warned that Precigen might not be able to commercialize its technologies because they "[might] not perform as expected when applied at commercial scale." However, warning that a technological method that it is "in the money" at developmental or other low volume

production levels is subject to the risk that the same method cannot be "scaled up" to larger-scale commercial production obviously does ***not*** apprise a reasonable investor ***that the company has been unable to develop an "in the money" technology at <u>any</u> stage of development to date.***

<u>*No Statements at Issue Are Inactionable "Opinion."*</u> Defendants (Mot. at 16-17) also claim certain misstatements are inactionable opinions. As a threshold matter, however, no statements at issue are couched as statements of "mere opinion." Rather, Defendants were purporting to report on matters of scientific fact, as shown by their data, or stating that they had objective bases for concluding that they had developed a profitable methodology based on current prices of natural gas, and the desired end-products.  Moreover, even *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.* expressly holds that "simply inserting 'I believe' in front of a statement does not convert a fact statement into an opinion." 135 S. Ct. 1318, 1336-37 (2015). Statements of having achieved particular yields, or having reached certain stages of development (such as showing that a technology is "in the money" at a pre-commercial production stage), are simply not "opinions," but are statements of objective scientific data or representations that a company's own model for showing profitability have been met. And whether Defendants misleadingly failed to disclose that the results they were reporting were based on use of natural gas – or pure methane – is not a matter of "opinion." *In re BofI Holding, Inc. Sec. Lit.*, 977 F.3d 781, 798 (9th Cir. 2020) (distinguishing "expressions of opinion" from "statements of fact capable of objective verification").

Moreover, even assuming *arguendo* that some of Defendants' statements (*e.g.*, that Precigen had achieved "breakthrough" results, or that the MBP had shown it was "in the money" at pre-large scale production levels), were somehow "mere opinions," under *Omnicare* they are still actionable if (1) "the speaker did not hold the belief she professed" and the belief is objectively untrue, (2) "the supporting fact [the speaker] supplied [is] untrue," or (3) that one or more "facts going to the basis for the issuer's opinion" is omitted and that "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 135 S. Ct. at 1327, 1332.  Here, all three alternative prongs are adequately met. First, the SAC cites to six CWs who corroborate the SEC Order and add that either defendant Walsh and his top lieutenant, Brian Yeh, to whom many of the CWs reported, were ***fully aware*** that the MBP

program was heavily reliant on pure methane, had not achieved the stated yields using natural gas, was not commercially viable during the Class Period, and failed to disclose that the Company was disclosing misleadingly cherry-picked data in its public statements. ¶¶47-75. *See also* scienter discussion at §D, below. Similarly, the SAC plainly alleges the existence of numerous facts that materially undermined the basis for any Defendant statements that were actually "opinions" – but whose omission rendered any opinion actionably misleading under *Omnicare. See In re Allied Nev. Gold Corp. Sec. Lit.*, 743 Fed. Appx. 887, 888 (9th Cir. 2018) (plaintiffs "adequately alleged that defendants possessed knowledge during the class period that left them with no basis for their optimistic statements"); *In re Atossa Genetics Inc. Sec. Lit.*, 868 F.3d 784, 802 (9th Cir. 2017) (no protection under *Omnicare* because "[defendant's] opinion statement did not fairly align[] with the information in [his] possession at the time").

Finally, Defendants' assertion (Mot. at 17) that they "believed" that there were "solutions" to the MBP program's shortcomings is simply irrelevant to whether their actual, specific statements at issue here were actionably false or misleading. Maybe they did believe there were solutions to Precigen's problems, but belief that a problem can be fixed does not absolve a defendant from their duty to disclose them when necessary to prevent their statements from being objectively misleading, or to satisfy their duty to speak "fully and completely" on the subject of the MBP's actual progress, once they have put that subject "in play." *Meyer v. Jinkosolar Hold'gs Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."). Thus, Defendants' reliance (Mot. at 7-8) on *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195 (9th Cir. 2021), is inapposite, as the SAC does not "rewrite[]" the misstatements; instead, Defendants chose to speak but failed to do so accurately.

D.    **The SAC Adequately Alleges A "Strong Inference" of Scienter**

When evaluating scienter, a court must accept the factual allegations as true and consider

14

"whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 326 (2007); *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (court must review "all the allegations holistically"); *VeriFone*, 704 F.3d at 702-03 ("the sum is greater than the parts"). Traditionally, the strong inference standard may be satisfied by factual allegations (a) constituting strong circumstantial evidence of a defendant's conscious misbehavior or recklessness (such as making statements contrary to documents or data either known or recklessly disregarded by the defendant), *see also In re Peregrine Sys., Inc. Sec. Lit.,* 2005 WL 8158825 at *42 (S.D. Cal. Mar. 30, 2005), (allegations of recklessness include "defendants' knowledge of facts or access to information contradicting their public statements," including their receipt of information directly at odds with an alleged misrepresentation) (*citing Novak v. Kasaks*, 216 F.3d 300, 308 (2nd Cir. 2000)), or (b) showing that defendants had motive and opportunity to commit fraud. The requisite inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre,' or even 'the most plausible of competing inferences'"; instead, the inquiry is "When the allegations *are accepted as true and taken collectively*, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

### 1.    The CW Allegations Support a Strong Inference of Scienter

Here, multiple CWs – spanning the entire the Class Period – stated that defendant Walsh and his top lieutenant, Yeh (to whom several CWs reported) were ***fully aware*** that, *inter alia*, the MBP had ***not*** achieved its stated yields using natural gas (let alone achieved "breakthrough" results), had ***not*** shown it was "in the money" or commercially viable, and was ***not*** timely meeting Precigen's own development "milestones." *See* ¶¶47-75. For example, CW3 stated that all personnel at Precigen's MBP facilities during CW3's tenure (July 2019 to May 2020) were aware of the ongoing MBP program challenges, including failure to meet internal program milestones (¶54; *accord* ¶64 (CW4)) – which was hardly surprising given that these problems were discussed at regular meetings between MBP engineers and senior management, including Walsh and Yeh. *See* ¶¶50-51, 54 (CWs 1, 2, & 3 citing weekly or bi-weekly status meetings with management);

¶¶64-65 (CW4, who reported to Yeh from 2016 to 2019, describing regular meetings, including quarterly meetings with Walsh where Walsh was fully briefed on the MBP program's status and ongoing difficulties). CWs 5 and 6 also recalled attending quarterly "town hall" meetings at the Company's South San Francisco location, which *Walsh led* – and defendant Kirk occasionally also attended – where the true state of affairs (including specifically how "commercial viability" was at least several years away) was discussed. ¶¶71, 74-75.

In sum, the CW statements "allege[] with particularity that defendants were in possession of contemporaneous, contradictory information when they made the false and misleading statements, giving rise to a strong inference of scienter." *Zuora*, 2020 WL 2042244, at *11. Indeed, the SAC specifically alleges how Walsh and Kirk were present at meetings where information was presented that flatly contradicted Defendants' public statements of having already achieved "in the money" status. ¶56 (CW3); ¶71 (CW5); *see also* ¶¶63-64 (CW4). The SAC even alleges how CW4 – *who oversaw MBP testing* – directly told both Walsh and his deputy (Yeh) that the Company was publicly presenting misleadingly cherry-picked results which reported favorable test results for key metrics without disclosing that they did not reflect results that had been reached in any single experiment. ¶¶59-61, 65. CW4 also recalled how – contrary to Defendants' statements from as early as 2017 that the MBP program had attained sufficiently high yields to proceed to "site selection" and "ground-breaking" for a small-scale commercial plant (¶¶36, 118, 129, 136, 148, 155, 158) – Walsh told CW4 in 2018 that, because the program had failed to achieve all three key production metrics simultaneously at the smaller 500-liter pilot plant level, "*there was no way*" Precigen would actually invest in a 20,000-liter facility in the foreseeable future. ¶66.

In addition, both CWs 4 and 5 described how all MBP test result data – including as to whether particular milestones had been met – were entered into the Company's Lab Inventory Management System *where it was accessible to anyone working on the MBP program.* ¶¶64, 69. This fact further supports the reliability of the CWs' claims (*see* above) that the problems within the MBP were *widely* known to essentially *everybody* involved in the program because, in addition to being discussed at regular meetings, test results showing that the MBP was *not* meeting key milestones, and *not* close to "commercial viability", would quickly become available to all

16

(including, one can reasonably infer, Walsh). ¶64. *Alphabet*, 1 F.4th at 706 ("the executive's access to the information, and ... the importance of the information" supports scienter).

For the same reasons as stated in §III.B, above, the SAC also describes each CW "with sufficient particularity to establish their reliability and personal knowledge … [of facts] indicative of scienter." *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016).

While Walsh's scienter is pled in spades, CWs 4 and 5 also described how – in addition to personally attending the quarterly "townhall" meetings at which the true state of the MBP was discussed – Kirk visited the MBP facility on multiple occasions to receive first-hand updates from MBP engineers and scientists. ¶¶66, 72. And Kirk himself also stated throughout the Class Period that Walsh regularly updated both him and the other Individual Defendants about the MBP program. ¶¶95-101; *see also Vancouver Alum. Asset Hold'gs Inc. v. Daimler AG*, 2017 WL 2378369, at *16 (C.D. Cal. May 31, 2017) (inferring scienter where "the Complaint alleges not only that these defendants were in a position to receive information about BlueTEC's inability to produce consistent 'clean diesel' emissions, but also that they in fact did receive such information, and thus made knowing material misrepresentations to investors").

Moreover, seriousness of the misstatements at issue and the extent to which the undisclosed adverse facts were known within a defendant company are also probative of scienter, as the more pervasive the fraud is, the less plausible are defendants' denials that they were somehow "alone" in being unaware of it. *See, e.g.*, *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012) (where CWs detailed facts supporting claim that defendants' practice of improperly inflating job placement statistics was both widespread and pervasive, such allegations support strong inference of scienter); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware ... and the stronger is the inference that defendants must have known."). Moreover, given that the whole point of the MBP program was to develop a profitable way to use natural gas (rather than prohibitively expensive pure methane) to produce marketable chemicals, each individual defendant was *at least* reckless in failing to disclose that reported yields were based on use of pure methane, and that the MBP was not hitting Precigen's own metrics for establishing profitability or

17

commercial viability at *any* developmental scale (let along full production scale) level.

Given the totality of Plaintiff's allegations, the SAC readily alleges the requisite strong inference of scienter as to *each* Defendant. *Zuora*, 2020 WL 2042244, at \*3 (scienter well-pled where CWs alleged that "Zuora's highest executives were informed of … integration failure[s]" at regular meetings); *RH*, 302 F. Supp. 3d at 1042 (scienter well-pled where CWs alleged internal issues were "well known internally and openly communicated at staff meetings"); *Fitbit*, 216 F. Supp. 3d at 1032 ("[B]oth CW 1 and CW 2 reported directly to COO Hartmann, indicating scienter by Fitbit executives," and also noting allegations of regular "reports that documented and ranked [the] various [undisclosed problems]; … types of customer complaints and device failures"); *Peregrine*, 2005 WL 8158825, at \*42 (adequate allegations of recklessness include "defendants' knowledge of facts or access to information contradicting their public statements").

### 2. The Core Operations Doctrine Supports a Strong Inference of Scienter

The Ninth Circuit has long held that where a corporate program is "*so **important*** to the company[,] that it [would be] absurd to suggest that the Board of Directors did not discuss [it]." *Berenson*, 527 F.3d at 988; *see also VeriFone*, 704 F.3d at 708 ("[It is] difficult to grasp the thought that the top two executives who reported 'gangbuster earnings' really had no idea that their company was headed towards bankruptcy given their knowledge of operational problems and industry difficulties."). Defendants' claims (Mot. at 19-21) that the MBP program was not a "core operation" and that they lacked knowledge of the truth about the program are similarly "absurd."

The MBP program was plainly a "core operation." For example, Kirk described the MBP unit as "probably our largest single team deployed to one single object in the entire Company." ¶95. As noted at §III.C., Precigen's SEC filings repeatedly touted the MBP's purported success, and the MBP was deemed so important that defendant Walsh (Precigen's EVP for "Energy & Fine Chemicals," which was largely the MBP unit) was often one of the few people (other than Kirk, COO Last, and CFO Sterling) who participated in Precigen's earnings calls. *See, e.g.*, Birn Decl., Exs. 5, 11; *see also id.*, Exs. 2 at 6 & 3 at 10 ("we [have] devised a strategy that allow[s] us to ***focus on our <u>core</u> expertise in synthetic biology***"); *id.*, Ex. 20 at 4 ("our immediate investments and activities are concentrated in these key areas: ***one, energy, where our [MBP] platform is***

*advancing to commercial scale*"). In fact, Kirk characterized the MBP business as more than "core," when he described how the MBP's purported "breakthroughs" made it "***probably the most valuable biotechnology*** *in history*." ¶101.

Moreover, in presenting MBP results to the public, Kirk repeatedly stated that Walsh (who was based at the same facility where the MBP was located) regularly kept the other Individual Defendants informed about the program. *See, e.g.*, ¶95 ("I spend a lot of time with Bob Walsh, who [is] Head of our Energy Sector."); ¶99 ("We press Bob all the time for – to tell us that we are solidly in the money in isobutanol."). Because the CWs also paint a portrait of Walsh and Kirk as having a hands-on management style, routinely speaking with MBP engineers and scientists, and attending or leading meetings, including "town halls" at which the non-public adverse facts at issue were discussed (*see generally* ¶¶57-67, 70-72, 74; 66, 72), these facts further support application of the "core operations" doctrine. *Alphabet*, 1 F.4th at 706 ("[W]e may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue."); *In re OmniVision Techs., Inc. Sec. Lit.*, 937 F. Supp. 2d 1090, 1111 (N.D. Cal. 2013) (core operations allegations bolstered where "several [CWs] described [the CEO as having] as a hands-on management style").

Defendants also argue (Mot. at 21) that "a lack of stock sales can detract from a scienter finding on a holistic inquiry," citing *Veal v. LendingClub Corp.*, 2021 WL 4281301, at *2 (9th Cir. Sept. 21, 2021). However, a "lack of stock sales by a defendant is not dispositive as to scienter"; *Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *Matrixx*, 563 U.S. at 48 ("absence of a motive allegation, though relevant, is not dispositive").

Moreover, this is ***not*** a case that involves no stock sales. *First*, defendants Walsh and Sterling, respectively, sold over $67,000 and $390,000 worth of their Precigen shares at inflated prices during the Class Period. Birn Decl., Exs. 31 and 33.

*Second*, the Individual Defendants effectively caused the defendant Company, Precigen, to engage in ***two*** rounds of vastly larger insider trading, also at inflated prices, when Precigen raised ***over $86 million*** in the First SPO of common shares in January 2018, and another ***$100 million*** in the Second SPO of common shares in late June 2018. ¶¶108-11. Precigen also sold ***$200 million***

19

in convertible notes in late June 2018 – and because part of the value of a convertible note is based on the value of the underlying stock, Precigen's Notes Offering also benefitted from a fraud-inflated common stock price. ¶¶110-11. While a generalized corporate motive to raise capital adds relatively little to a *scienter* analysis, here, Defendants (especially Kirk, who controlled approximately half of Precigen's equity; *see* https://investors.precigen.com/static-files/5bd45d88-4ddd-4924-8be5-c9a9fc39a002, at 48), had a strong incentive to ensure that Precigen's SPOs and Notes Offerings raised as much money as possible – ***particularly since the Company was forced to disclose just 7 months later that it was running out of cash and that there was "substantial doubt about [its] ability to continue as a going concern*****.**" ¶77. These circumstances further support an inference of scienter. *See, e.g.*, *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at \*8 (C.D. Cal. Oct. 20, 2011) (that company was "desperate for operating cash" and its "ability to continue operating was dependent on raising additional capital" supported allegations of scienter). *In re Ibis Tech. Sec. Lit.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (strong scienter inference raised where defendants allegedly delayed impairment charge to complete stock offering); *In re Datastream Sys., Inc. Sec. Lit.*, 2000 WL 33176025, at \*3 n.4 (D.S.C. Jan. 27, 2000) (allegations that defendant "presented materially false information to … ensure completion of a public offering" was sufficient to plead scienter); *In re Centocor, Inc. Sec. Lit. III*, 1998 WL 964184, at \*2 (E.D. Pa. Dec. 1, 1998) (same).

*Third*, Defendants had a motive to inflate Precigen's share price where, as here, it planned to use it as currency to acquire other entities. ¶¶106-07; *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (motive to inflate share price to acquire other companies strongly supported scienter). All of the above allegations place Defendants' misstatements within a broader "narrative," which "points to the existence of scienter." *ESG*, 828 F.3d at 1035.

Defendants also note that Kirk and "his controlled entities" bought roughly $180 million worth of Precigen shares during the Class Period, which they argue is "inconsistent" with *scienter*. Mot. at 21. However, Defendants' "stock purchase" argument applies (at most) ***only*** to Kirk. Moreover, numerous courts "have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud."

20

*Kyung Cho v. UCBH Hold'gs, Inc.*, 890 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012); *see also, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (where "defendant may have believed that he could eventually sell his shares at a profit by continuing to hide the fraud or by resolving undisclosed problems without the public learning of the true facts, courts refuse to hold that defendants' stock purchases were inconsistent with fraud"); *Tellabs*, 513 F.3d at 710 (same). In addition, while $180 million to most people would certainly be a large sum to spend on buying more Precigen shares, that sum was a mere fraction of Kirk's $3.3 billion in total assets as of the start of the Class Period. *See* https://web.archive.org/web/20170318005017 /https://www.forbes.com/profile/randal-kirk/.

Finally, the SAC also alleges that Defendants' misrepresentations about the MBP program began just two months after Precigen had reported its record-setting FY 2016 losses, and just three months after disclosing the breakup of its previously touted MBP partnership with Dominion. ¶¶31-35. That Precigen's net loss had doubled, with analysts also having recently turned bearish on its prospects (and its MBP program), cannot be ignored when considering Defendants' motive to change its corporate narrative by announcing misleading results and phony "breakthroughs."

### 3.    Scienter Is Well-Pled as to the Undisclosed SEC Inquiry Claims

On November 8, 2018 and March 1, 2019, Defendants warned about the ***possibility*** of Precigen becoming the subject of "governmental investigations." ¶¶156, 161. Here, no CW statements need even be considered to strongly infer that Defendants (except Last) had ***actual knowledge*** that this statement was materially misleading, as Defendants ***concede*** that they received a subpoena in October 2018 informing the Company that the SEC had begun an investigation "concerning the Company's disclosures regarding its methane bioconversion platform." ¶83. It would defy credulity to believe that the then CEO (Kirk), CFO (Sterling), and EVP in charge of the MBP program (Walsh) somehow lacked knowledge of this SEC inquiry by November 2018. *Cf. Zuora*, 2020 WL 2042244, at \*11 (allegations showing defendants "[possessed] contradictory information when they made the false and misleading statements" supported inference of scienter).

### E.    The SAC Adequately Alleges Loss Causation

To plead loss causation, plaintiff need only allege that "revelation of fraudulent activity,

*rather than changing market conditions or other <u>unrelated</u> factors*, proximately caused the decline in defendant's stock price," *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020), typically by "plausibly" alleging corrective disclosures by which "defendant's fraud was revealed to the market and caused the resulting losses." *Id.* Although Rule 9(b) applies, that standard is "not [] burdensome" in the loss causation context, as "plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *BofI*, 977 F.3d at 794. Moreover, Courts treat loss causation as "a context-dependent inquiry … as there are an infinite variety of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). *Lloyd* held that the disclosure of a government investigation "can form the basis for a viable loss causation theory if" – as here – "the complaint also alleges a subsequent corrective disclosure by the defendant." *Id.* A plaintiff also need not plead that the misstatements or omissions were the *sole* cause of their loss, as long as they were substantial. *In re Daou Sys, Inc..*, 411 F.3d 1006, 1025 (9th Cir. 2005).

Here, the SAC alleges six corrective partial disclosures. *First*, on February 28, 2019, Defendants announced that substantial doubt existed as to its ability to continue as "going concern" and that it would be considering asset sales and other measures to stay afloat (¶77) – even though they had repeatedly assured investors, *since mid-2017*, that Precigen's MBP "breakthroughs" had justified its hiring of investment banks to pursue "strategic and financial options" for the MBP. ¶¶118, 125, 128, 130, 142, 148. As companies normally want to avoid insolvency and forced asset sales, the SAC plausibly alleges that the next day's 36.5% share price drop (¶80) was due – at least in part – to investors concluding that Defendants' previously announced "breakthroughs" were not as advertised (as otherwise Precigen would have *already* successfully monetized at least part of the MBP program's value, rather than be forced into announcing a serious insolvency risk).

*Second*, on August 8, 2019, Precigen announced plans to spin-off its MBP program into a new company (and that Precigen expected to significantly reduce its stake in that entity over time) – which caused Precigen's shares to fall 8.8%. ¶¶81-82. The SAC thus plausibly alleges both that the market was *very* disappointed by the terms of this deal, and that the news of the deal was a further partial revelation that the MBP's purported past "successes" had been materially inflated.

22

*Third*, on March 2, 2020, Precigen disclosed that the SEC had been investigating its public statements about the MBP program *since at least October 2018*. This news further signaled that Defendants had likely misled investors about the platform – and *also* disclosed that their November 2018 and March 2019 warnings of *possible* government investigations (¶¶156, 161) were misleading (as by then Defendants were *already* under investigation). ¶¶83-84.  Combined with the next day's *17% price drop* (¶85), loss causation is amply pled for March 2020.

*Fourth*, on May 6, 2020 – when Precigen announced a "reduction in force" and the *suspension of operations at MBP Titan* (with its shares falling 1.55% the next day) (¶¶86-87) – and *fifth*, on August 10, 2020 – when Precigen announced that it had written off $12.5 million in MBP assets (with its shares falling over 10% the next day) (¶¶88-90) – once again the SAC amply alleges how these disclosures further revealed just how badly Defendants had misled as to the MBP's purported "breakthrough" successes and allegedly "in the money" technology.

*Sixth*, on September 25, 2020, the world learned of the SEC Order and its contents, including the SEC's findings that Precigen had made "inaccurate" statements about the MBP's "purported success [in] converting relatively inexpensive natural gas into more expensive industrial chemicals." ¶92. As in *Lloyd*, 811 F.3d at 1210, while "the market reacted hardly at all to [Precigen's] bombshell disclosure," this final corrective disclosure only strengthens (rather than undermines) Plaintiff's broader loss causation allegations, as it is supports Plaintiff's theory that investors had already understood prior news of an SEC inquiry "as [at least] a partial disclosure."

*Defendants' Various Loss Causation Arguments Do Not Remotely Support Dismissal.* As a threshold matter, as set forth above, Plaintiff has given Defendants adequate notice of his loss causation theory as to each corrective disclosure. *BofI*, 977 F.3d at 794.

Next, Defendants misstate the law by arguing that Plaintiff's loss causation theory as to "the MBP-related statements" fails "because he does not allege the purportedly 'corrective disclosures' caused the market to 'learn of and react to the fraud, as opposed to merely reacting to reports of the defendant's poor health generally." Mot. at 22 (citing *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014). But as Judge White has noted, "*Loos* addressed only *one* way of pleading loss causation, not the 'infinite variety' of possible proximate cause allegations." *In re*

23

*WageWorks, Inc. Sec. Lit.*, 2020 WL 2896547, at \*8 (N.D. Cal. June 1, 2020). Thus, Plaintiff may *also* plead "materialization of the risk," alleging that corrective discloses revealed the true extent of relevant risks – such as failure to discover "breakthroughs" in a key technology platform and the related heightened risks of insolvency (*e.g.*, the risk of running out of money before the technology demonstrates sufficient value to offset the high development costs) – which were concealed by Defendants' fraudulent statements. *See, e.g., id.*; *Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*21 (N.D. Cal. Nov. 27, 2018).

For example, in *In re Vivendi Univ., S.A. Sec. Lit.*, 634 F. Supp. 2d 352 (S.D.N.Y. 2009), *cited with approval* by *Azar*, defendants made various misleading statements that concealed the risk to Vivendi's liquidity. In that case, plaintiffs' expert isolated certain drops in Vivendi's share price due to events like ratings downgrades and asset sales, which allegedly involved the materialization of the magnitude of the liquidity risk. *Id.* at 365-69. The defendants, like here, argued that plaintiffs' conception of liquidity risk was untethered to a "one-to-one" correspondence between concealed facts and the materialization of the risk, and was "so all encompassing" as to be "meaningless." *Id.* at 354, 366-67. The court disagreed, holding that loss causation can be established by an event that that "discloses part of the truth that was previously concealed by the fraud," even if the event does "not identify specific [prior] company statements as misleading." *Id.* at 364; *accord Azar*, 2018 WL 6182756, at \*21. *As in Vivendi*, Defendants' argument that no plausible loss causation theory ties to the corrective disclosures of February and August 2019 and May and August of 2020 (nos. 1, 2, 4, 5 above) is wrong and their attack on Plaintiffs' theory is a matter for expert testimony rather than dismissal at the pleadings.

Bizarrely, Defendants also assert that the SAC fails to allege that Precigen or the MBP were in trouble, claiming (Mot. at 23) that "such conclusions [are] at odds with the program's success." Like much of Defendants' brief, however, such arguments simply *ignore* Plaintiff's allegations that, whatever the MBP's scientific "success" may have been, *it never approached commercial "success,"* and when the Class Period ended its value was so marginal that the MBP program was *shut down* and its assets written off, while Precigen faced insolvency. ¶¶77, 86-90.

Finally, as to the March and September 2020 corrective disclosures (nos. 3, 6 above),

24

Defendants argue (Mot. at 23) that *Lloyd* requires "particular facts (*i.e.*, analysts and news reports) demonstrating **market speculation** that the investigation **suggested a prior statement was false**." However – leaving aside that *Lloyd* (like *Loos*) did not purport to discuss "materialization of the risk" causation theory (beyond reiterating that there are "infinite ways" a tort can cause a loss, 811 F.3d at 1210 – *Lloyd* also **expressly** held that where, as here (*see* ¶91), there **is** a "subsequent corrective disclosure by the Defendant" confirming that a previously disclosed inquiry concerned the accuracy of allegedly false statements at issue, then "the [earlier] announcement of an investigation **can** form the basis of a viable loss causation theory." *Lloyd* 811 F.3d at 1210.

### F.    The SAC Adequately Alleges §20(a) Control Person Claims

Defendants Kirk, Last, and Sterling seek dismissal of the §20(a) claims against them only on grounds that no underlying §10(b) claim has been pled. As noted above, that argument fails. As for Walsh, he asserts he lacked "control" over any other defendant – but described himself as a "Section 16 Officer" (*i.e.*, as the direct or indirect beneficial owner of more than 10% of the Company's equity (¶¶21, 102)). Moreover, as the EVP in charge of the unit responsible for the MBP, he was clearly in a position to control and shape not just his own false statements about the MBP, but those made by the Company generally. Such allegations readily suffice. *In re Montage Tech. Grp. Ltd. Sec. Lit.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015) ("general allegations concerning an individual's title and responsibilities to be sufficient to establish control").

## IV.    DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IS OVERBROAD

Plaintiff does not object to Defendants' citations to SEC filings and earnings call transcripts for the limited purpose of showing what statements Precigen made during the Class Period. Defendants, however, cannot use such exhibits (as well as the articles marked Birn Decl., Exs. 15-17) on a §12(b)(6) motion to establish the truth of any matters asserted therein, nor to present a counternarrative. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999-1008 (9th Cir. 2018).

<u>**CONCLUSION**</u>

Defendants' motion to dismiss should be denied in its entirety. Alternatively, if the Court finds the SAC is inadequately pled in any respect, Plaintiff requests leave to replead.

Dated:  December 17, 2021                    Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 s/ John T. Jasnoch
John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
jjasnoch@scott-scott.com

William C. Fredericks (*pro hac vice*)
Thomas L. Laughlin, IV (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
wfredericks@scott-scott.com
tlaughlin@scott-scott.com
jjacobson@scott-scott.com

*Lead Counsel for Lead Plaintiff Raju Shah
and the Putative Class*

P'S OPP. TO DEFS' MOT. TO DISMISS & REQ. FOR JUDICIAL NOTICE; Case No. 5:20-CV-06936-BLF

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

      s/ *John T. Jasnoch*
      JOHN T. JASNOCH

P'S OPP. TO DEFS' MOT. TO DISMISS & REQ. FOR JUDICIAL NOTICE; Case No. 5:20-CV-06936-BLF