UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE PRECIGEN, INC. SECURITIES ) C-20-06936 BLF
LITIGATION,                      )
                                 ) SAN JOSE, CALIFORNIA
                                 )
                                 ) APRIL 7, 2022
                                 )
                                 ) PAGES 1-51
_____  )


TRANSCRIPT OF ZOOM PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:     SCOTT + SCOTT ATTORNEYS AT LAW LLP
                        BY:  WILLIAM C. FREDERICKS
                             JEFFREY P. JACOBSON
                        230 PARK AVENUE, 17TH FLOOR
                        NEW YORK, NEW YORK  10169

FOR DEFENDANT           WILSON, SONSINI, GOODRICH & ROSATI
PRECIGEN:               BY:  LAURIE B. SMILAN
                             NINA F. LOCKER
                        650 PAGE MILL ROAD
                        PALO ALTO, CALIFORNIA  94304

FOR DEFENDANT           NORTON ROSE FULBRIGHT
WALSH:                  BY:  PETER A. STOKES
                        98 SAN JACINTO BOULEVARD, SUITE 1100
                        AUSTIN, TEXAS  78701


OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

SAN JOSE, CALIFORNIA                    APRIL 7, 2022

P R O C E E D I N G S

(ZOOM PROCEEDINGS CONVENED AT 9:48 A.M.)

THE CLERK:  WE'RE MOVING ON TO THE ABADILLA CASE NEXT.

COUNSEL, PLEASE RAISE YOUR HANDS.  PLEASE ACCEPT THE INVITATIONS TO JOIN.

(PAUSE IN PROCEEDINGS.)

THE CLERK:  ONE MORE, YOUR HONOR.

THE COURT:  OKAY.  IT WOULD BE NICE TO HAVE SOMEONE FROM THE DEFENSE.  I'M SURE THEY'RE WAITING TO COME ON.

THE CLERK:  YES.

OKAY, YOUR HONOR.

THE COURT:  ALL RIGHT.  IS THAT EVERYBODY?

GOOD MORNING.  THANK YOU FOR JOINING ON ZOOM.  LET'S CALL THE CASE AND GET YOUR APPEARANCES.

THE CLERK:  CALLING CASE 20-6936, ABADILLA VERSUS PRECIGEN, ET AL.

COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCE, AND AGAIN, IF WE COULD BEGIN WITH THE PLAINTIFF AND THEN MOVE TO DEFENDANT.

MR. FREDERICKS:  GOOD MORNING, YOUR HONOR.

WILLIAM FREDERICKS, SCOTT & SCOTT, FOR LEAD PLAINTIFF AND THE CLASS.

THE COURT:  GOOD MORNING.

MR. JACOBSON:  GOOD MORNING, YOUR HONOR.

JEFF JACOBSON FROM SCOTT & SCOTT FOR LEAD PLAINTIFF AND THE CLASS.

THE COURT:  GOOD MORNING.

MS. SMILAN:  GOOD MORNING, YOUR HONOR.

LAURIE SMILAN FROM WILSON, SONSINI, GOODRICH & ROSATI FOR THE DEFENDANTS.

THE COURT:  GOOD MORNING.

MS. SMILAN:  AND I BELIEVE MY COLLEAGUE, NICKI LOCKER, IS ALSO ON THE CALL.

THE COURT:  OH, OKAY.

AND, MR. STOKES, ARE YOU MAKING AN APPEARANCE?

MR. STOKES:  YES, YOUR HONOR.

PETER STOKES ON BEHALF OF DEFENDANT ROBERT WALSH.

THE COURT:  GOOD MORNING.

MR. STOKES:  GOOD MORNING.

THE COURT:  HAVE WE GOT MS. LOCKER?

MS. SMILAN, ARE YOU ARGUING THE CASE THIS MORNING?

MS. SMILAN:  YES, I AM, YOUR HONOR.

THE COURT:  GREAT.  SHOULD WE WAIT FOR MS. LOCKER, OR DO YOU THINK SHE'S JUST LISTENING IN?

THE CLERK:  SHE'S COMING OVER NOW, YOUR HONOR.

THE COURT:  OH, GOOD.  OKAY.

THE CLERK:  THERE WE GO.

THE COURT:  ALL RIGHT.

GOOD MORNING, MS. LOCKER.  WOULD YOU LIKE TO STATE YOUR APPEARANCE.

OH, YOU'RE ON MUTE.

MS. LOCKER:  OKAY.  I SEEM TO BE HAVING TECHNICAL DIFFICULTIES THIS MORNING, AND I APOLOGIZE.

THE COURT:  NO PROBLEM.

MS. LOCKER:  IN PERSON, IT'S EASIER TO JUST PUT ONE FOOT IN FRONT OF ANOTHER.

GOOD MORNING, YOUR HONOR.  NINA LOCKER ON BEHALF OF THE PRECIGEN DEFENDANTS FROM WILSON, SONSINI, GOODRICH & ROSATI.

THE COURT:  GOOD MORNING.

ALL RIGHT.  WELL, THIS IS MY FIRST ROMP THROUGH THE COMPLAINT HERE AND THE STORY.

IT'S -- I DIDN'T FIND THE COMPLAINT, THE PLEADING, TO BE COMPLICATED.  I FOUND THE MOTION TO BE COMPLICATED.  SO I'M GOING TO MAKE SOME COMMENTS THAT ARE REALLY NOT MEANT TO BE A TENTATIVE RULING BECAUSE THERE ARE JUST SO MANY LITTLE PIECES HERE, AND THAT'S TYPICAL.

SO MS. SMILAN, THIS IS CERTAINLY NOT A CRITICISM AT ALL, BUT I GENERALLY TRY TO PUT THESE FALSE STATEMENTS INTO BASKETS SO THAT I CAN LOOK AT THEM.  I THINK YOU'VE BRIEFED IT THAT WAY AS WELL, AND I APPRECIATE THAT.

I'M TRYING TO MAKE SOME SENSE OF THE STATE OF THE -- I DON'T WANT TO USE THE WORD "EVIDENCE" -- BUT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS THAT I HAVE THAT WOULD DEAL WITH

THE POST-2017 STATEMENTS THAT ARE AT ISSUE IN THE CASE, SO I'LL APPRECIATE SOME ARGUMENT ON THAT.

BUT I'VE GOT THE THREE STATEMENTS ALLEGED AS FALSE IN THE SECOND AMENDED COMPLAINT FROM 2017 THAT WERE ALSO THE SUBJECT OF THE SEC ORDER, AND I RECOGNIZE ALL THE LIMITATIONS ON THAT.

BUT THOSE WERE -- AND IT APPEARS THAT DURING THAT PERIOD OF TIME IN 2017, THAT THE TESTING WAS DONE WITH PURE METHANE AND NOT WITH NATURAL GAS AND THAT -- AND THEN IN 2018, MS. SMILAN, YOU ARGUE IN YOUR PAPERS THAT THE TESTING WAS ACTUALLY DONE WITH NATURAL GAS.

THAT'S NOT ALLEGED IN THE SECOND AMENDED COMPLAINT, AND SO I'M NOT QUITE SURE WHERE I'M GETTING THAT PIECE OF INFORMATION FROM, IF I'M GETTING IT AT ALL, OR IF THAT'S JUST YOUR ARGUMENT TO ME ABOUT WHAT IS TO BE -- TO COME IN THE FUTURE.  I WASN'T SURE ABOUT THAT.

IN TERMS OF -- AND, AGAIN, I'M JUST GOING TO HIGHLIGHT SOME OF THE AREAS WHERE I HAD SOME CONCERNS.

WHEN I READ THE ALLEGED FALSE STATEMENTS FROM THE 2017 PERIOD, I DON'T SEE THAT IT'S ALLEGED AS PROJECTED TO BE IN THE MONEY.  YOUR MOTION AT PAGE 15, LINES 5 AND 6, SUGGESTS THAT YOUR -- THAT PRECIGEN WAS PROJECTING TO BE IN THE MONEY.

BUT WHEN I READ THE STATEMENT, IT ACTUALLY READS AS RIGHT NOW WE'RE IN THE MONEY, AND THAT IS A VERY DIFFERENT CIRCUMSTANCE IN TERMS OF FORWARD-LOOKING VERSUS CURRENT CIRCUMSTANCES.

AND I DON'T SEE THE TERM "IN THE MONEY" BEING THE SAME AS "ON TRACK," WHICH WAS THE SUBJECT OF THE TESLA ORDER, BECAUSE IF YOU'RE ON TRACK, IT MEANS YOU'RE GETTING TO A PLACE YOU WANT TO BE.  IF YOU'RE "IN THE MONEY," IT MEANS YOU'RE PROFITABLE RIGHT NOW.

THAT'S HOW I READ IT, JUST AS A PLAIN READING.  SO I HAVE SOME CONCERNS THERE.

ALSO, GOING -- SO THE -- AND I THINK IT'S A CLOSE CALL ON THE ISSUE OF WHETHER THE COMPANY WAS OBLIGATED TO EXPRESSLY STATE IT WAS BEING INVESTIGATED BY THE S.E.C., SO I'LL WANT TO HEAR A LITTLE MORE THERE.

SWITCHING OVER TO CONCERNS I HAVE WITH THE SECOND AMENDED COMPLAINT, IT'S ACTUALLY DIFFICULT FOR ME TO DETERMINE WHO THE SPEAKER WAS THAT IS BEING CHARGED WITH THE FALSE STATEMENT.  I MEAN, I READ IT, AND I ACTUALLY MADE MY OWN NOTES ON -- I HAD TO ANNOTATE EACH FALSE STATEMENT BEFORE I COULD PICK UP A NAME THAT YOU ALLEGE.  I MEAN, IT JUST WASN'T CLEAR TO ME BECAUSE I THEN WANTED TO GO BACK OVER THE C.W.'S STATEMENTS TO SEE WHAT THE SCIENTER ALLEGATIONS WERE.

AND I GUESS AT THE END OF THE DAY, I'M NOT COMFORTABLE THAT THE FALSE STATEMENTS ARE ADEQUATELY ALLEGED AGAINST SPECIFIC DEFENDANTS AS OPPOSED TO ALL OF THEM.  AND I AM CONCERNED THAT THE -- I THINK THE C.W.'S POSITIONS IN THE COMPANY WERE MODEST IN RELATION TO THESE ALLEGED FALSE STATEMENTS.  I'M NOT -- I WOULD AGREE THAT THERE'S MORE

SCIENTER ALLEGATION ON MR. WALSH THAN THE OTHERS.  I'M JUST NOT SURE THAT MR. WALSH IS CHARGED WITH ANY OF THE FALSE STATEMENTS.

IT DOES APPEAR THAT HE -- IT DOES APPEAR THAT HE MADE STATEMENTS 7 AND 8 -- I NUMBERED THEM MYSELF, I DON'T HAVE THE PARAGRAPH NUMBERS -- BUT THAT WOULD BE THE AUGUST 9, 2018 EARNINGS CALL, AND MR. WALSH IS IDENTIFIED ON THE NOVEMBER 8, 2018 EARNINGS CALL AS WELL.

AND THAT HAS TO DO -- WELL, IT IS AS IT'S ALLEGED.

SOME OF THESE FALSE STATEMENTS DON'T IDENTIFY ANY SPECIFIC DEFENDANT, LIKE THE FEBRUARY 28, 2019.  I SUPPOSE YOU WANT ME TO GO LOOK AT THE 8-K AND SEE WHO SIGNED IT, BUT IT WOULD BE NICE IF IT WERE ALLEGED AS TO WHO YOU'RE SUING; AND THE MARCH 20, 2019, 10-K, THAT'S THE 2018 ANNUAL REPORT, AGAIN, DOESN'T IDENTIFY ANYONE THERE.

I -- AS I SAID, I WOULD AGREE WITH THE PLAINTIFFS THAT THERE ARE MORE ALLEGATIONS FROM THE C.W.S THAT MIGHT SHOW SCIENTER BY MR. WALSH, BUT THERE'S -- I DON'T SEE ANYTHING FOR STERLING AND LAST, AND FOR KIRK, I AGREE WITH MS. SMILAN THAT IT DOES APPEAR THAT HE WALTZED IN AND OUT OF THE TOWN HALL MEETINGS.  IT'S NOT CLEAR WHAT WAS BEING SPOKEN DURING THE TIME THAT HE WAS THERE, AND SO I JUST NEED MORE SPECIFICS.

AND I THINK FOR PLAINTIFFS, I KNOW WE'VE FOCUSSED MOSTLY ON SCIENTER.  THAT'S USUALLY THE HARDEST THING.  IT'S MY OBLIGATION TO LOOK AT IT HOLISTICALLY, AND I'M -- AND THIS

WHOLE CORE OPERATIONS, WELL, I'VE NEVER SEEN ONE THAT WORKED, BUT THERE'S THIS DEBATE AS TO WHETHER THIS MBP PROJECT, OR PROGRAM, WAS CORE TO THE COMPANY.

AND THE FACT THAT IT HAD THE POTENTIAL OF TAPPING INTO A $100 BILLION INDUSTRY I DON'T THINK SAYS IT'S CORE TO THE COMPANY IF THEY'RE STILL IN THE LAB TRYING TO SEE IF IT EVEN WORKS.  SO I HAVE A LITTLE TROUBLE WITH THAT AS WELL.

SO THAT DOESN'T -- I HOPE -- I DON'T THINK THAT HELPS YOU A WHOLE LOT, BUT I JUST WANTED TO RAISE SOME OF THE THINGS THAT WERE ON MY MIND ABOUT THE DEFICIENCIES.

SO THIS IS THE DEFENSE MOTION, I'M GOING TO TURN TO YOU. I'M GLAD TO HAVE A FULL ARGUMENT -- WE HAVE A FULL HOUR.  I'M GLAD FOR YOU TO TAKE A HALF AN HOUR, OR IF YOU WANT TO RESERVE A FEW MINUTES OF YOUR TIME TO HAVE THE FINAL WORD AS WELL, BUT I'M GLAD TO HAVE YOU DO THAT.  BUT I DO HAVE AMPLE TIME TO HEAR YOUR ARGUMENTS.

MS. SMILAN:  OKAY.  THANK YOU, YOUR HONOR.  THANK YOU FOR YOUR GUIDANCE.

AGAIN, THIS IS LAURIE SMILAN FROM WILSON, SONSINI ON BEHALF OF THE DEFENDANTS.

THE COURT POINTED OUT THAT IT'S A LITTLE BIT DIFFICULT TO TELL FROM THE COMPANY STATEMENTS WHETHER THEY WERE USING NATURAL GAS OR METHANE UNTIL NOVEMBER OF 2018, WHICH IS THE FIRST TIME THE COMPANY EVER SAID THEY WERE TESTING WITH NATURAL GAS.

THE COURT:  AND WHERE DO I SEE THAT?  SO, MS. SMILAN, THAT'S REALLY MY QUESTION, AND I -- THIS IS A SMALL POINT, BUT I KNOW YOU HAVE A BIG TEAM THAT WORKED ON THIS.  YOU GAVE ME PAGE NUMBERS FOR DOCUMENTS, BUT YOU DIDN'T HIGHLIGHT ANYTHING, AND I WILL TELL YOU, I -- ON MOST OF THE PAGES, I DIDN'T KNOW WHAT YOU WERE TALKING ABOUT BECAUSE YOU DIDN'T DRAW MY ATTENTION.  SO IT'S A SMALL POINT, BUT I REALLY STRUGGLED.

AND I'M GOING TO TAKE ISSUE WITH THIS WHOLE POINT OF ENABLING.  YOU MADE IT IN YOUR OPENING BRIEF AND IN YOUR CLOSING.  IT'S RIGHT IN THE SECOND AMENDED COMPLAINT FROM THE SLIDE SHOW.

I DON'T KNOW WHAT YOU'RE TALKING ABOUT ON PAGE 6 OF EXHIBIT 6.  YOU REALLY THREW ME OFF.

SO MAYBE THAT'S A DIVERSION FROM WHAT YOU WANT TO TALK ABOUT.

BUT WHAT EVIDENCE DO I HAVE THAT I CAN CONSIDER NOW THAT NATURAL GAS WAS PART OF THE TESTING IN 2018?  WHERE DO I FIND THAT?

MS. SMILAN:  OKAY.  SO IF YOU LOOK AT THESE STATEMENTS IN THE CONFERENCE CALL FROM NOVEMBER OF 2018, THE COMPANY --

THE COURT:  WHAT EXHIBIT IS THAT?

MS. SMILAN:  -- SPECIFICALLY STATED -- I'M SORRY. LET ME SEE IF I CAN PULL IT UP, YOUR HONOR.

THE COMPANY SPECIFICALLY STATED THAT IT HAD ACHIEVED

IMPROVING YIELD FROM NATURAL GAS, AND THAT'S THE FIRST TIME THEY EVER SAID THAT, THAT THEY SPECIFICALLY IDENTIFIED THE SOURCE, THE FEEDSTOCK FOR THE YIELDS THAT HAD BEEN ACHIEVED.

LET ME TRY TO PULL UP THE DOCUMENTS.

THE COURT:  SO IT'S ALLEGED, THOUGH, THAT YOU SAID THAT, BUT IT WAS FALSE BECAUSE THESE YIELDS WERE FROM PURE METHANE.  THAT'S WHY I GOT THROWN OFF.

MS. SMILAN:  RIGHT.

BUT WHERE ARE THE FACTS THAT SUGGEST THAT THAT NOVEMBER 18TH STATEMENT WAS FALSE?  THEY JUST ALLEGE IT.

THE COURT:  OKAY.

MS. SMILAN:  THE ONLY THING THAT THEY DO IS THAT THEY CLAIM THAT BECAUSE METHANE WAS USED IN THE LAB IN EARLIER TESTING, THAT THAT NECESSARILY PERSISTED.

THEY RELY ON THE SEC'S ORDER, WHICH WE'VE EXPLAINED WHY THE SEC'S ORDER IS NOT JUDICIALLY NOTICEABLE.  IT'S NOT A FINDING OF FACT.  IT DOESN'T SUBSTITUTE OR SATISFY FOR THE PSLRA'S PLEADING REQUIREMENTS.

BUT THE SEC, WHICH DIDN'T CONCLUDE ITS INVESTIGATION UNTIL 2020, ONLY CHALLENGED THE THREE 8-K'S AND THE SLIDESHOWS FOR THE COMPANY THEN IN 2017.

EVEN THE SEC ORDER SAID THE COMPANY HAD BEGUN TESTING WITH GAS, BUT IT HASN'T ACHIEVED THE SAME LEVEL OF YIELDS WITH GAS YET.

THE COURT:  SURE.

MS. SMILAN: ALTHOUGH THEY'RE OPTIMISTIC ABOUT IT. OKAY?

SO OTHER THAN THAT SEC ORDER, THE PLAINTIFFS CAN'T POINT TO ANY FACTS THAT SUGGEST THAT METHANE WAS BEING USED IN TESTING AFTER NOVEMBER OF 2017.

AND WE ARGUE THAT THE FACT THAT THE SEC SAID IT IS NOT JUDICIALLY NOTICEABLE OR SUFFICIENT TO SATISFY THE PSLRA'S STRICT PLEADING REQUIREMENTS.

NOW, AS FAR AS THE ENABLE, YES, I MEAN, IN THE PREAMBLES AND IN THE BEGINNING OF THE COMPLAINT, THE PLAINTIFFS OMIT THAT WORD. THEY MAY HAVE USED IT IN A LATER QUOTE, BUT THE IMPRESSION THAT THE COMPLAINT TRIES TO GET ACROSS IS THAT WE SAID THAT THE COMPANY WAS TESTING WITH NATURAL GAS INSTEAD OF THAT THEY WERE ENABLED, THAT THE MBP PLATFORM ENABLED THE USE OF NATURAL GAS.

THE COURT: OKAY. BECAUSE AT PARAGRAPH 119, I'VE GOT A SCREENSHOT OF THE SLIDE SHOW THAT EXPRESSLY SHOWS THAT THE COMPANY WAS SAYING THAT THE TECHNOLOGY ENABLES THE PROFITABLE USE.

MS. SMILAN: IT ENABLES THE PROFITABLE USE, THAT IS CORRECT.

THE COURT: OKAY. GO AHEAD.

MS. SMILAN: AND THAT'S WHAT THE SLIDESHOW SAYS.

AND THAT WAS THE GOAL OF THE ENTIRE PROCESS WAS FOR THEM TO BE ABLE TO USE NATURAL GAS, WHICH IS SUPER CHEAP, IN ORDER

TO BE ABLE TO HAVE THEIR GENETICALLY ENGINEERED MICROORGANISMS SPIT OUT CARBON BASED COMPOUNDS THAT HAD VALUABLE INDUSTRIAL USAGES.

HOWEVER, AT THE BEGINNING OF THE CLASS PERIOD, IN 2017, THE COMPANY WAS ENGINEERING THE PRODUCTION MECHANISM, THE MOLECULE, THE MICROORGANISM ITSELF.  THAT INVOLVED TAKING THESE BUGS AND GENETICALLY MODIFYING THEIR DNA, TESTING THEM, SEEING WHAT THE YIELDS WERE, AND THEN SAYING, OH, WELL, WE SHOULD MAKE THIS FURTHER MODIFICATION.

IT WAS A VERY ITERATIVE, COMPLICATED PROCESS.  WHEN YOU'RE DOING STUFF AT THE LAB, IT MAKES SENSE TO AVOID CONFOUNDING FACTORS AS MUCH AS POSSIBLE, RIGHT?

SO NATURAL GAS IS APPROXIMATELY 90 PERCENT METHANE, RIGHT? METHANE WAS WHAT THIS METHANOTROPH WAS EATING, CONSUMING, AND THEN EXCRETING THE VALUABLE CHEMICALS.  SO THE METHANE WAS USED IN THE LAB TO CONTROL -- AS A CONTROL, BECAUSE FROM ONE TEST TO ANOTHER, YOU WANTED TO MAKE SURE THAT YOU COULD MEASURE THE IMPROVEMENTS WITHOUT THERE BEING ANY CONFOUNDING FACTORS THAT MIGHT RESULT IN A --

THE COURT:  OKAY.  SO NO ONE IS COMPLAINING THAT YOU USED THE WRONG SCIENTIFIC METHODS.

THE QUESTION IS, WHAT WERE INVESTORS LED TO BELIEVE BASED ON THE ACTUAL TESTING THAT WAS BEING DONE AT THE TIME?

AND THE ALLEGATION IS THEY WERE LED TO BELIEVE THAT THE -- THAT THESE WERE RESULTS FROM NATURAL GAS IN 2013.

MS. SMILAN:  WELL, I MEAN, THAT'S WHAT THE SEC SAID.

THE COURT:  THAT'S WHAT THE COMPLAINT SAYS.  I'M LOOKING AT THE COMPLAINT.

MS. SMILAN:  THAT'S WHAT THE COMPLAINT SAYS.

BUT, YOU KNOW, THERE WAS NO ADMISSION IN THE SEC SETTLEMENT.

THE COURT:  YEAH, BUT I'M JUST LOOKING AT ALLEGATIONS.  I'VE GOT FACTUAL ALLEGATIONS.

MS. SMILAN:  CORRECT.

THE COURT:  I GUESS -- I GUESS --

MS. SMILAN:  BUT THE --

THE COURT:  I GUESS WHAT I'M SAYING IS THAT THIS CASE COULD GO FORWARD ON THE 2017 STATEMENTS AND NOT THE 2018 STATEMENTS.  I MEAN, I'LL GIVE LEAVE TO AMEND, BUT RIGHT NOW, I'M SEEING THAT IT DOES LOOK LIKE THE BASIS FOR THE FALSE STATEMENT BEING THAT IT -- THAT THE TESTING WAS DONE WITH NATURAL GAS -- WITH METHANE, IT'S ACTUALLY NOT, IT'S NOT BORNE OUT BY THE DOCUMENTS I'M LOOKING AT AND THERE'S NO INDICATION.  SO I'M WITH YOU ON THAT.

BUT I'M NOT WITH YOU ON THE 2017.

MS. SMILAN:  RIGHT.  WELL, YOU KNOW, IF A COMPANY -- IF MODERNA IS TRYING TO EXPLAIN HOW ITS TESTS FOR ITS NEW VACCINE ARE SHOWING PROMISE IN THE LAB, RIGHT, AND THEY'RE USING SMALL TESTING IN PETRI DISHES OR LAB BEAKERS OR WHATNOT, AND THEY'RE TRYING TO EXPLAIN TO INVESTORS HOW THE PROCESS

WORKS FOR THE MRNA VACCINE, THEY SHOW A SLIDE SHOW, RIGHT?  AND THAT SLIDE SHOW MIGHT SHOW THE VACCINE INTERACTING WITH THE HUMAN RNA IN A PARTICULAR -- WITH PARTICULAR MECHANISMS.

SO WHAT THE PLAINTIFFS ARE ASKING YOU TO DECIDE IS THAT BECAUSE THEY WERE PRESENTED ALONGSIDE OF SLIDES THAT SHOWED THE PROCESS, THAT INVESTORS UNDERSTOOD THAT IT ALREADY WAS AT THAT POINT, THAT THE --

THE COURT:  SO -- BUT THAT'S -- I DON'T -- WELL, MR. FREDERICKS AND MR. JACOBSON MAY SAY I'M BOTCHING THEIR ALLEGATIONS, BUT WHEN I READ THE MAY 10, 2017 PRESS RELEASE, SLIDE SHOW EARNINGS CALL ALLEGATION AT PARAGRAPH 118 OF THE SECOND AMENDED COMPLAINT, THE HIGHLIGHTED PORTION HERE IS WHAT I'M FOCUSSING ON, "THIS YIELD LEVEL PRODUCES A POSITIVE IN THE MONEY GROSS MARGIN BASED ON CURRENT NATURAL GAS AND PRODUCT PRICES."

IT'S, WE'RE IN THE MONEY NOW.

BUT, IN FACT, AN INVESTOR DOESN'T KNOW THAT THAT'S IN THE MONEY WITH -- I MEAN, THIS IS ALL A HUGE PROJECTION, BUT IT DOESN'T SAY THAT.  IT SAYS WE'RE THERE, WE ARE ALREADY THERE.

THAT'S -- SO THAT'S WHY I DON'T EVEN THINK IT'S FUTURE-LOOKING.  THAT'S THE PROBLEM I HAVE WITH THIS.

MS. SMILAN:  RIGHT.  IF I MAY, YOUR HONOR, JUST TO CLOSE --

THE COURT:  OKAY.

MS. SMILAN:  -- ON THE POINT ABOUT WHAT THE

STATEMENTS SAY ABOUT USING NATURAL GAS.

SO THE TESLA CASE THAT WE POINTED OUT TO THE COURT --

THE COURT:  RIGHT.

MS. SMILAN:  -- SAYS, YOU KNOW, THAT YOU REALLY HAVE TO LOOK AT THE STATEMENT.  IS THAT WHAT IT SAYS?

THE COURT:  CORRECT.

MS. SMILAN:  DOES IT SAY IN THE 2017 SLIDES, WE ACHIEVED THESE YIELDS USING NATURAL GAS?  IT DOESN'T SAY THAT.

AND SO, YOU KNOW, IT DOESN'T MATTER WHAT AN -- I MEAN, FOR PURPOSES OF THE SECURITIES FRAUD, OF THE SECURITIES FRAUD CLAIM, IT'S NOT WHAT SOME INVESTOR MIGHT HAVE IMPLIED.  IT'S NOT WHETHER THEY ASSUMED THAT THIS PRODUCT WAS ALREADY BEING PRODUCED WITH NATURAL GAS AND IN THE MONEY.

IT'S, WHAT DOES IT ACTUALLY SAY?

THE COURT:  SO IT SAYS THAT YOU HAVE -- IT SAYS THAT THE MBP "HAS ACHIEVED" -- SO THAT'S A STATEMENT OF FACT --

MS. SMILAN:  HAS ACHIEVED YIELDS.

THE COURT:  -- "YIELDS NECESSARY FOR SITE SELECTION" --

MS. SMILAN:  RIGHT.

THE COURT:  -- FROM THE TWO MOLECULES.  "THIS YIELD," MEANING THE SAME YIELD YOU'VE ACHIEVED, "PRODUCES A POSITIVE 'IN THE MONEY' GROSS MARGIN."

MS. SMILAN:  RIGHT.  SO THE PLAINTIFFS' COMPLAINT IS THAT IF YOU USE THE PRICE OF METHANE, THAT THAT COULDN'T BE SO,

RIGHT, BECAUSE METHANE WAS TOO EXPENSIVE, AND SO FROM THAT, THAT WOULD IMPLY THAT IT WAS BASED ON NATURAL GAS.

NOW, THAT'S A LOT OF ASSUMPTIONS THAT WERE READ INTO THIS PROJECTION.  THIS PROJECTION WAS MADE TO DETERMINE WHETHER OR NOT THE 2,3 BDO WAS GOING TO BE COMMERCIALLY VIABLE.

THE COURT:  I DON'T SEE THIS AS A PROJECTION.  I GUESS THAT'S WHERE YOU AND I DEPART.  I SEE THIS AS A STATEMENT OF CURRENT FACT.

MS. SMILAN:  HOW COULD IT BE?  WITH ALL DUE RESPECT, YOUR HONOR.

THE COURT:  I'M JUST READING IT.

MS. SMILAN:  RIGHT.  THIS WAS A COMPANY THAT WAS TESTING A MICROBE IN THE LAB.

THE COURT:  SEE, NOW YOU WANT THE INVESTOR TO START ASSUMING THINGS THAT TESLA WOULDN'T ALLOW BY ASSUMING THAT THEY KNOW -- THAT THEY'VE PUT ON THE WHITE COAT AND THE PROTECTIVE GEAR AND HAVE GONE INTO THE LAB.

MS. SMILAN:  WELL, IT WAS -- IT WAS THAT IT WAS AT THE STAGE THAT IT WAS BEING TESTED IN A LAB.

WHAT THE PROJECTIONS WERE WHEN THE COMPANY SAID IT WAS ON TRACK --

THE COURT:  WHERE IS THE WORD "ON TRACK"?  I'M SORRY.

MS. SMILAN:  IT'S ACTUALLY --

THE COURT:  DID I MISS THAT?

MS. SMILAN:  YEAH, IT'S ACTUALLY IN ONE OF THE

COMPANY'S STATEMENTS AT PARAGRAPH 153 AND PARAGRAPH 158 OF THE COMPLAINT WHERE THE COMPANY USED THE WORD "ON TRACK," THAT SITE SELECTION IS ON TRACK BECAUSE THE COMPANY HAD MET 50 PERCENT OF ITS TARGET FOR THE PLANT USING NATURAL GAS.  AND 158, WHICH IS FEBRUARY 2019.

SO THAT'S THE -- LET ME BACK UP.

PARAGRAPH 153 IS THE NOVEMBER '18 STATEMENT, THE FIRST TIME THAT THE COMPANY ANNOUNCED THAT IT HAD ACHIEVED YIELDS WITH NATURAL GAS.  IT HAD BEEN TESTING WITH NATURAL GAS BEFORE THEN, IT JUST HADN'T COME CLOSE TO THOSE YIELDS.

THE COURT:  OKAY.

MS. SMILAN:  PARAGRAPH 158 ALSO SAYS ON TRACK FOR THE PLANT.

AND IF YOU LOOK AT THE STATEMENTS IN PARAGRAPH 142, ON MAY 10TH --

THE COURT:  I'M NOT -- I'M SORRY TO BE SO BASIC.

MS. SMILAN:  OH, NO.

THE COURT:  I DON'T SEE THE WORDS "ON TRACK" IN THOSE PARAGRAPHS.  I DON'T SEE THAT THOSE WORDS WERE USED.  AND, OF COURSE, THOSE -- I'M MISSING SOMETHING.

I'M LOOKING AT THE SECOND AMENDED COMPLAINT.  I DON'T SEE THAT BEING ALLEGED IN THE COMPLAINT.  I DON'T SEE THE PLAINTIFFS ALLEGING THE "ON TRACK" LANGUAGE -- THAT "ON TRACK" LANGUAGE WAS A FALSE STATEMENT.

SO I'M SORRY, I'M JUST NOT FOLLOWING.

MR. FREDERICKS:  YOUR HONOR, I BELIEVE THAT "ON TRACK" DOES APPEAR AT THE VERY TOP OF PAGE 50 OF THE COMPLAINT.

BUT I AGREE, I DO NOT SEE IT ANYWHERE IN PARAGRAPH 158.

THE COURT:  OKAY, IS ON TRACK FOR YEAR-END.

WERE YOU -- YOU WEREN'T CONTESTING THAT AS A FALSE STATEMENT, THOUGH, WERE YOU?  SITE SELECTION IS NOT WHAT YOU'RE ARGUING IS A FALSE STATEMENT, IS IT?

MR. FREDERICKS:  THAT IS CORRECT, YOUR HONOR.

MS. SMILAN:  OKAY.  WELL, I'LL MOVE ON.

THE --

THE COURT:  THANK YOU.

MS. SMILAN:  THE IN THE MONEY PROJECTIONS, THOUGH, HAD TO HAVE BEEN, HAD TO HAVE BEEN A FORWARD-LOOKING STATEMENT BECAUSE IN MOST CASES, YOUR HONOR, WHEN THE PLAINTIFFS ALLEGE THAT THE MARKET HAD AN UNDERSTANDING THAT THAT MEANT THAT IT WAS CURRENTLY IN THE MONEY, THEY WOULD BE ABLE TO -- IN OTHER WORDS, THAT IT WAS BEING SOLD, THAT IT WAS PROFITABLE, THAT THE QUANTITIES AND THE METHODS OF PRODUCTION WERE AT THAT POINT IN TIME SUFFICIENT TO CREATE POSITIVE GROSS MARGINS, THEY WOULD BE ABLE TO POINT TO SOME ANALYST REPORT, SOME NEWSPAPER REPORT, OR SOME SUBSEQUENT STATEMENT BY MARKET OBSERVERS THAT SUGGESTED AFTER THE FACT AT LEAST, OH, WE'RE VERY SURPRISED, WE HAD BEEN UNDER THE IMPRESSION ALL ALONG THAT THIS WAS A PRODUCT THAT WAS ALREADY PROFITABLE, THAT WAS ALREADY BEING MANUFACTURED USING NATURAL GAS AS A FEEDSTOCK, AND THAT THE COMPANY WAS ON THE

BRINK OF COMMERCIALIZATION.

THERE'S NOTHING LIKE THAT WHATSOEVER IN THE COMPLAINT.

THE COURT:  OKAY.  WHY DON'T YOU GO AHEAD?

MS. SMILAN:  OKAY, FINE.

THE COURT:  THANK YOU.

MS. SMILAN:  IN ANY EVENT, ALL OF THESE STATEMENTS, WHICH WE BELIEVE ARE PROJECTIONS, YOU KNOW, WERE ACCOMPANIED BY ALL SORTS OF CAUTIONARY LANGUAGE, RIGHT?  THE COMPANY SAID THE MBP PROGRAM IS IN ITS EARLY STAGES OF DEVELOPMENT, WE MAY NOT BE ABLE TO DEVELOP AND COMMERCIALIZE OUR TECHNOLOGIES, THE PRODUCTS -- THE TECHNOLOGIES MIGHT NOT PERFORM AS EXPECTED WHEN APPLIED AT COMMERCIAL SCALE, THERE'S ALL THESE SCALING ISSUES, WE STILL NEED YIELD IMPROVEMENTS, AND WE MAY NEVER ACHIEVE OR MAINTAIN PROFITABILITY.

THE COURT:  UM-HUM.

MS. SMILAN:  PLAINTIFFS READ ALL OF THAT CAUTION OUT, RIGHT?  AND, YOU KNOW, IN THE DXE CASE, THIS COURT SAID YOU DON'T HAVE TO WARN ABOUT THE SPECIFIC ISSUE AS LONG AS YOU WARN ABOUT WHAT THE EVENTUALITIES ARE THAT MAY NOT COME TO PASS THAT MIGHT PREVENT THE FORWARD-LOOKING STATEMENT FROM COMING TRUE.

TESLA SAYS THE SAME THING.

AND WE ALSO CITED SEVERAL CASES INVOLVING DEVELOPMENT PROCESSES NOT UNLIKE THE ONES THAT THE MBP PROGRAM WAS INVOLVED IN, AQUA METALS AND AMYRIS, WHICH ACTUALLY WAS A BIOCONVERSION PROJECT.

ALTERNATIVELY, PRECIGEN BELIEVES THAT THESE YIELDS SUGGESTED THAT PRODUCTS WOULD BE IN THE MONEY USING NATURAL GAS PRICES, WHICH IS WHAT THEY SAID, AND LATER THAT THE IMPROVED YIELDS JUSTIFIED SITE SELECTION ARE OPINIONS, RIGHT?

SO IT'S WELL SETTLED THAT INTERPRETATIONS OF RESULTS OF SCIENTIFIC EXPERIMENTS AND WHAT THE IMPLICATIONS OF THOSE SCIENTIFIC STUDIES ARE ARE OPINIONS.  BECAUSE REASONABLE PERSONS CAN DISAGREE ABOUT HOW YOU ANALYZE THE DATA, HOW YOU INTERPRET THE RESULTS, WHAT YOU EXTRAPOLATE FROM THOSE RESULTS, AND NEITHER OF THEM LEND THEMSELVES TO OBJECTIVE CONCLUSIONS.

AS THE NINTH CIRCUIT RECENTLY SAID IN TESLA, PURE STATEMENTS OF OPINIONS ARE GENERALLY NOT ACTIONABLE.

AND LIABILITY ISN'T ESTABLISHED BY DEMONSTRATING THAT THERE'S SOME FACT CUTTING THE OTHER WAY BECAUSE, AS OMNICARE AND ALIGN TEACH, THAT'S OFTEN THE CASE, WHICH IS WHY THE STATEMENT IS OFFERED AS AN OPINION, ESPECIALLY GIVEN THE CONTEXT, RIGHT, WHICH OMNICARE AND ALIGN BOTH SAY NEED TO BE CONSIDERED.

AND AGAIN, I POINT TO ALL OF THE CAUTIONARY LANGUAGE THAT THE COMPANY PUT OUT EVERY TIME IT SPOKE.  WE MIGHT NOT EVER ACHIEVE PROFITABILITY, WE MIGHT NOT BE ABLE TO COMMERCIALIZE, WE MIGHT ENCOUNTER ANY NUMBER OF PROBLEMS WHEN WE TRY TO SCALE THIS UP TO THE POINT OF EVEN SMALL SCALE COMMERCIAL PRODUCTION.

THE COURT:  UM-HUM.

MS. SMILAN:  AND THE C.W.'S OPINIONS ABOUT ALL THESE

DIFFERENT LITTLE CHALLENGES AND PROBLEMS ARE NOT FACT, RIGHT? SO THEY'RE NOT EVEN FACTS THAT CUT THE OTHER WAY.  THEY'RE DIFFERENCES OF OPINION.

AND ONE THING THAT'S REALLY NOTABLE HERE IS THAT NOT ONE OF THESE C.W.'S -- AND I SHARE THE COURT'S, OBVIOUSLY, SKEPTICISM ABOUT THEIR RELIABILITY GIVEN THEIR POSITIONS AND THE VAGUENESS OF THEIR ALLEGATIONS -- NOT ONE OF THEM SAYS THAT ANY ONE OF THESE CHALLENGES WERE NOT AND COULD NOT BE OVERCOME.

AND THAT INCLUDES TESTING WITH NATURAL GAS AND ACHIEVING YIELDS WITH NATURAL GAS THAT ACTUALLY SUPPORTED THE COMPANY'S PLAN TO MOVE TO A SMALL SCALE COMMERCIAL FACILITY.

THE COURT:  DID THEY MOVE -- I MEAN, DO I HAVE ANY FACTS SHOWING THAT THEY EITHER DID OR DID NOT MOVE TO THE FACILITY?

MS. SMILAN:  THEY DID NOT BECAUSE -- SO THE COMPANY, IN NOVEMBER OF 2018, YOU KNOW, TALKED ABOUT THAT THEY WERE -- BASED ON THEIR NATURAL GAS RESULTS, THEY WERE STARTING TO DO SITE SELECTION AND WERE READY FOR GROUND BREAKING.

IN FACT, THEY SAID THAT EARLIER, TOO.  THEY WERE ENTHUSIASTIC AND OPTIMISTIC ABOUT THEIR PROJECTIONS, WHICH, YOU KNOW, THEY WEREN'T MAKING THESE PROJECTIONS TO FOOL ANYONE. THEY WERE MAKING THESE PROJECTIONS ON THE BASIS OF TRYING TO DECIDE WHETHER OR NOT TO MAKE A SIGNIFICANT INVESTMENT AND CONTINUE TESTING AND RAMPING UP AND BUILDING A PLANT.

AS THE COMPLAINT MAKES CLEAR, AND AS WE'VE SHOWN, THE

REASON THAT NONE OF THAT HAPPENED WAS THAT THE COMPANY -- WHICH HAD VERY MANY DIFFERENT VENTURES, ALL OF WHICH WERE TRYING ALL THESE NEW BIOTECH PROJECTS -- RAN OUT OF MONEY.  THERE WERE GOING CONCERNS, WARNINGS, BEGINNING IN 2018, AND ULTIMATELY THE COMPANY HAD TO DIVEST ALMOST ALL OF ITS NON-HEALTH CARE CORE INITIATIVES.

THE NINTH CIRCUIT'S RECENT DECISION IN TWITTER IS ALSO HELPFUL HERE BECAUSE WHETHER YOU'RE MAKING A PROJECTION, STATING AN OPINION, OR REPORTING ON MILESTONES AND PROGRESS, THERE'S NOT AN OBLIGATION TO OFFER AN INSTANTANEOUS UPDATE OF EVERY INTERNAL DEVELOPMENT, ESPECIALLY WHEN IT INVOLVES THE OFT TORTUOUS PATH OF THE SETTLEMENT.  AND THAT'S THE TWITTER CASE, WHICH IS ALSO CONSISTENT WITH MATRIXX AND THIS COURT'S DECISION IN ORACLE, RIGHT?

THE COURT:  YES, UM-HUM.

MS. SMILAN:  SO WE DIDN'T HAVE A DUTY TO DISCLOSE ALL THESE DETAILS ABOUT, YOU KNOW, WE'RE USING METHANE IN THE LAB, OR THAT ETHANE CAN BE INHIBITORY, ESPECIALLY SINCE WE KNEW THAT THERE WAS A SOLUTION TO THAT, WHICH THE COMPANY LATER PERFECTED.  RIGHT?

AND THE FACT THAT THE C.W. SAYS, AND I'LL TOUCH ON THIS, THAT, YOU KNOW, WE CHERRY PICKED FROM DIFFERENT EXPERIMENTS AND THAT WE WOULDN'T BE ABLE TO TRANSLATE OUR PEAK YIELDS FROM THE CHERRY PICKED EXPERIMENTS TO A STABLE AND RELIABLE PRODUCTION PROCESS, WELL, THAT WAS REJECTED IN THE AMYRIS CASE, WHICH IS

ANOTHER BIOCONVERSION CASE.

NONE OF THAT HAD TO BE DISCLOSED.  NOT MEETING INTERNAL GUIDELINES, WHICH WERE NEVER SHARED WITH INVESTORS, DOESN'T HAVE TO BE DISCLOSED.  SO TESLA, TWITTER, AMYRIS, THIS COURT'S DECISION IN ORACLE ALL SUGGEST THAT NONE OF THAT INFORMATION NEEDED TO BE DISCLOSED.

THE ONLY TIME, TWITTER SAYS, WHICH IS FAMILIAR FROM MATRIXX, THAT A COMPANY HAS TO DISCLOSE THOSE KIND OF INTERNAL DETAILS ABOUT DEVELOPMENT IS IF IT MADE -- IF THAT WOULD MAKE AN AFFIRMATIVE STATEMENT MISLEADING, WHICH BRINGS US BACK TO PLAINTIFFS' ALLEGATIONS THAT WE SAID THAT WE USED NATURAL GAS, NOT PURE METHANE, WHICH IS NOT TRUE.

THE COURT:  OKAY.

MS. SMILAN:  AND, YOU KNOW, THE COURT HAS LOOKED AT THE 2017 8-K'S, THE PLAINTIFFS RELY ON THE SEC ORDER, WHICH THEY CAN'T DO.

BUT PER TESLA, WHERE DOES IT SAY THAT?  WHERE DOES IT SAY THAT THOSE YIELDS WERE PRODUCED WITH NATURAL GAS AS OPPOSED TO THE FACT THAT THE MODEL WAS DESIGNED TO ENABLE THE USE OF NATURAL GAS?

SO EVEN BEFORE TESLA, RIGHT, IN ORACLE, IN THE 2019 DECISION, THE COURT SAID, YOU KNOW, THE FACT THAT CUSTOMERS WOULD HAVE EXPECTED NEW PRODUCTS TO LINK UP WITH OLD ONES WHEN THE COMPANY NEVER MADE THAT REPRESENTATION, THAT DIDN'T GIVE RISE TO A DUTY TO DISCLOSE THAT THEY WEREN'T CONNECTED.

IN NEKTAR, YOU KNOW, THERE WAS A PATIENT THAT SO SKEWED THE RESULTS AS TO MAKE THEM, ACCORDING TO SCIENTIFIC EXPERTS THAT WERE CITED IN THE COMPLAINT, UNRELIABLE.  THEY WOULD HAVE ASSUMED THEY WERE EXCLUDED, AND THE COURT SAID, NO, THEY NEVER SAID THAT.

AND EVERY SINGLE ONE OF THE PROCESS WAS, WE NEED TO BE OPERATING.  IF WE'RE MANUFACTURING LEAD IN AQUA METALS, EVEN THOUGH THE COMPANY DIDN'T STATE THAT, YEAH, THE PROCESS IS WORKING, BUT YOU'RE PRODUCING UNSALABLE LEAD IN TINY QUANTITIES AND THE LEAD YOU ARE SELLING WASN'T MADE BY YOUR PROCESS, THAT'S NOT ACTIONABLE.

SO YOU REALLY NEED TO -- YOU KNOW, I MEAN, THE -- TESLA AND THESE CASES ARE REALLY SAYING THAT THE PLAINTIFFS NEED TO FOCUS ON WHAT WAS ACTUALLY SAID AND ARE NOT, FOR PURPOSES OF A 10(B)(5) CASE, ALLOWED TO PROCEED ON THE BASIS OF WHAT INVESTORS MIGHT HAVE IMPLIED.

THE COURT:  SURE.  OKAY.  AND, I MEAN, TESLA IS CLEARLY AN IMPORTANT CASE HERE.  I DON'T DISAGREE.

CAN I JUST COMMENT THAT I'M NOT INCLINED TO GO DOWN THE ROAD WITH YOU ON LOST CAUSATION.

MS. SMILAN:  OKAY.

THE COURT:  IT WAS BOLD OF YOU TO RAISE THAT ISSUE AT THE MOTION TO DISMISS, AND I THINK YOU'VE HELPED ME TO UNDERSTAND WHERE THE PROBLEMS MIGHT LIE.

BUT I THINK A REASONABLE -- AT THE -- EVEN UNDER THE

PSLRA, A REASONABLE INFERENCE CAN BE DRAWN THAT THIS PROJECT WAS DRAGGING THEM DOWN AND THE -- THE SECOND AMENDED COMPLAINT CLEARLY RELATES THE STOCK DROPS TO THESE PARTICULAR ANNOUNCEMENTS.

SO I WASN'T -- I WASN'T INCLINED TO DISMISS ON THAT BASIS.

MS. SMILAN:  OKAY.  I WOULD ONLY POINT OUT, YOUR HONOR, JUST BRIEFLY, THAT THE FACT THAT THE COMPANY ANNOUNCED, FOR EXAMPLE, THAT THE SEC HAD BEGUN AN INVESTIGATION OR THAT THEY HAD ENTERED INTO A SETTLEMENT, WHICH THE PLAINTIFFS DON'T EVEN ALLEGE THAT THAT'S CORRECT BECAUSE THE STOCK PRICE WENT UP, BUT THAT WAS IN THE CONTEXT OF A 10-K, WHICH IS HUNDREDS OF PAGES WHERE THE COMPANY IS BASICALLY SAYING WE HAVE A $1.7 BILLION DEFICIT.

THE COURT:  YEAH, I KNOW.

MS. SMILAN:  SO I HEAR YOU.

THE COURT:  POINT TAKEN ON HOW HARD LOST CAUSATION MAY BE, BUT I'M NOT INCLINED TO DISMISS ON THAT.

OKAY.  I'M GOING TO LET YOU RESERVE A FEW MINUTES AT THE END, BECAUSE I KNOW YOU'LL WANT TO RESPOND TO THE PLAINTIFFS.

BUT MR. JACOBSON, MR. FREDERICKS, WHO'S GOING TO BE ARGUING?

MR. FREDERICKS:  YOUR HONOR, IT'S MR. FREDERICKS, AND I'LL BE TAKING THE LEAD HERE.

THE COURT:  GOOD.

MR. FREDERICKS:  I APPRECIATE THE COURT'S COMMENTS AT

THE BEGINNING, AND LET ME TRY TO JUST REITERATE THOSE POINTS WHERE I THINK WE'RE IN PRELIMINARY AGREEMENT WITH THE COURT'S VIEWS.

THE COURT:  OKAY.

MR. FREDERICKS:  CERTAINLY WITH RESPECT TO THE TESLA CASE, I THINK YOUR HONOR HIT IT RIGHT ON THE HEAD.  THIS IS NOT A PROJECTIONS CASE.

THIS IS A CASE WHERE PEOPLE, WHERE THE DEFENDANTS ARE REPORTING ON RESULTS THAT THEY ARE REPRESENTING TO THE INVESTING COMMUNITY THEY HAVE ACHIEVED.

AND, YOU KNOW, CAUTIONARY LANGUAGE BESPEAKS CAUTION, AND FORWARD-LOOKING STATEMENTS ACT AS A SAFE HARBOR, THAT ONLY COMES INTO PLAY IF YOU'RE TALKING ABOUT A FORWARD-LOOKING STATEMENT, BECAUSE AS YOUR HONOR KNOWS, YOU CAN'T WARN PEOPLE THAT SOMETHING BAD MIGHT HAPPEN WHEN IT'S ALREADY HAPPENED OR WHEN YOU'RE MISREPRESENTING AN ACTUAL STATEMENT, OR ACTUAL CONDITIONS.

SO I WON'T BELABOR THAT POINT FURTHER.

I DO WANT TO START BY ADDRESSES ONE POINT JUST SO I DON'T FORGET IT, BECAUSE I DON'T THINK WE DEALT WITH IT FULLY IN THE BRIEFS.  THIS IS THE WHOLE ISSUE OF DEFENDANT SAYING THAT AT LEAST AS TO THE SEC ORDER, THERE WAS ADEQUATE RISK DISCLOSURE.

AS YOUR HONOR KNOWS, WE ALLEGE THAT IT WAS FALSE AND MISLEADING FOR THEM TO MERELY WARN OF A POSSIBLE INVESTIGATION WHEN, IN FACT, THERE WAS ALREADY ONE THERE.

I'D JUST LIKE YOUR HONOR TO MAKE A NOTE, OR FOR YOUR CLERK TO MAKE A NOTE OF YOUR HONOR'S DECISION IN THE VEAL V. LENDINGCLUB CORP. CASE, WHICH IS CITED IN THE BRIEFS, THOUGH NOT FOR THIS POINT, WHERE YOUR HONOR BASICALLY DISTINGUISHING LENDINGCLUB WHERE THEY ACTUALLY DISCLOSED AN INVESTIGATION, AND YOUR HONOR DISTINGUISHED THAT FROM THE BIOSCRIPT CASE WHERE THEY USED ALMOST EXACTLY THE SAME LANGUAGE HERE, IDENTICAL FACT PATTERN, WHERE THEY SAY, WELL, FROM TIME TO TIME, WE'RE SUBJECT TO AN INVESTIGATION.  THAT'S THE LANGUAGE THAT DEFENDANTS HANG THEIR HAT ON IN THEIR REPLY.

AND YOUR HONOR BASICALLY SAID, NO, THAT'S A COMPLETELY DIFFERENT CASE AND THAT WOULD BE ACTIONABLE, OR IMPLIED THAT WOULD BE ACTIONABLE.

SO I JUST WANT TO MENTION THAT BECAUSE IT WASN'T REALLY IN THE BRIEFS.

BUT THE BIG PICTURE HERE, YOUR HONOR, IS DEFENDANTS WANT TO REWRITE THE COMPLAINT, WANT TO REWRITE THE ALLEGATIONS, AND REALLY WANT TO REWRITE HISTORY BY SAYING, INVESTORS WERE TOLD WE HAD THIS TECHNOLOGY, IT WAS PROMISING, AND, YOU KNOW, IT LOOKS LIKE ONE DAY WE'LL HAVE SOMETHING WHERE WE CAN MAKE MONEY.

THAT IS DIAMETRICALLY THE OPPOSITE OF WHAT THEY WERE SAYING.  THEY WERE SAYING, WE'VE MET THESE LEVELS.  IN FACT, YOU KNOW, KIRK WENT OUT OF HIS WAY IN MAY AND IN OTHER STATEMENTS IN 2017 AND 2018 TO SAY, NOW THAT WE'VE MADE THIS

BREAKTHROUGH, WE'RE HIRING INVESTMENT BANKS TO SEE WHAT WE CAN DO WITH ALL OUR OPTIONS.

YOU ARE HIRE INVESTMENT BANKS, YOU TALK ABOUT SITE SELECTION WHEN YOU HAVE GOTTEN A PROVEN COMMERCIALLY VIABLE TECHNOLOGY.  YOU DON'T GO HIRE MORGAN STANLEY TO HELP YOU, YOU KNOW, DO SOME MORE RESEARCH IN THE LAB.  THAT'S WHEN, YOU KNOW, A BIG MOMENT, IT'S LIKE DEFENDANT LAST SAID, IT'S A VERY BREAKTHROUGH MOMENT.  KIRK HIMSELF DESCRIBES THIS AS PERHAPS THE BIGGEST BREAKTHROUGH IN THE HISTORY OF BIOTECHNOLOGY.

THE COURT:  WELL, I DON'T THINK HE WAS SAYING THAT HIS OWN RESULTS WERE THE BIGGEST BREAKTHROUGH.  I THINK HE WAS TALKING ABOUT THE MARKET BEING THE BIGGEST -- I THINK YOU TAKE HIS COMMENT TOO FAR, FRANKLY.

MR. FREDERICKS:  WELL, I -- WITH ALL DUE RESPECT, IF YOU'D LOOK AT WHAT HE ACTUALLY SAID, HE THOUGHT THAT THIS WAS, LIKE, THE GREATEST THING SINCE SLICED BREAD IN THIS ENTIRE INDUSTRY.

BUT IN ANY EVENT --

THE COURT:  SO THAT WOULD BE THE OVER EXUBERANCE OF A CEO THAT THE NINTH CIRCUIT HAS MADE CLEAR IS NOT ACTIONABLE, AND, YEAH, I MEAN, HE'S THE BIGGEST CHEERLEADER FOR THE COMPANY.  THAT'S WHAT HE GETS PAID FOR.

MR. FREDERICKS:  POINT TAKEN, YOUR HONOR.

BUT THE CONTEXT OF ALL THESE COMMENTS, BREAKTHROUGH, SITE SELECTION, WE'RE GETTING READY TO BRING IN THE BIG TIME

INVESTMENT BANKERS, ALL OF THAT IS IN THE CONTEXT OF THESE STATEMENTS ABOUT WE'RE IN THE MONEY, WE'RE COMMERCIALLY VIABLE, AND OUR TEST RESULTS JUSTIFY IT.

AND I'M REALLY SURPRISED TO STILL HEAR DEFENDANTS KIND OF ARGUE, WELL, METHANE, PURE METHANE, NATURAL GAS, IT'S ALL SORT OF THE SAME.

YOU KNOW, IT'S NOT THE SAME.  ONE COSTS 3 BUCKS A UNIT, ONE COSTS 650 BUCKS A UNIT.

AND, YOU KNOW, TO PERHAPS USE A CRUDE ANALOGY TO TESLA, IF ELON MUSK HAD ROLLED OFF A COUPLE OF PRODUCTION LINE CARS AND THEY WERE ACTUALLY JUST, YOU KNOW, CONVENTIONAL, YOU KNOW, FUEL BURNING CARS, I THINK EVERYONE WOULD HAVE SAID, WHAT?  WHAT? THE WHOLE POINT OF TESLA IS YOU'RE MAKING ELECTRIC CARS AND NOW YOU'RE JUST ROLLING OUT ANOTHER INTERNAL COMBUSTION ENGINE CAR? YOU KNOW, THAT'S NOT DOING IT.

AND THE SAME THING HERE.

THE COURT:  SO I THINK, MR. FREDERICKS, THOUGH, WHERE I'M DRILLING DOWN ON THE SECOND AMENDED COMPLAINT IS THAT I THINK IT'S WORTH HAVING YOU GO BACK THROUGH THE 2017 ALLEGATIONS AND ALLEGE SCIENTER.

I NEED YOU TO RELATE THEM TO THE SPECIFIC DEFENDANTS.  YOU KIND OF LUMP THEM ALL TOGETHER, AND I ONLY GLEANED CERTAIN NAMES, BUT YOU'VE BROUGHT THIS 10(B)(5) AGAINST ALL OF THEM WITHOUT DISTINCTION AMONG THE DIFFERENT FALSE STATEMENTS.

I NEED YOU TO DO THAT SO THAT I CAN REALLY ANALYZE IT.

THE 2018 STATEMENTS THAT YOU ALLEGE, I'M LESS SURE THOSE ARE GOING TO FLY BECAUSE I DON'T -- I AGREE WITH MS. SMILAN THAT I DON'T ACTUALLY SEE FACTUAL ALLEGATIONS THAT SHOW THAT THESE -- THAT THE 2018 STATEMENTS WERE FALSELY, FALSELY IMPLYING THAT THEY -- THAT THE TESTING WAS DONE WITH NATURAL GAS WHEN, IN FACT, IT WAS DONE WITH PURE METHANE.

I MEAN, THE STATEMENTS THEMSELVES SAY THAT IT WAS NATURAL GAS RESULTS.

SO I NEED YOU TO -- THOSE I DON'T EVEN KNOW THAT YOU'LL GET -- I'M GOING TO LET YOU TRY TO BEEF THAT UP SO THAT YOU CAN GET THROUGH THE GATE ON THEM EVEN BEING PROPERLY ALLEGED FALSE STATEMENTS.

BUT LET'S TURN TO THE SCIENTER ISSUE, BECAUSE I REALLY THINK YOU HAVE A BIG ROADBLOCK THERE.

MR. FREDERICKS:  WELL, LET'S START WITH WALSH AND MOVE OUT FROM WALSH.

THE COURT:  OKAY.

MR. FREDERICKS:  WALSH IS THE GUY WHO'S HEADING THIS BUSINESS.  YOU KNOW, FOR HIM, THERE'S NO DISPUTE WHETHER MBP IS CORE OPERATIONS OR NOT.  THAT'S WHAT HE'S DOING.  HE IS THE SENIOR EXECUTIVE IN CHARGE OF THIS.

THE COURT:  YEAH.

MR. FREDERICKS:  WE HAD ALLEGATIONS FROM OUR C.W.S THAT HE REGULARLY ATTENDS DIVISIONAL MEETINGS.  HIS DEPUTY ATTENDS MEETINGS EVEN MORE FREQUENTLY.  I THINK THERE'S A

REASONABLE INFERENCE THAT ANYTHING MATERIAL THAT'S SAID AT THE MORE JUNIOR LEVEL MEETINGS GETS KICKED UP BY HIS DEPUTY TO THE BOSS PRETTY QUICKLY.

THE COURT:  SO THE PROBLEM WITH WALSH THERE WAS THAT I DIDN'T KNOW WHICH FALSE STATEMENTS, BECAUSE THERE ARE -- YOU KNOW, I COULDN'T GLEAN HIS NAME FROM THE LISTED, THE TEN LISTED FALSE STATEMENTS.  SO THAT'S WHERE THE COMPLAINT IS DEFICIENT.

MR. FREDERICKS:  YOUR HONOR, IF IT WOULD BE HELPFUL TO THE COURT, WE COULD PROBABLY SUBMIT A CHART WHICH --

THE COURT:  SO I -- YES, AND I NORMALLY -- SO I ALWAYS ASK FOR THAT CHART.  I THOUGHT IT WAS IN MY STANDING ORDERS, AND IT'S NOT, SO SHAME ON ME.

THE CHART IS -- YOU'VE DONE IT IN MANY CASES, I'M SURE, SO YOU KNOW EXACTLY, I NEED THE CLAIM, I NEED THE PERSON, I NEED THE DATE, I NEED WHICH C.W., I NEED TO KNOW WHAT THE SCIENTER IS.  SO IT'S -- IT'S INVALUABLE TO ME, AND I THINK IT REALLY HELPS YOU TO PERSUADE ME THAT YOUR CLAIM MEETS ALL THE REQUIREMENTS.

SO I DON'T NEED YOU TO DO IT THIS TIME BECAUSE I'M GOING TO LET YOU AMEND, SO I'M GOING TO GIVE YOU A RELATIVELY HIGH LEVEL ORDER BECAUSE I DON'T NEED TO DRILL DOWN.  YOU ALL ARE EXPERTS IN SECURITIES LAW.  I'M NOT GOING TO TEACH YOU ANYTHING.

MR. FREDERICKS:  YOUR HONOR, LET ME TRY TO ADDRESS YOUR CONCERNS AT A LITTLE BIT HIGHER LEVEL.

THE COURT:  OKAY.

MR. FREDERICKS:  WE CAN CERTAINLY TELL YOU WHICH CONFERENCE CALLS WALSH WAS AT VERSUS OTHERS.  AGAIN, LET'S JUST START WITH WALSH.

THE COURT:  WELL, HE HAS TO HAVE ACTUALLY UTTERED THE WORDS, BUT, YOU KNOW --

MR. FREDERICKS:  WELL, AS -- YOU KNOW, THE DEFENDANTS CITE THE JANUS CASE, BUT JANUS ALSO MAKES CLEAR, IF YOU'RE ULTIMATELY RESPONSIBLE FOR THE CONTENT OF THE STATEMENT, THE FACT THAT YOU --

THE COURT:  YOU HAVE TO ALLEGE THOSE FACTS.

MR. FREDERICKS:  I'M SORRY?

THE COURT:  YOU HAVE TO ALLEGE THOSE FACTS, WHICH I'LL LET YOU DO.

BUT YOU DON'T ALLEGE THAT HE WAS -- I MEAN, ULTIMATELY RESPONSIBLE FOR WHAT GOES ON IN THE LAB, I DON'T THINK THERE'S AN AFFIRMATIVE DUTY TO TACKLE YOUR CEO WHEN HE'S MAKING A BLUNDER.  I MEAN, IT WOULD BE LIKE THE SECRETARY OF STATE TACKLING THE PRESIDENT WHEN HE SAYS SOMETHING OFF SCRIPT.  YOU KNOW, IT'S JUST NOT REQUIRED.

MR. FREDERICKS:  YOUR HONOR, ON THAT POINT, IF I CAN CITE YOU A FIFTH CIRCUIT DECISION --

THE COURT:  SURE.

MR. FREDERICKS:  -- WHICH IS -- IT'S THE BARRIE CASE, B-A-R-R-I-E, AND IT'S FIFTH CIRCUIT, 2005, AND IT'S

409 F.3D 653, AND THE -- YOU KNOW, THE ISSUE COMES UP THERE, WELL, WHAT HAPPENS IF YOU HAVE PEOPLE IN A ROOM WHERE SOMEONE'S LYING OR MAKING A FALSE STATEMENT AND YOU'RE THERE.

AND THE FIFTH CIRCUIT SAYS, AND THIS IS AT PAGE 656, "MOREOVER, COURTS HAVE REPEATEDLY HELD THAT A HIGH RANKING COMPANY OFFICIAL CANNOT SIT QUIETLY AT A CONFERENCE WITH ANALYSTS KNOWING THAT ANOTHER OFFICIAL IS MAKING FALSE STATEMENTS AND HOPE TO ESCAPE LIABILITY FOR THOSE STATEMENTS."

AND IT GOES ON TO SAY THAT'S PARTICULARLY SO WHEN YOU'RE MISREPRESENTING THINGS WHERE THE SILENT PERSON IS PARTICULARLY IN CHARGE OF THE FACTS UNDER, UNDERMINING AND DISCREDITING THE TRUTH.

THE COURT:  THAT'S RIGHT ON POINT.

MR. FREDERICKS:  SO WE DON'T -- SO AS A THRESHOLD MATTER, YEAH, IF YOU'RE THE PRESIDENT OR THE SECRETARY AND THE PRESIDENT -- WELL, IT'S -- THE SECURITIES LAWS DON'T APPLY TO THE PRESIDENT.

THE COURT:  NO, THEY DON'T.

MR. FREDERICKS:  BUT IN THE BUSINESS CONTEXT --

THE COURT:  OKAY.

MR. FREDERICKS:  -- THE CFO CAN'T JUST STAND BY AND WATCH HIS CEO LIE TO INVESTORS.

THE COURT:  OKAY.  SO I THINK IN AN AMENDED COMPLAINT THAT THAT CHART IS GOING TO REALLY BE HELPFUL TO ME, AND YOU KNOW I'M GOING TO RELY ON IT EQUALLY TO YOUR ALLEGATIONS.  SO

YOU CAN -- MAYBE YOU CAN APPEND IT TO THE THIRD AMENDED COMPLAINT AND MAKE IT PART OF THE COMPLAINT.

MR. FREDERICKS:  YOUR HONOR, WE HEAR YOU AND WE CAN CERTAINLY ALLEGE THAT KIRK, WHO IS A -- WHO IS WORTH $3 BILLION AND IS OVERSEEING A LARGER COMPANY, HE IS RELYING ON WALSH TO DO THIS.

THE COURT:  SO I -- ALL RIGHT.  SO WE START WITH WALSH, AND I CERTAINLY AGREE THAT YOUR C.W.S SPEAK MORE DIRECTLY TO WHAT THEY OBSERVED WITH MR. WALSH.

I DON'T HAVE THE DIRECT LINE TO THE FALSE STATEMENT, AND I THINK YOU CAN DO -- IT SOUNDS LIKE YOU CAN RELATIVELY EASILY DO A BETTER JOB FOR ME THERE TO HELP ME OUT AND TO IDENTIFY WHICH STATEMENTS HE WAS IN THE ROOM ON OR ACTUALLY MADE.

BUT -- AND THEN WITH -- I'M REALLY NOT SEEING ADEQUATE ALLEGATION OF SCIENTER FOR LAST, STERLING, AND KIRK, AND I MADE MY COMMENT ABOUT YOUR C.W.S SAY HE CAME TO SOME TOWN HALL MEETINGS.

YOU KNOW THE KIND OF SPECIFICITY THAT THE NINTH CIRCUIT APPROVED, AND THAT IS WHAT WAS THE CONTENT OF THE MEETING, WHEN WAS THE MEETING?  I DON'T EVEN HAVE DATES OF WHEN THE MEETINGS WERE.

SO IT WOULD BE -- THOSE ARE THE KIND OF FACTS THAT I NEED.

MR. FREDERICKS:  I -- WE WILL, OF COURSE, DO WHATEVER WE CAN TO ADDRESS YOUR HONOR'S CONCERNS.

THE COURT:  GOOD.  I KNOW THOSE ARE HARD, YEAH.

MR. FREDERICKS:  I WOULD JUST SAY THAT IN THE CONTEXT OF CORE OPERATIONS AND THAT DATA, YOU KNOW, IF THE COMPANY IS SPENDING -- WELL, THEY'RE -- THERE ARE A COUPLE OF THINGS HERE. THE CLASS PERIOD BEGINS JUST AFTER THEY BROKE UP WITH ANOTHER MAJOR INVESTOR WHO WAS GOING TO FUND THIS PROJECT.

THE COURT:  OKAY.

MR. FREDERICKS:  THAT BEGS THE QUESTION, WHY DID THEY WALK AWAY?

THEN THEY SAY WE'RE BRINGING IN THESE INVESTMENT BANKERS. THEY NEVER COME UP WITH ANYTHING.

AT THE END OF THE CLASS PERIOD, THE TECHNOLOGY IS BASICALLY VIEWED AS WORTHLESS.  YOU KNOW, THEY -- J.P. MORGAN WRITES DOWN THE VALUE OF ITS PROJECTION BY 500 MILLION, THEY'RE TAKING WRITE DOWNS ON THE PLANT AND EQUIPMENT.

IF THIS WERE SUCH A GREAT TECHNOLOGY, WHERE IS IT?

THE COURT:  SO -- BUT MR. FREDERICKS, THE SECURITIES LAWS DON'T GUARANTEE THAT EVERY PROJECT WILL SUCCEED, AND FRANKLY -- I MEAN, YOU'VE READ MY OTHER ORDERS.  BASIC MISMANAGEMENT IS BASIC MISMANAGEMENT.  IT'S NOTHING ELSE.  YOU CAN FIRE THE CEO BECAUSE OF IT, BUT THE SECURITIES LAWS DON'T APPLY.

MR. FREDERICKS:  YOUR HONOR, I WAS GOING TO MAKE A SLIGHTLY DIFFERENT POINT --

THE COURT:  OKAY.

MR. FREDERICKS:  -- WHICH IS THAT EVERYONE KNEW THAT

THIS WHOLE ENTERPRISE WAS ABOUT CONVERTING NATURAL GAS --

THE COURT:  SURE.

MR. FREDERICKS:  -- NOT CONVERTING PURE METHANE.

THE NOTION THAT THE SENIOR OFFICERS, WHO ARE ROUTINELY ISSUING STATEMENTS TALKING ABOUT THE PROGRAM, DIDN'T KNOW, OR NEVER EVEN THOUGHT TO ASK, BY THE WAY, HAVE YOU ACTUALLY DONE THIS WITH NATURAL GAS?

THE COURT:  IN 2018, DIDN'T THEY ALLEGE THAT THEY DID IT WITH NATURAL GAS?  THAT'S WHY I'M DRAWING THE LINE BETWEEN THE 2017 AND 2018 ALLEGED FALSE STATEMENTS IS THAT IT -- YOU KNOW, I REALLY THINK THAT, AT LEAST ON THE ALLEGING FALSITY, YOU MIGHT HAVE SOMETHING, AND IT MAY BE AN OMISSIONS THEORY, I'LL HAVE TO REALLY THINK ABOUT IT, ON THE 2017 STATEMENTS.

THE 2018 STATEMENTS, YOU'VE GOT TO TELL ME -- YOU'VE GOT TO ALLEGE FACTS, NOT JUST YOUR CONCLUSION, THAT THE STATEMENTS -- THAT THE REPRESENTATIONS OF YIELD WERE DERIVED FROM PURE METHANE EXPERIMENTS, THAT THE STATEMENTS SAY IT'S DERIVED FROM NATURAL GAS EXPERIMENTS, AND I THINK MS. SMILAN IS EXACTLY RIGHT.  IF YOU'RE TAKING ON THE FUNDAMENTAL FALSITY OF THE REPRESENTATION OF NATURAL GAS THERE, YOU NEED SOME FACTS BECAUSE I DON'T HAVE THEM.

MR. FREDERICKS:  YOUR HONOR --

THE COURT:  THAT'S ALL.

MR. FREDERICKS:  -- LET ME DRAW THE COURT'S ATTENTION TO PARAGRAPH 142, IT'S PAGE 45 OF THE COMPLAINT.

THE COURT:  OKAY.

MR. FREDERICKS:  THIS IS MAY 2018.

THE COURT:  OKAY.

MR. FREDERICKS:  AND IT'S SIX LINES FROM THE BOTTOM OF THE PAGE.  IT SAYS 2,3 BDO YIELDS ARE UP 25 PERCENT SINCE LAST REPORTED.

THE COURT:  YEP.

MR. FREDERICKS:  WELL, THE LAST REPORTED IS FROM THE FALL OF 2017, YOU KNOW, THAT NOVEMBER STATEMENT THAT'S WITHIN THE SCOPE OF THE SEC ORDER, IT'S SORT OF IN THAT FIRST CATEGORY.

NOW, ADMITTEDLY -- AND IF YOU, YOU KNOW, LOOK AGAIN AT PARAGRAPH 14, IT TALKS ABOUT --

THE COURT:  ACTUALLY, THAT'S NOT TRUE, BECAUSE AT PARAGRAPH 139, THERE'S THE MARCH 1, 2018 10-K, THE COMPANY'S 2017 ANNUAL REPORT REPRESENTS UTILIZATION -- "IN ENERGY, WE ARE WORKING TO CREATE NOVEL, HIGHLY ENGINEERED BACTERIA THAT UTILIZE FEEDSTOCKS, TYPICALLY NATURAL GAS."

LET'S SEE IF THIS -- TO DATE, WE'VE PROVEN --

MR. FREDERICKS:  THERE IS, TO MY KNOWLEDGE, NO REPORT ON YIELDS IN --

THE COURT:  OKAY, NO, THERE'S NO REPRESENTATION THAT NATURAL GAS WAS USED IN THE MARCH 1.  SORRY, I MISREAD THAT.

MR. FREDERICKS:  SO OUR, OUR ALLEGATION IS -- AND I THINK IT'S WELL PLED -- THAT WHEN THEY SAY IN MAY 2018, OH,

IT'S UP 25 PERCENT SINCE WE LAST REPORTED, AND SINCE, YOU KNOW, THEY DON'T SAY THE REPORT, THE BASIS OF REPORTING IS ANY DIFFERENT, I THINK THE CONCLUSION IS, WELL, YOU KNOW, IT'S -- YOU KNOW, OUR -- YOU KNOW, WE HAD THESE NUMBERS.

WELL, THEY'RE ACTUALLY PURE METHANE NUMBERS, THEY AREN'T NATURAL GAS NUMBERS, WE DIDN'T TELL YOU THAT, WE HID THE BALL. WELL, WE'RE USING THE SAME NUMBERS IN BUILDING ON IT.

THEY TALK AGAIN IN PARAGRAPH 144 ABOUT REACHING PROFITABLE YIELDS.

THEN YOU GO TO AUGUST 9.  AGAIN, THEY SAY, PARAGRAPH 148, BDO YIELDS THIS TIME UP 22 PERCENT SINCE LAST REPORT.

SO IT'S STILL THE SAME THING.

NOW, YOUR HONOR, I WILL ADMIT THAT WHEN YOU GET TO NOVEMBER, THEN THEY CHANGE THEIR LANGUAGE A LITTLE BIT.  AT PARAGRAPH 155, THE SECOND SENTENCE OF MR. WALSH IS, QUOTE, "FIRST, IN OUR LEAD PROGRAM, 2,3-BDO, WE ARE NOW PRODUCING BDO FROM NATURAL GAS AND ROUGHLY 50 PERCENT" -- YOU KNOW, THEY'RE TALKING ABOUT SOMETHING ELSE.

NOW, IT MAY BE THAT THEY CHANGED THEIR METRIC, BECAUSE IN AUGUST OF THAT YEAR THEY GOT A SUBPOENA FROM THE SEC SAYING, YOU KNOW, WE'RE HAVING TROUBLE WITH HOW YOU'RE REPORTING THINGS, AND THEY STARTED TO USE A LITTLE DIFFERENT LANGUAGE.

BUT I THINK THAT WHEN YOU SAY, FALSELY, OUR YIELD IS UP 25 PERCENT IN 2017, THEN IN 2018, UP UNTIL AT LEAST AUGUST, YOU SAY, OH, WE'RE ANOTHER 25 PERCENT OVER WHAT WE PREVIOUSLY SAID,

WE'RE UP ANOTHER 22 PERCENT, YOU'RE JUST REENFORCING --

THE COURT: WHERE ARE THE FACTUAL ALLEGATIONS THAT IN -- THAT IN MAY OF 2018 THAT IT WAS -- THAT IT WASN'T DONE WITH NATURAL GAS? I'M JUST MISSING -- YOU DRAW THE CONCLUSION THAT -- WHEN YOU SAY WHY IS IT FALSE, PARAGRAPH 151, YOU SAY THE FEEDSTOCK WITH WHICH THE COMPANY ACHIEVED ITS MBP SUCCESS WAS PURE METHANE, NOT NATURAL GAS.

AM I SUPPOSED TO TAKE THAT AS A FACTUAL ALLEGATION?

MR. FREDERICKS: YES.

THE COURT: OKAY.

MR. FREDERICKS: AND THAT'S CONFIRMED BY, AMONG OTHER THINGS, SEVERAL OF OUR C.W.S, YOU KNOW, ONE OF WHOM IS THE PERSON RESPONSIBLE FOR OVERSEEING MBP TESTING, C.W. 4.

THE GUY SAID, YOU KNOW, EVERYTHING THAT'S BEING REPORTED WAS, WAS WITH PURE METHANE.

SO, YOU KNOW, THIS ISN'T JUST UNCORROBORATED THAT WE'RE JUST MAKING IT UP AND WE'RE RELYING PURELY ON INFERENCE.

THE COURT: OKAY.

MR. FREDERICKS: WE HAVE A CREDIBLE PERSON WHO SAID YOU GOT IT.

AND HE'S ALSO SAID -- AND WE HAVEN'T DISCUSSED THIS, YOUR HONOR -- THAT WHEN THEY WERE REPORTING THESE NUMBERS MAKING IT SOUND AS IF WE'RE IN THE MONEY, WE'RE COMMERCIALLY VIABLE, YOU KNOW, THEY WERE SORT OF CHERRY PICKING, LIKE, ONE OF THREE METRICS THAT SORT OF SAID, OKAY, WE'VE MET PRODUCTIVITY, WE'RE

IN THE MONEY.

THEY DIDN'T SAY, WELL, WE MET THE METRIC FOR ONE OF THREE CRITICAL CRITERIA TO BE IN THE MONEY.  THEY SAID, WE'RE IN THE MONEY.

AND, YOU KNOW, TO NOT EXPLAIN TO INVESTORS THAT, YOU KNOW, THESE PRODUCTIVITY NUMBERS, YIELD NUMBERS ARE BEING ACHIEVED IN THE CONTEXT WHERE YOU AREN'T BEING ABLE TO DO ANOTHER ONE -- YOU KNOW, YOUR HONOR IS WELL FAMILIAR WITH THE LAW THAT, YOU KNOW, LITERAL TRUTH IS NOT A DEFENSE.

THE COURT:  OH, I UNDERSTAND.

MR. FREDERICKS:  THE SECURITIES LAWS ARE NOT ABOUT LITERAL TRUTH.  I HEARD A LOT OF LITERAL TRUTH ARGUMENT FROM DEFENSE COUNSEL.

IF YOU HAVE PUT A SUBJECT IN PLAY -- THIS IS THE SCHUENEMAN CASE, IF I'M NOT MISPRONOUNCING IT -- IF YOU PUT A SUBJECT IN PLAY, YOU DON'T NEED TO DISCUSS EVERY LAST POSSIBLE FACT ABOUT IT, BUT YOU'VE GOT TO DISCLOSE ENOUGH SO YOU AREN'T MISLEADING PEOPLE.

THE COURT:  SURE.

MR. FREDERICKS:  WE AREN'T TALKING ABOUT MINOR THINGS.  WE'RE TALKING ABOUT THE WHOLE BASIS OF THEIR TELLING THE WORLD AND THEIR INVESTORS THAT THEY'RE READY TO GO WITH NATURAL GAS, YOU KNOW, THEIR CHARTS -- THEY TALK ABOUT, YOU KNOW, YIELD, EVERYONE KNOWS THEY'RE ABOUT TO BRING NATURAL GAS, THEY HAVE THE LITTLE BOXES IN THE COMPLAINT WHICH SHOW NATURAL

GAS CONVERSION.  THEY DIDN'T SAY PURE METHANE CONVERSION, THEY SAID NATURAL GAS CONVERSION.

YOU KNOW, THERE ARE GREY AREA CASES.  THIS IS NOT ONE OF THEM.

THE COURT:  OKAY.  SO LET'S -- I WANT TO WRAP THIS UP SO I CAN GIVE MS. SMILAN THE LAST WORD SINCE IT'S HER MOTION.  AS I SAID, I'M NOT GOING TO -- I THINK I'M GOING TO PASS ON THE LOST CAUSATION ARGUMENT AT THIS POINT.

IT IS GOING TO BE A HARD ISSUE FOR YOU, BUT MAYBE, YOU KNOW, DISCOVERY WILL HELP YOU.

BUT THE -- ON SCIENTER, YOU KNOW, IN EVERY CASE I KNOW YOU HIT THIS WALL THE FIRST TIME YOU SEE THE JUDGE, THAT WE'RE NEVER SATISFIED WITH IT.

I'M GOING TO GIVE YOU SOME GUIDANCE ON CLEANING UP THE ALLEGATIONS SO THAT I CAN REALLY ANALYZE THEM.  I DON'T WANT YOU TO CONSIDER THAT ANY OF THE FALSE STATEMENTS ARE IN THE CLEAR BECAUSE I HAVE SOME PROBLEMS WITH THEM, AND IF MS. SMILAN COMES BACK NEXT TIME AND IDENTIFIES SORT OF A NEW TOTALITY VIEW OF A FALSE STATEMENT, I WANT YOU TO BE ON NOTICE THAT YOU BETTER AMEND AS BEST YOU CAN.

BUT I'M REALLY STRUGGLING WITH THE, WITH THE SCIENTER AND WITH -- EVEN WITH WALSH, I'VE GOT TO RELATE WHAT HE KNEW TO THE STATEMENTS THAT WERE MADE BY HIM.

SO I JUST NEED YOU TO CONNECT THE DOTS FOR ME.  I NEED YOU -- YOU KNOW, YOU ALWAYS HAVE TO GO BACK MORE ON SCIENTER,

SO I'M GOING TO NEED YOU TO DO THAT.

I WILL ASK FOR THAT CHART, AND YOU KNOW HOW DO IT. YOU KNOW EXACTLY WHAT BENEFITS YOU AND ME IN EVALUATING THIS NEXT TIME THROUGH.

I THINK THAT'S ENOUGH GUIDANCE FOR YOU ON IT. OF COURSE THERE WILL BE A WRITTEN ORDER, BUT I WANT TO JUST MAKE SURE I'M CLEAR.

MR. FREDERICKS: YOUR HONOR, I'LL YIELD IF I CAN JUST HAVE ANOTHER 30 SECONDS.

THE COURT: GO AHEAD, PLEASE.

MR. FREDERICKS: I TRUST THAT THE COURT WILL RESERVE JUDGMENT ON OUR CORE OPERATIONS AND PLAUSIBLE INFERENCES ARGUMENT. THE FACT THAT THE COMPANY MAY HAVE SET THINGS UP SO THAT ALL THE RESEARCH SCIENTISTS ARE REPORTING DIRECTLY TO YEH AND THEN YEH REPORTS TO WALSH, I THINK THE COURT WOULD BE SETTING A TERRIBLE PRECEDENT TO WRITE A DECISION THAT SORT OF SAID, OH, WELL, YOU KNOW, YOU SET UP ENOUGH FUNCTIONAL BARRIERS BETWEEN THE PEOPLE AT THE TOP AND THE PEOPLE AT THE BOTTOM, THEY'RE GOING TO BE SCOT-FREE. I THINK THAT WOULD BE TERRIBLE.

SENIOR EXECUTIVES HAVE RESPONSIBILITIES TO KNOW WHAT'S GOING ON OR TO BE RECKLESS, AND FOR WALSH, WHO WAS RUNNING THIS PROJECT, NOT TO KNOW OF SOME OF THESE PROBLEMS, I THINK IT JUST DEFIES CREDULITY.

THE COURT: SO WHEN YOU ALLEGED THE CASE, OF COURSE, YOU DIDN'T JUST BREAK OUT CORE OPS AS APPLYING TO WALSH.

THAT'S ALWAYS A PROBLEM THAT I HAVE IS THAT -- AND I APPRECIATE THE CLARIFICATION NOW.

SO JUST TO BE CLEAR, IN THIS CASE, I'M NOT GOING TO ACTUALLY -- I'M NOT SEEING THAT I'M GOING TO CONCLUSIVELY ELIMINATE ANY OF YOUR CLAIMS, SO I WON'T BE SETTING A BAD PRECEDENT BECAUSE I'M GOING TO GIVE YOU LEAVE TO AMEND, SO THERE WON'T BE ANY.

IN SOME CASES -- I MEAN, IN THE ORACLE CASE, I CUT OUT SOME PIECES OF IT FROM THE GET-GO AND THEN JUST SAID, THIS IS NOT GOING TO FLY.  THEN WHEN THEY CAME BACK, I SAID I ALREADY TOLD YOU THESE WERE OUT.

THIS ONE DIDN'T FALL INTO THOSE NEAT CATEGORIES IN THE SAME WAY, BUT THE RESULT IS THE SAME BECAUSE I'M GOING TO GRANT THIS MOTION.  SO DON'T -- SO I JUST WANT THAT TO BE SAID.  I'M NOT GOING TO BE SETTING ANY PRECEDENT WITH THIS ORDER BECAUSE I'M GOING TO LET YOU HAVE A SECOND STAB AT IT.  OKAY?

MR. FREDERICKS:  YOUR HONOR, WE APPRECIATE YOUR GUIDANCE.

I MEAN, IS IT EASIER IF WE SIMPLY, YOU KNOW, REQUEST LEAVE TO AMEND AND WITHDRAW THE CURRENT COMPLAINT AS MOOT?  I ALWAYS GET LITTLE CHILLS WHEN I HEAR SOMEONE SAY A MOTION TO DISMISS IS GRANTED BECAUSE THAT SORT OF IMPLIES --

THE COURT:  WELL, YOU KNOW, YOU MAKE MY LIFE MUCH EASIER -- AND OF COURSE MS. SMILAN WOULD NEVER DISAGREE WITH SOMEONE WITHDRAWING THE COMPLAINT.

I WOULD GIVE LEAVE TO AMEND.  IF YOU FEEL THAT WHAT I'VE SAID ON THE RECORD IS ADEQUATE, IT SOUNDS LIKE YOU DON'T EVEN WANT AN ORDER GRANTING THE MOTION WITH LEAVE TO AMEND.  YOU JUST WANT TO TAKE THIS GUIDANCE AND WITHDRAW IT UPON APPROVAL OF LEAVE TO AMEND ALONE.  IS THAT WHAT YOU'RE SAYING?

MR. FREDERICKS:  YOUR HONOR, I'M ALWAYS HESITANT TO TELL A JUDGE HOW TO HANDLE AN ADMINISTRATIVE MATTER.  BUT AS LONG AS IT'S UNDERSTOOD BY EVERYONE ON THIS PHONE THAT, THAT IT'S A DISMISSAL WITHOUT PREJUDICE --

THE COURT:  OH, YEAH, SURE.

MR. FREDERICKS:  -- BECAUSE YOUR HONOR WANTS TO SEE A DIFFERENT COMPLAINT AND THAT YOU'RE RESERVING JUDGMENTS ON MERITS ISSUES, I DON'T HAVE A PROBLEM.

THE COURT:  OKAY, THAT'S GOOD.  I THINK WHAT I'M GOING TO DO, AND I WANT MS. SMILAN TO FINISH UP, BY I'M INCLINED TO GRANT IT AND ISSUE A VERY SHORT, HIGH LEVEL ORDER THAT GIVES YOU -- BECAUSE WE'VE HAD SUCH A LENGTHY DISCUSSION.

MS. SMILAN, I DON'T WANT TO GLOSS OVER SOME OF THESE IMPORTANT POINTS THAT YOU'VE RAISED, SO I HAVE TIME RESERVED FOR YOU AND I DO WANT TO HEAR YOUR FINAL COMMENTS.

MS. SMILAN:  OKAY.  THANK YOU, YOUR HONOR.  I APPRECIATE THAT.

FIRST, WHETHER IN RESPONSE TO A SHORT ORDER OR A LONG ORDER, I THINK THAT THERE ARE SO FEW ALLEGATIONS HERE WITH RESPECT TO MR. LAST, WHO LEFT EARLY IN THE CLASS PERIOD, AND

ALSO MR. STERLING, WHO WAS THE CFO AND SAID NOTHING ABOUT AND IS NOT ALLEGED TO HAVE KNOWN ANY OF THE DETAILS, OTHER THAN THE VAGUE, APPARENTLY, WALSH KEPT KIRK BROADLY AWARE OF WHAT WAS GOING ON IN THE COMPANY, THEY OUGHT NOT TO BE RENAMED AS DEFENDANTS IN THIS CASE.

THE COURT:  WELL, IT'S -- IT WAS STARTLING HOW LITTLE THERE WAS ON MR. LAST AND MR. STERLING.

MS. SMILAN:  CORRECT.

I WOULD MAKE THE SAME ARGUMENT WITH RESPECT TO ALL OF THE DEFENDANTS, BUT I DON'T THINK THAT THE PLAINTIFFS NEED TO NAME THESE FORMER EXECUTIVES IN THEIR COMPLAINT.

THE COURT:  WELL, I THINK MAYBE IT IS FAIR COMMENT TO MR. FREDERICKS THAT WHEN HE'S CONSIDERING AN AMENDED COMPLAINT, THAT HE MAY CHOOSE NOT TO BRING CLAIMS AGAINST MR. LAST AND MR. STERLING.  I'M GOING TO GIVE HIM THAT OPPORTUNITY.  I KNOW THE COMPLAINT IS THIN ON THEM.  THERE ARE SOME FALSE STATEMENTS ATTRIBUTED TO THEM, THOUGH.

MS. SMILAN:  OKAY.  THE -- RIGHT.

BUT WHAT THE PLAINTIFF SEEMS TO LOSE SIGHT OF HERE IS THAT IN ORDER TO PLEAD FRAUD WITH PARTICULARITY UNDER THE PSLRA, THE PLAINTIFF HAS TO LINK THE SPEAKER OF THE STATEMENT --

THE COURT:  YES.

MS. SMILAN:  -- WITH THE SPECIFIC FACTUAL ALLEGATIONS THAT DEMONSTRATE SCIENTER, AND THEY HAVEN'T DONE THAT HERE.

THE CORE OPERATIONS DOCTRINE IS NOT GOING TO APPLY TO

THOSE TWO GENTLEMEN.  YOU KNOW, THERE'S NO FACTS HERE THAT SUGGEST -- THEIR NAMES AREN'T EVEN MENTIONED, THAT THEY WERE INVOLVED IN ANY MEETINGS, THAT THEY MADE ANY ADMISSIONS, THAT THEY WERE CLOSELY MONITORING THAT WAS GOING ON IN THIS ONE LITTLE VENTURE OUT IN SOUTH SAN FRANCISCO WHEN THEY WERE OVERSEEING A LARGE, A LARGE ORGANIZATION.

THE COURT:  YEAH.

MS. SMILAN:  AND THE PLAINTIFFS ARE GOING TO HAVE TIME -- WE HAVEN'T TOUCHED UPON IT -- THEY'RE GOING TO HAVE A VERY DIFFICULT TIME OVERCOMING THE FACT THAT THERE IS -- IF THERE'S AN INFERENCE HERE, IT'S AN INFERENCE OF INNOCENCE.

EVERY SINGLE ONE OF THESE DEFENDANTS INCREASED THEIR HOLDINGS IN PRECIGEN DURING THE CLASS PERIOD, THE THREE YEAR CLASS PERIOD.  MR. KIRK AND HIS ENTITIES INVESTED ANOTHER $180 MILLION IN THE STOCK OF THIS COMPANY, WHICH YOU DON'T DO IF YOU DON'T BELIEVE THAT THE COMPANY IS, YOU KNOW, TRUTHFUL AND THAT IT HAS A REAL PROSPECT OF COMMERCIAL VIABILITY.

AND IN ADDITION TO THAT, THE COMPANY WAS INVESTING MILLIONS AND MILLIONS OF DOLLARS AND ON THE BRINK OF OPENING A PLANT TO TRY TO COMMERCIALIZE THIS PROJECT.

SO ALL OF THAT IS COMPLETELY INCONSISTENT WITH WHAT THE PLAINTIFFS ARE ALLEGING, THE ALLEGATION OF SCIENTER, WHICH IS WHAT THEY'RE REQUIRED TO PLEAD.

THE COURT:  OKAY.  ALL RIGHT.

OKAY.  THANK YOU ALL.  REALLY, THE BRIEFING WAS GREAT.

LET ME MAKE -- I HAVE ONE QUESTION FOR MR. FREDERICKS. YOU KNOW AS MUCH AS YOU'RE GOING TO KNOW.  THE ORDER I GIVE YOU WON'T BE ANY MORE ILLUMINATING, AND SO I WILL ISSUE THAT AT A HIGH LEVEL.

I WANT TO GIVE YOU THE AMOUNT OF TIME YOU NEED TO GIVE ME YOUR BEST AMENDED PLEADING, AND SO I KNOW IT'S ACTUALLY SOMEWHAT TYPICAL TO EVEN REQUEST UP TO 60 DAYS LEAVE TO AMEND. WHAT -- HOW MUCH TIME WOULD YOU LIKE?

MR. FREDERICKS:  YOUR HONOR, I WOULD BE HAPPY TO TAKE THE EXTRA 60 DAYS.  SOMETIMES IT TAKES SOME TIME TO GET BACK TO CONFIDENTIAL WITNESSES.

THE COURT:  YEAH.

MR. FREDERICKS:  YOU KNOW, SO THAT'S SOMETHING I WOULD ANTICIPATE WE WOULD WANT TO DO.

THE COURT:  OKAY.

MR. FREDERICKS:  SO IF IT'S AN OFFER, I'M TAKING IT.

THE COURT:  OKAY.  IT'LL BE -- AND THE TIME WILL RUN FROM THE DATE OF MY ORDER, NOT FROM TODAY.  THAT ALWAYS MAKES THINGS CLEARER.

YOU CAN ALWAYS FILE IT EARLIER IF YOU'RE READY.  I'VE NEVER HAD THAT ACTUALLY HAPPEN.

MR. FREDERICKS:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  YOU WILL INCLUDE THE CHART WE'VE TALKED ABOUT, AND I'LL NEED A RED LINED VERSION OF THE AMENDED COMPLAINT.  SO IF YOU WOULD DO THAT, THAT HELPS ALL OF US.

AND THEN ON A FOLLOW-UP MOTION, MS. SMILAN, I WAS GOING TO ASK YOU TO RESUBMIT THE SPECIFIC PAGES WITH HIGHLIGHTING, BUT SINCE I'M GOING TO ISSUE AN ORDER AT A HIGH LEVEL, I'M NOT GOING TO HAVE YOU GO BACK OVER IT THIS TIME.  BUT IF YOU -- I JUST DON'T THINK IT'S NECESSARY.  I REALLY THINK WE'VE COVERED IT.

BUT, AGAIN, BECAUSE I KNOW I'LL SEE YOU ALL AGAIN -- YOU KNOW, WE'VE ALL HANDLED LOTS OF THESE CASES -- WHEN YOU SUBMIT THE STACK OF DOCUMENTS -- AND IT MAY BE THE SAME STACK, SO YOU'RE GOING TO HAVE TO RESUBMIT THEM, IT'S THE CHAMBERS COPIES THAT I'M TALKING ABOUT -- I'LL NEED YOU TO HIGHLIGHT THE PARAGRAPH THAT YOU'RE REFERRING ME TO IN THE DOCUMENT, NOT JUST CITE THE PAGE NUMBER.

YOUR TABLE OF CONTENTS GIVING ME DEFINITIONS AND SPECIFICS WAS VERY HELPFUL.  THANK YOU FOR THAT.  WHENEVER I GOT CONFUSED, I COULD JUST GO RIGHT BACK TO IT AND IT SET ME STRAIGHT ON WHICH TOP OF THE PAGE, BOTTOM OF THE PAGE NUMBERS.  SO THANK YOU FOR THAT EXTRA EFFORT.

BUT IF ONE OF YOUR TEAM MEMBERS WILL JUST HIGHLIGHT THOSE PASSAGES, THAT'LL -- BECAUSE WE LITERALLY SAT ON SOMETHING TRYING TO FIND SOMETHING THAT DIDN'T SEEM TO BE ON THE PAGE.

MS. SMILAN:  ABSOLUTELY, YOUR HONOR, WE WILL DO THAT.

THE COURT:  ALL RIGHT.  THESE CASES REQUIRE ME TO TAKE A VERY DEEP DIVE.  I HAVE FOUND THAT IT'S NOT HELPFUL TO TAKE A DEEP DIVE IF I'M GIVING LEAVE TO AMEND, AND I THINK

WE'VE DONE THAT HERE ON THE RECORD.  BUT TO WRITE A 50 PAGE ORDER ONLY TO BE AMENDED, I DON'T THINK IT'S WORTH IT AND IT WOULD TAKE ME A MONTH TO DO THAT.

SO I THINK THIS IS THE BEST, MOST EFFICIENT WAY TO GO FORWARD.

THANK YOU ALL.  I WILL LOOK FORWARD TO THE NEXT ROUND.

YES, MR. FREDERICKS?

MR. FREDERICKS:  I JUST HAVE ONE SUGGESTION --

THE COURT:  SURE.

MR. FREDERICKS:  -- WHICH YOUR HONOR CAN DEAL WITH AS YOU SEE FIT.

THERE WERE A NUMBER OF INSTANCES WHERE I FELT, READING DEFENDANTS' PAPERS, THERE WAS CITATION TO MATERIAL FOR THE TRUTH OF THE MATTER ASSERTED RATHER THAN FOR AN ACCEPTABLE PURPOSE, SUCH AS SAYING, WELL, WE MADE THESE DISCLOSURES OR WE GAVE THESE RISK WARNINGS.

AND I THINK IT MIGHT BE HELPFUL, IF YOU'RE HAVING US REDO OUR COMPLAINT, WHICH WE'RE HAPPY TO DO, IF WE'RE COMING BACK, I THINK IT MAY JUST SORT OF BE HELPFUL IF YOU COULD GIVE THE COURT'S OWN GUIDANCE AS TO WHETHER YOU THINK THAT WE'RE RIGHT ABOUT THAT.  BECAUSE THEN I THINK WE JUST END UP FIGHTING OVER SOME THINGS WHICH ARE REALLY OUTSIDE THE FOUR CORNERS OF THE COMPLAINT, AND FRANKLY, WE WERE KIND OF AT A LOSS AS TO WHAT TO DO WITH IT BECAUSE SO MUCH WAS THERE.

THE COURT:  YOU KNOW, THAT'S AN INTERESTING POINT.

I'M NOT SURE I -- I COULDN'T THINK OF AN EXAMPLE.

I THINK -- TO ME, MS. SMILAN MADE THE POINT THAT THE DOCUMENT SAYS IT WAS BASED ON NATURAL GAS AND IT'S YOUR OBLIGATION TO PLEAD THE FACTS THAT SHOW THAT THAT WAS FALSE.

SO SHE WASN'T REPRESENTING THE TRUTH.  SHE WAS SAYING THAT THE PUBLICLY FILED DOCUMENTS REVEAL A SET OF CIRCUMSTANCES THAT WAS DISCLOSED, AND IF YOU TAKE ISSUE WITH IT, YOU NEED THE FACTS TO SHOW IT'S UNTRUE.

MS. SMILAN, DID I UNDERSTAND YOUR COMMENT?

MS. SMILAN:  THAT'S ABSOLUTELY CORRECT.  SO WHEN WE'RE TALKING ABOUT THE 2018 AND AFTER DOCUMENTS, EITHER THEY DIDN'T SAY NATURAL GAS OR THEY DID SAY NATURAL GAS.

AND IN THAT SECOND SET OF CIRCUMSTANCES, BEGINNING IN NOVEMBER, THEY HAVE TO PLEAD FACTS SHOWING THAT IT WASN'T NATURAL GAS.

THE COURT:  YEAH.

MS. SMILAN:  AND IN THE EARLIER PERIOD, IN 2018, THEY HAVE TO PLEAD FACTS SHOWING THAT IT WAS, THAT IT WAS METHANE BECAUSE IT DOESN'T SAY ONE WAY OR ANOTHER.

THE COURT:  WELL, AND MR. FREDERICKS SUGGESTS A REASONABLE INFERENCE IS THAT IT'S BUILT ON THE SHOULDERS OF THE LAST ANNOUNCEMENT, AND THAT MAY BE A REASONABLE INFERENCE.  SO THAT'S FINE.  OKAY.

MR. FREDERICKS:  I WON'T BELABOR THE POINT.

THE COURT:  OKAY.

MR. FREDERICKS:  IF YOUR HONOR WASN'T UNDULY CONFUSED --

THE COURT:  I WASN'T.

MR. FREDERICKS:  WE THOUGHT OUR COMPLAINT WAS AT LEAST RELATIVELY STRAIGHTFORWARD.

THE COURT:  IT WAS.

MR. FREDERICKS:  WE WILL -- WE WILL REPLEAD. WE THANK THE COURT FOR ITS TIME.  THANK YOU SO MUCH.

THE COURT:  ALL RIGHT.  AND, YOU KNOW, IT WAS TEN DISCRETE FALSE STATEMENTS AS OPPOSED TO WHEN I DID THE ORACLE CASE, THERE WERE 50.  SO IT'S A BIG DIFFERENCE.

ALL RIGHT.  THANK YOU ALL.  I REALLY APPRECIATE IT, AND I WILL LOOK FORWARD TO SEEING YOU NEXT TIME.

MS. SMILAN:  THANK YOU, YOUR HONOR.

MR. JACOBSON:  THANK YOU, YOUR HONOR.

MR. FREDERICKS:  THANK YOU, YOUR HONOR.

(THE PROCEEDINGS WERE CONCLUDED AT 11:01 A.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF ZOOM PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  APRIL 26, 2022