John T. Jasnoch (CA 281605)
**Scott+Scott ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
jjasnoch@scott-scott.com

William C. Fredericks (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
**Scott+Scott ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6464
Facsimile: (212) 223-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

*Attorneys for Lead Plaintiff Raju Shah and*
*Lead Counsel for the Putative Class and*
*for Lead Plaintiff Raju Shah*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MARTIN JOSEPH ABADILLA, et al., | Case No.: 5:20-cv-06936-BLF |
| Plaintiff, | Dept.: Courtroom 3, 5th Floor |
| v. | Judge: Honorable Beth Labson Freeman |
| PRECIGEN, INC., et al., | Date: October 19, 2023 at 9:00 AM |
| Defendants. | |

*This Document Relates to:*

*ALL CONSOLIDATED ACTIONS*

**DECLARATION OF WILLIAM C. FREDERICKS IN SUPPORT OF (A) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND (B) PLAINTIFF'S COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

1.    I, William C. Fredericks, am a partner in the firm of Scott+Scott Attorneys at Law LLP ("Scott+Scott" or "Lead Counsel").  Scott+Scott is counsel for the Court-appointed Lead Plaintiff and proposed class representative Raju Shah ("Plaintiff" or "Lead Plaintiff").  I have personal knowledge of the matters stated herein based on my participation in the Action and review of records maintained by my firm.

2.    I respectfully submit this Declaration in support of (i) Lead Plaintiff's motion for final approval of the proposed $13 million settlement and plan of allocation, and (ii) Plaintiff's Counsel's motion for attorneys' fees and litigation expenses.

3.    Capitalized terms not otherwise defined herein have the same meaning as used in the Stipulation and Agreement of Settlement, dated March 1, 2023, ECF No. 128 (the "Stipulation") at §§1.1-1.53.

4.    For the reasons set forth set forth below and in the accompanying memoranda,[1] I respectfully submit that: (i) the terms of the proposed Settlement and Plan of Allocation are fair, reasonable, and adequate in all respects and should be finally approved by the Court; and (ii) Plaintiff's Counsel's Fee and Expense Application (including the request for a modest 15 U.S.C. §78u-4(a)(4) award of $3,000 to the Lead Plaintiff) is fair and reasonable, and should also be approved in all respects.

5.    The following exhibits are attached to this Declaration:

| Exhibit A | Scott+Scott Time & Lodestar by Professional |
| Exhibit B | Scott+Scott Time & Lodestar by Category of Work |
| Exhibit C | Scott+Scott Litigation Expenses |
| Exhibit D | Scott+Scott Firm Resume |

---

[1]    *See* Plaintiff's Motion and Memorandum in Support of Final Approval of Proposed Class Action Settlement and Plan of Allocation (the "Settlement Mem."); and (ii) Plaintiff's Counsel's Motion and Memorandum in Support of Fee and Expense Application (the "Fee Mem.").

## I.    PRELIMINARY STATEMENT

6.    The proposed Settlement, if approved by the Court, will resolve all claims asserted in this Action against Precigen, Inc. (formerly known as Intrexon Corporation), and its current and former officers and other Related Persons, in exchange for a cash payment of $13,000,000 for the benefit of the Settlement Class.  All of the $13 million Settlement Amount has been received and deposited into an escrow account that is currently earning interest for the benefit of the Class.

7.    It is respectfully submitted that the proposed Settlement represents a decidedly favorable result for the Class in the face of very significant litigation risk on both liability and damages issues.  The Settlement was only reached after two years of vigorously contested litigation, including full briefing and oral argument on Defendants' motion to dismiss Plaintiff's Second Amended Complaint (the "SAC") and Plaintiff's filing of a further expanded Third Amended Complaint (the "TAC").  Moreover, the proposed Settlement was only reached after an extended arm's-length mediation process conducted under the auspices of a highly experienced mediator, the Hon. Layn Phillips (U.S.D.J., ret.) of Phillips ADR ("Judge Phillips" or the "Mediator"), which involved the exchange of comprehensive mediation submissions, the production of certain internal Precigen documents, and a full day face-to-face mediation session with Judge Phillips.  Significantly, the Settlement is based on and fully consistent with Judge Phillips's independent "mediator's proposal," and the Stipulation of Settlement itself was not signed until after further months of negotiation and after Lead Counsel's review of over 83,000 pages of additional internal documents that Precigen produced as part of the mediation process.

8.    As set forth in the accompanying Declaration of Adam D. Walter of the Court-appointed Claims Administrator, A.B. Data (the "Walter Decl."), pursuant to the Court's July 7, 2023 Preliminary Approval Order (ECF No. 135), A.B. Data mailed 72,491 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and Nominees.  Walter Decl. at ¶8.  In addition, A.B. Data posted the Notice and Claim Form, along with other relevant documents on a dedicated website (the "Settlement Website") at http://www.PrecigenSecuritiesLitigation.com, and caused the Summary Notice to be published in *Investors' Business Daily* and transmitted over the internet via the *PR Newswire*.  *Id.* at ¶¶9, 14.

A.B. Data has also established and maintained a call center that is staffed by live operators during business hours, and Class members may call with questions about the Settlement or the claims process. *Id*. at ¶¶10-13.  Although the deadline for submitting requests for exclusion from the Settlement are not due until September 26, 2023 and objections to the Settlement (or any aspect thereof) are also not due until then, to date **no** objections have been submitted only **one** opt out request has been received, *id*. at ¶¶15-16, and Lead Counsel is not aware of any others.[2]

9.    The Court, after a hearing, entered its Preliminary Approval Order, having found that (subject to further review at the Fairness Hearing) the proposed Settlement appeared to meet all relevant criteria for approval as "fair, reasonable and adequate" in light of the risks and challenges faced by Plaintiff and the Class in proving, and collecting on, the Released Claims. Due notice having been issued, the Court should now grant final approval.

10.    Lead Plaintiff also requests the Court's final approval of the proposed Plan of Allocation ("POA").  The POA provides for a *pro rata* distribution of the Settlement Fund, based on "Recognized Loss Amounts" that take into account the different per share losses that Class members suffered depending on when they bought and (if applicable) sold their Precigen common shares.  It is respectfully submitted that this kind of *pro rata* distribution plan, which was prepared by Lead Counsel and an experienced expert in such matters, is entirely customary in cases of this type, and should also be approved as fair, reasonable, and adequate.

11.    I also respectfully submit that Plaintiff's Counsel's request for attorneys' fees equal to 25% of the $13,000,000 Settlement Fund and reimbursement of $88,688.02 in litigation expenses (plus interest at the same rate as earned by the Settlement Fund) for their work in connection with the settled claims is fair and reasonable.  As detailed in the accompany Fee Memorandum, the requested fee is equal to the Ninth Circuit's "benchmark" fee of 25% of the recovery in securities and other complex class cases where (as here) the representation was undertaken by Plaintiff's Counsel on an entirely contingent basis.  Moreover, as detailed below at §VI, the requested fee for all time spent by all Plaintiff's Counsel (including Scott+Scott and the

---

[2]    Plaintiff's Counsel will address any objections or exclusions that may yet be received in their Reply papers, which are due on October 5, 2023.

Schall Law Firm), in litigating and settling this matter equates to a "multiplier" of roughly 1.62 on counsel's "lodestar" (*i.e.*, counsel's hourly rates multiplied by the hours spent on litigating and settling those claims), even after Lead Counsel eliminated or reduced certain time entries as a matter of billing discretion. *See* ¶¶51, 73 below. Given that "positive" multipliers of 2x to 4x are commonly awarded – and given the superior results achieved here in the face of substantial litigation risk – it is respectfully submitted that the unexceptional 1.62 multiplier here strongly confirms the reasonableness of the requested 25% "benchmark" fee. *See also* §VI below and Exhibits A and B filed herewith, as well as the accompanying separate Declaration by Brian Schall, Esq. ("Schall Decl.").

12.      Finally, Lead Counsel supports Lead Plaintiff Shah's request for an award of $3,000 pursuant to 15 U.S.C 15 U.S.C §78u-4(a)(4) as fair and reasonable, based on the time Mr. Shah spent on this matter.

## II.      BACKGROUND

### A.      History of the Action

13.      This litigation commenced on October 5, 2020, with the filing of *Abadilla v. Precigen, Inc., et al.*, No. 5:20-cv-06936-BLF (N.D. Cal.), which alleged securities fraud claims on behalf of a putative class against Precigen, former Chief Executive Officer Randal J. Kirk ("Kirk"), and then-defendant Rick L. Sterling ("Sterling") (the Company's former Chief Financial Officer). ECF No. 1.

14.      Following the filing of various related actions and competing motions to consolidate and to appoint lead plaintiffs and lead counsel, on April 8, 2021, the Court (a) consolidated all related actions, and (b) appointed Mr. Shah as Lead Plaintiff and Scott+Scott as Lead Counsel in the resulting consolidated action. ECF No. 57.

15.      On May 18, 2021, Lead Plaintiff filed his Consolidated Amended Class Action Complaint (the "Consolidated Complaint") which, *inter alia*, added as additional defendants former Precigen's Senior Vice President of Energy & Fine Chemical Platforms (Robert F. Walsh III ("Walsh")) and Precigen's former Chief Operating Officer (Andrew J. Last ("Last")). ECF No. 71.

16.    On August 2, 2021, Defendants, together with former defendants Sterling and Last, either moved to dismiss the Consolidated Complaint (ECF No. 83) or, in the case of defendant Walsh, separately joined in that motion (*id.*).

17.    Thereafter, pursuant to a Stipulation and Order entered on September 22, 2021 (ECF No. 87), on September 27, 2021 (i) Lead Plaintiff filed his Second Amended Class Action Complaint (ECF No. 88) (the "SAC") as to the same defendants who had been named in the Amended Complaint, and (ii) the Court terminated the then-pending motion to dismiss as moot (ECF No. 89).  On November 3, 2021, Precigen, Kirk, Sterling, and Last filed their opening brief and other supporting materials in support of their Corrected Notice of Motion and Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 96) (the "Renewed Motion to Dismiss"), which was separately joined in by Defendant Walsh (*id.*).

18.    Lead Plaintiff thereafter submitted full briefing and supporting papers in opposition to Defendants' Renewed Motion to Dismiss on December 17, 2021 (ECF No. 98), and the moving Defendants submitted their reply brief (as well as certain additional supporting materials) in further support of their Renewed Motion to Dismiss on January 28, 2022 (ECF Nos. 102-103).

19.    On April 8, 2022, the Court heard oral argument on the Renewed Motion to Dismiss.  At oral argument, the Court stated that, *inter alia*, it was not persuaded that falsity had been adequately alleged as to more than a limited number of Defendants' alleged misstatements, and that *scienter* had not been adequately alleged as to any Defendant.  Accordingly, the Court stated that it intended to grant the Renewed Motion to Dismiss, while also granting Lead Plaintiff leave to file a further amended complaint. *See* ECF Nos. 106, 110.

20.    On May 31, 2022, the Court issued its 19-page Order Granting Defendants' Renewed Motion to Dismiss with Leave to Amend (the "MTD Order", ECF No. 111).  In the MTD Order, as to falsity issues, the Court found, *inter alia*, that Plaintiff had adequately alleged falsity as to Defendants' statements from 2017 and from May and August of 2018 regarding reported "yields," but rejected the bulk of Plaintiff's claims based on other post-2017 statements (including those which alleged that Precigen had failed to meet internal timelines or misled investors as to having reached stated levels of commercial viability).  The Court also further rejected Plaintiff's

theory that Precigen's disclosures about the progress of the Company's MBP program were based on "cherry-picked" data in light of the Ninth Circuit's recent decision in *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 2022 WL 1573821 (9th Cir. May 19, 2022), and further found that "many" of the misstatements alleged in the SAC were inactionable puffery or statements of opinion.  MTD Order at 8-11.  As to *scienter*, the Court also found that the SAC's allegations, including those based on accounts from confidential witnesses that Lead Counsel had identified, located, and interviewed, were all insufficiently strong to meet the demanding "strong inference" standard established by the Private Securities Litigation Reform Act of 1995 for pleading *scienter*, and that Plaintiff's motive allegations were not compelling.  MTD Order at 11-14.  The Court did, however, grant Plaintiff 60 days to file a further amended complaint.

21.    In response, Lead Counsel redoubled their investigative efforts, worked to identify and interview additional potential confidential witnesses, and timely filed Plaintiff's TAC on August 1, 2022.  ECF No. 116.  That complaint, *inter alia*, dropped Last and Sterling as defendants and claims based on certain misstatements that the Court had found to be inactionable as a matter of law, and added certain additional factual allegations (including new information obtained from additional confidential witnesses).

22.    While Lead Counsel continued to pursue litigation through renewed investigative efforts and the preparation of an even more detailed complaint, as discussed below the Parties also began preliminary discussions regarding the time, place, and manner of a possible mediation.

**B.    The Settlement Negotiations, the "Mediator's Proposal," and the Stipulation of Settlement**

23.    Beginning in June 2022, shortly after the Court issued its MTD Order, Defendants and Lead Plaintiff, by their counsel, began preliminary discussions regarding the possibility of trying to resolve the claims at issue through mediation, and the Parties ultimately agreed to retain a highly experienced mediator of securities class actions, Judge Layn Phillips, for that purpose.

24.    On August 2, 2022, Lead Plaintiff and the remaining defendants (Precigen, Walsh, and Kirk) jointly advised the Court that they had agreed to try to pursue a settlement through mediation.  That same day the Court entered an Order approving the Parties' proposed stipulation

1    to vacate existing deadlines for briefing Defendants' motion to dismiss the operative complaint,

2    so that the Parties could focus on seeing if they could reach a mediated settlement (ECF Nos. 118-

3    119).

4          25.     Pursuant to the Mediator's instructions, Lead Plaintiff and Defendants prepared and

5    exchanged comprehensive opening mediation briefs and supporting materials on September 30,

6    2022, and submitted additional reply mediation papers and supporting materials on November 3,

7    2022. In addition, as part of the mediation process, Precigen produced to Lead Plaintiff certain

8    relevant Precigen documents that Lead Plaintiff had requested in advance of the mediation.

9          26.     On November 17, 2022, representatives of the Parties attended a full-day in-person

10    mediation session in New York City under the auspices of the Mediator.

11          27.     At the end of this full-day mediation session, Judge Phillips made a "mediator's

12    proposal" for a global settlement of all claims asserted in the Action (including those asserted

13    against Walsh), under which, *inter alia*, Lead Plaintiff (on behalf of himself and the putative class)

14    would settle, compromise, and release all claims against Precigen and its current and former

15    officers, directors, employees, agents, and representatives (in their capacities as such) in exchange

16    for Defendants' payment of $13 million in cash.

17          28.     Lead Plaintiff, Precigen, and Kirk accepted the "mediator's proposal" in principle,

18    subject to the Parties' resolution of certain non-monetary terms regarding the nature, scope, and

19    completion of confirmatory discovery to be provided to Lead Plaintiff by Precigen prior to

20    executing any final stipulation of settlement. The Parties thereafter promptly (and jointly) notified

21    the Court of these developments.

22          29.     Lead Plaintiff and Precigen reached an agreement in early December 2022,

23    whereby Precigen agreed to produce to Lead Counsel confirmatory discovery materials consisting

24    of roughly 83,000 pages of additional internal Precigen documents. On January 20, 2023, Lead

25    Counsel advised Precigen that their review had confirmed their earlier assessment that the

26    proposed $13 million Settlement was fair, reasonable, and adequate, and that Lead Plaintiff would

27    elect to proceed with the Settlement.

28

30.    In January 2023, Defendant Walsh also agreed to become a party to the Settlement, on terms consistent with the "mediator's proposal," and as reflected in the Stipulation.

31.    On March 1, 2023, Plaintiff's and Defendants' Counsel completed the process of finalizing and executing the Stipulation and the exhibits thereto.  On the same day, the Parties also entered into a confidential Supplemental Agreement, which gives Precigen the right to terminate the Settlement if valid requests for exclusion are received from persons or entities entitled to be members of the Settlement Class in an amount that exceeds an amount agreed to by the Parties.

**C.    The Court's Preliminary Approval of the Settlement**

32.    On March 2, 2023, Lead Plaintiff filed his motion for preliminary approval of the Settlement, together with the Stipulation and exhibits thereto, and a supporting memorandum of law and declaration.  ECF No. 128.

33.    After a hearing on July 6, 2023, on July 7, 2023, the Court entered its Preliminary Approval Order (ECF No. 135) which, *inter alia*, preliminarily approved the Settlement and the Parties' agreed Notice Plan, as amended.  The Order also preliminarily certified the following class – which is substantively the same as that alleged in the TAC – for settlement purposes:

> [A]ll Persons or entities who purchased or otherwise acquired publicly traded shares of the common stock of Precigen, Inc. f/k/a Intrexon Corporation ("Precigen") (ticker PGEN, formerly XON) between May 10, 2017 and September 25, 2020, inclusive (the "Class Period"), and were damaged thereby.[3]

**III.    COUNSEL'S COMPLIANCE WITH THE COURT'S NOTICE REQUIREMENTS**

34.    In accord with the Preliminary Approval Order, Lead Counsel, through the Claims Administrator, has implemented a comprehensive combined notice-by-mail and notice-by-publication program.  "Notice Packets" – which contain all required information regarding the Settlement and how Class Members can (i) exclude themselves from the Settlement Class; (ii)

---

[3]    Excluded from the proposed Settlement Class are (i) Defendants; (ii) the past and current officers, directors, partners and managing partners of Precigen (and any of Precigen's subsidiaries or affiliates, including but not limited to MBP Titan LLC); (iii) the immediate family members, legal representatives, heirs, parents, subsidiaries, successors, successors and assigns of any excluded Person; and (iv) any entity in which any excluded Person(s) have or had a majority ownership interest, or that is or was controlled by any excluded Person(s). Also excluded from the Settlement Class will be those Persons who file valid and timely requests for exclusion.  *See* Preliminary Approval Order, ECF No 135, at 1.

object to the Settlement, the Plan of Allocation, or the Fee and Expense Application; (iii) file a Proof of Claim; and/or (iv) attend the Fairness Hearing – have been mailed to 72,491 potential Class Members or their nominees. Notice Packet materials have also been, and continue to be, posted at http://www.precigensecuritieslitigation.com, along with other case-related documents. In addition, the Summary Notice – which directs class members to the dedicated Settlement Website at www.precigensecuritieslitigation.com – was published on *PR Business Wire* (internet) and in *Investor's Business Daily* (print). *See generally* Walter Decl., at ¶¶2-9.

35.     To date, Lead Counsel have received no objections, and are aware of only the one opt-out request received by Claims Administrator. *See* Walter Decl. ¶¶15-16. Should any objections be filed or received prior to the Fairness Hearing, Lead Plaintiff will address them in reply papers.

## IV.    THE SIGNIFICANT BENEFITS OF THE PROPOSED SETTLEMENT VS. THE MATERIAL LIKELY RISKS OF CONTINUED LITIGATION

### A.    Litigation Risks

36.     The risks of litigation here were plainly substantial, and some of the challenges that Plaintiff faced in prevailing on liability on the claims that he proposes to settle were made clear early on. For example, at oral argument on Defendants' motion to dismiss on April 8, 2022, as noted above the Court raised doubts about various aspects of Plaintiff's main claims under §10(b) and SEC Rule 10b-5(b), and of their secondary "control person" liability claims under §20(a). In particular, although the Court ultimately found in its MTD Order that Lead Plaintiff had adequately alleged that certain statements from the first part of the Class Period were misleading because they purported to describe test results based on use of natural gas (when Plaintiff alleged that they had instead been obtained using pure methane), the MTD Order *also* found that numerous other statements were *not* actionable. ECF No. 111 at 7-11. The dismissed statements were largely from the latter half of the Class Period and included all of Defendants' various statements that Precigen's Methane Bioconversion Platform ("MBP") had reached "in the money" status with respect to being able to produce certain chemicals. Lead Counsel believed that the Court's findings that these and certain other key false and misleading statements at issue were not actionable was

1  incorrect – and hoped to so persuade the Court on repleading – but there could be no assurance

2  that the Court would reverse course after reviewing the TAC's efforts to replead those claims.

3      37.    Moreover, although Lead Counsel believe that they would have been able to show

4  that Defendants acted with *scienter*, such proof is never certain in a §10(b) case.  First, although

5  defendant Walsh (the executive who headed the MBP Program) was the defendant most at risk of

6  being found to have acted with *scienter* (based primarily on his closeness to the program), he

7  retired from Precigen well before the end of the Class Period, and he personally made only a few

8  of the allegedly false or misleading statements at issue.  Moreover, Walsh did not engage in any

9  suspicious stock sales during the Class Period – a factor that makes it significantly harder to plead

10 (let alone prove) that he acted with *scienter*.  And the Court had already rejected Plaintiff's reliance

11 on certain confidential witnesses ("CWs") to support the requisite "strong inference" of Walsh's

12 *scienter*, so once again there could be no assurance that Plaintiff's reliance on many of the same

13 CWs in the TAC would cause the Court to reach a different view as to Walsh's *scienter*.  Second,

14 with respect to defendant Kirk, Precigen's former chief executive officer and the only other

15 individual defendant, the challenges of pleading and proving his *scienter* were even greater, as (i)

16 he was much more removed from the MBP Program than Walsh, (ii) the CW allegations against

17 Kirk were significantly weaker than they were as to Walsh, and (iii) Kirk (like Walsh) also did not

18 sell a suspiciously large percentage of his Precigen shares during the Class Period.

19     38.    In addition, Defendants also had significant loss causation defenses.  This case, for

20 example, did not involve a single large drop in Precigen's share price in response to a "clean"

21 disclosure that one or more of Defendants' prior statements about the MBP Program had been

22 false.  Instead, this case involved a series of roughly ten "partial corrective disclosure dates," with

23 Plaintiff alleging that the truth about Defendants' alleged misstatements and omissions only

24 emerged gradually over a multi-year period.  On the facts alleged, proving loss causation was

25 particularly challenging because on certain alleged "partial corrective disclosure dates" the

26 negative stock price reaction was not statistically significant, and even on dates when there was a

27 statistically significant reaction there were other negative (and hence potentially "confounding")

28 disclosures relating to non-MBP-related aspects of Precigen's business.  As a result, proving that

1    the observed price declines on such dates were related to fraud-related disclosures (as opposed to

2    unrelated matters) would likely be difficult.  After considering these and other loss causation

3    issues, as noted above, Lead Plaintiff's damages expert estimated that the range of reasonably

4    recoverable damages in this case was roughly $135 million to $270 million – but unsurprisingly

5    Defendants contended that maximum recoverable damages were a mere fraction of such amounts.

6        39.    Moreover, even if Plaintiff had prevailed on all his claims against Defendants, the

7    Class's ability to actually collect on a judgment significantly greater than $13 million (let alone

8    one anywhere near the Class's maximum reasonably recoverable damages) is doubtful at best.  For

9    example, Precigen's business has been in sharp decline in recent years and on November 9, 2022

10   – just a week before the Parties' face-to-face mediation session with Judge Phillips – Precigen

11   reported in its Form 10-Q for the third quarter of 2022 that there was "substantial doubt about the

12   Company's ability to continue as a going concern."  In addition, Defendants have only limited

13   available insurance coverage, which could well have been fully exhausted had Lead Plaintiff

14   elected to litigate the Class's claims through discovery, summary judgment, trial, and likely

15   appeals.  And although defendant Kirk is a wealthy individual, as noted above at ¶37, the claims

16   against him were far weaker than those against Walsh.

17       40.    Here, there was a prior governmental investigation into certain aspects of the claims

18   alleged, which resulted in imposition of a financial penalty of $2.5 million against Precigen under

19   §13 of the Exchange Act.  However, the findings of that SEC investigation did not result in any

20   allegations of fraud (as §13 has no *scienter* element), and (as Defendants have repeatedly pointed

21   out) were limited to settled allegations involving only three alleged misstatements which were all

22   from 2017, and which involved no admissions of even innocent misstatement by any Defendant.

23   Accordingly, Lead Plaintiff still bore the full brunt of trying to establish that the numerous alleged

24   misstatements from the last three years of the Class Period (up through September 25, 2020) were

25   actionable – and, as to all fraud claims in *this* Action, Lead Plaintiff would still have to plead and

26   prove *scienter*, loss causation, and damages.  In sum, while the SEC's investigative work provided

27   an assist, this is decidedly not a case were Plaintiff could have had a "free ride" to any settlement

28

1    – let alone a better settlement than the $13 million recovery obtained by Plaintiff's work here – or

2    where Plaintiff failed to pick up (with a vengeance) where the SEC had stopped.

3        **B.    Benefits of Settlement**

4        41.    Most settlements provide the benefit of at least some recovery, as well as the

5    avoidance of further delays and the uncertainties of further litigation.  Here, however, there would

6    be an especially long and costly road ahead to any litigated recovery, with many months (and more

7    likely years) of hard-fought fact and expert discovery involving highly complex (and indeed novel)

8    methane conversion technologies – even assuming that the TAC survived Defendants' planned

9    motion to dismiss the TAC (which Defendants provided to Plaintiff as part of the mediation

10   process).  As noted below, however, Lead Counsel believe that published data further confirm

11   their own view that the recovery obtained here was not just "some recovery," but represents a

12   decidedly superior recovery in the face of above-average litigation risk.

13       42.    Lead Plaintiff's consulting damages expert advised that reasonably recoverable

14   damages were in the range of $135 million to $270 million here.  Thus, the $13 million Settlement

15   represents approximately 5% of the high end of this range, which assumes that Lead Plaintiff

16   would not only survive dismissal, but also ultimately run the table on all reasonably disputable

17   liability and loss causation issues at summary judgment and trial (while avoiding any reversals on

18   appeal).  By comparison, NERA Economic Consulting recently reported that, between 2011 and

19   2021, the median securities class action settlement equated to roughly 2.8% of maximum damages

20   in cases involving estimated investor losses between $100 million and $199 million, and 2.3% for

21   estimated investor losses between $200 million and $399 million.  *See* J. McIntosh & S. Starykh,

22   *Recent Trends In Securities Class Action Litig.: 2021 Full-Year Review,* NERA ECON.

23   CONSULTING (Jan. 25, 2022), available at www.nera.com/publications/archive/2022/recent-trends-

24   in-securities-class-action-litigation-2021-full-y.html ("NERA Report").  In addition, based on

25   other published analysis, the Settlement is almost double the size of the median securities class

26   action settlement ($6.9 million) in the Ninth Circuit between 2012 and 2021.  *See* L. Bulan & L.

27   Simmons, *Securities Class Action Settlements: 2021 Review and Analysis*, CORNERSTONE

28

1    RESEARCH, (2021), available at https://www.cornerstone.com/wp-

2    content/uploads/2022/03/Securities-Class-Action-Settlements-2021-Review-and-Analysis.pdf.

3    **C.    Lead Counsel's Conclusion**

4        43.    Here, absent the proposed Settlement, continued litigation would have required (i)

5    further extensive motion to dismiss briefing directed at the TAC, to be followed by (assuming that

6    dismissal was denied); (ii) the undertaking of comprehensive document discovery that, to a

7    significant degree, would have involved highly technical materials regarding Precigen's novel

8    methane bioconversion technologies and testing programs; (iii) the taking of depositions of

9    numerous Precigen officers and employees on the details of those same highly technical programs;

10   (iv) an expert discovery process that was expected to include, at a minimum, both sides retaining

11   experts on measuring achievement of bio-technological development milestones and other

12   technical issues, as well as on loss causation and damages issues; (v) full briefing of a contested

13   class certification motion, and related expert discovery; (vi) the all but inevitable motions by

14   Defendants for summary judgment; and then (assuming that Plaintiff successfully opposed such

15   motions) (vii) extensive pre-trial motions *in limine* and *Daubert* motions; (viii) trial; and (ix) likely

16   post-trial motions, and thereafter appeals, by the losing side.  Such further litigation and appeals

17   would not only have been enormously costly but would also almost certainly take several more

18   years to play out.

19       44.    In sum, by accepting Judge Phillips' mediator's proposal and finalizing the

20   proposed Settlement, Lead Plaintiff seeks to secure a $13 million "bird in the hand" to settle claims

21   that, from a collectability standpoint, might well have ultimately proven to be worth materially

22   less than that amount *even if*, after years of litigation, Plaintiff prevailed on liability and secured

23   the full amount of the maximum reasonably recoverable damages.  Lead Counsel, for all of the

24   reasons set forth herein and in their accompanying Memorandum in Support of Final Approval,

25   also strongly support the Settlement as representing a superior result for the Class, and as readily

26   meeting the "fair, reasonable, and adequate" standards required for final approval by this Court.

27   **V.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE**

28

45.    The proposed Plan of Allocation (the "POA") is set forth at pp. 11-14 of the Notice. Lead Counsel developed the POA in consultation with Plaintiff's consulting damages expert – a Ph.D.-holding financial economist and chartered financial analyst (C.F.A.) with over 25 years of experience in advising both private litigants and the Securities Exchange Commission on (among other things) damages, loss causation and plan of allocation issues in federal securities cases.

46.    The objective of the POA is to equitably distribute the Net Settlement Fund among Authorized Claimants.  In short, the POA proposes that the Net Settlement Fund be allocated to Authorized Claimants (*i.e.*, those who submit a completed Claim Form to the Claims Administrator that is ultimately approved for a payment) on a *pro rata* basis based on the relative size of their Recognized Claims, where their Recognized Claims are, in turn, based on that portion of the losses on their Class Period purchases of Precigen shares that can be fairly attributed to the Defendants' misconduct as alleged in the TAC.  In other words, the POA is based on the declines in value of Precigen common stock that occurred following partial disclosure events, which gradually disclosed the truth concerning the true state of Precigen's MBP program (which, in turn, reduced the amount of artificial inflation in the stock price allegedly caused by the alleged misstatements and omissions at issue).  In Lead Counsel's experience, this type of *pro rata* POA (which, in the interest of reducing administrative costs, also provides that an otherwise Recognized Claim Amount must be at least $10 to qualify for a payment) is customary in securities class actions.

47.    Moreover, although the POA was set forth in full in the Notice, to date no objections to the POA have been received.  Accordingly, it is respectfully submitted that the POA is fair, reasonable, and adequate, and that it also merits final approval.

## VI.    PLAINTIFF'S COUNSEL'S FEE AND EXPENSE APPLICATION SHOULD BE APPROVED AS FAIR AND REASONABLE

### A.    The Work Performed and Time Expended

48.    As set forth in the accompanying Fee Memorandum, federal courts have long recognized that that attorneys who successfully represent a class are entitled to compensation for

1   their services, and that attorneys who obtain a recovery for a class in the form of a common fund

2   should be awarded fees and expenses from that fund.

3       49.    Here, Plaintiff's Counsel seek attorneys' fees equal to 25% of the $13 million

4   Settlement Fund – or $3.25 million (excluding interest) for the time they have spent, and have yet

5   to spend, on this matter.  As detailed below, Plaintiff's Counsel (even after making various

6   reductions based on billing discretion) have collectively spent 2,328.70 hours, with a lodestar value

7   of $2,000,279.00, on investigating, litigating, and settling the claims at issue.  Lead Counsel

8   respectfully submit that it is well within this Court's discretion to award the requested fee, both

9   because it is precisely equal to the Ninth Circuit's "benchmark" 25% fee, and because the resulting

10   "lodestar multiplier" is an unexceptional 1.62 compared to fee awards approved by other courts in

11   this Circuit and across the country in securities class actions.  *See* Fee Memorandum; *see also*

12   ¶¶72-74 below.  Similarly, it is respectfully submitted that the superior recovery obtained here in

13   the face of significant risk, as well as all other factors applied by Ninth Circuit courts, also supports

14   the full award of the requested "benchmark" 25% fee.

15       50.    As a threshold matter, it is appropriate to begin Lead Counsel's justification of the

16   requested 25% fee by summarizing the substantial work that my firm performed in this matter.

17   Filed herewith as Exhibit A is a schedule summarizing the amount of time spent by attorneys and

18   professional support staff employees of Scott+Scott on this matter from inception through July 7,

19   2023 (the date of the Preliminary Approval Order), together with a summary lodestar calculation

20   for those individuals.  The information set forth therein (and in Exhibit B filed herewith) regarding

21   the amount and nature of time spent on the Action by attorneys and professional staff at my firm

22   is based on daily time records regularly prepared and maintained by my firm, which are available

23   at the Court's request.  I am the lead partner who primarily oversaw and conducted the day-to-day

24   activities in this matter, and I and others at my firm reviewed these daily time records in preparing

25   this Declaration to confirm their accuracy, as well as the reasonableness of the time billed to the

26   litigation.  All time expended in preparing this application for fees and expenses was excluded.

27       51.    In the course of preparing both Exhibit A and the more detailed summary at Exhibit

28   B, various adjustments were made in the exercise of billing discretion to *reduce* the amount of

1   time reported therein.  In particular, the following time has been removed and excluded: (i) all

2   time expended and incurred after the entry of the Preliminary Approval Motion on July 7, 2023;

3   (ii) all time incurred by any timekeepers who spent fewer than 10 hours working on this Action;

4   and (iii) various time entries recorded on various matters that were reduced or removed as a matter

5   of billing discretion.  In addition, although experience suggests that my firm will continue to

6   expend material amounts of time working on claims administration matters in the coming months

7   (*e.g.*, responding to class member inquiries, advising on disputed claims, and ultimately working

8   with the Claims Administrator to prepare "final distribution" motion papers for submission to the

9   Court), my firm's attached lodestar summaries make no adjustment to account for any time yet to

10  be incurred (although the requested 25% fee will also cover all such future time).

11         52.    Accordingly, Lead Counsel believe that the time reflected in my firm's lodestar

12  calculations is reasonable in amount and was reasonably necessary for the effective prosecution

13  and resolution of this Action.  Moreover, the billing rates reflected for the partners, attorneys, and

14  other professional support staff are the firm's standard billing rates for contingent cases, and are

15  the same (or comparable to, after adjusting for periodic rate increases) as those accepted by courts,

16  including those in this Circuit, in other contingent-fee securities class action, and similarly

17  complex commercial class and/or derivative litigation.  The firm's rates are set based on an annual

18  analysis of rates that are charged by firms performing comparable work and that have been

19  approved by courts.  Different timekeepers within the same employment category (*e.g.,* partners,

20  associates, paralegals, etc.) may have different rates based on a variety of factors, including years

21  of practice, years at the firm, year in the current position (*e.g.,* years as a partner), relevant

22  experience, relative expertise, and the rates of similarly experienced peers at our firm or other

23  firms.  For personnel who are no longer employed by Scott+Scott, the billing rate used for all

24  lodestar calculations is based upon the rate for that person in his or her final year of employment

25  with the firm.

26         53.    Filed herewith as Exhibit B is a chart, in a form consisted with this Court's Standing

27  Order on Civil Cases, that reflects the hours spent by each timekeeper during the course of the

28  Action, broken down using the following task categories:

54. **Factual Investigation:** This category includes time spent on my firm's thorough investigation into the claims asserted in the Action, which primarily included (i) collecting and reviewing Precigen's SEC filings, press releases, conference call transcripts from the roughly five year period from approximately a year before through roughly a year after the start of the lengthy Class Period at issue; (ii) collecting and reviewing published articles (as well internet reports, blogs and message boards) on Precigen specifically, and/or methane bioconversion technologies generally; (iii) collecting and reviewing the voluminous Wall Street and other analyst reports on Precigen covering the same roughly five year period; and (iv) identifying, locating, and interviewing – and in several instances repeatedly *re*interviewing – numerous former Precigen employees to better understand the considerable scientific and business complexities of Precigen's methane bioconversion development program (the "MBP") and to try to build Plaintiff's case on falsity and scienter.  Time allocated to this category also includes time spent analyzing potential clients' losses and relevant inquiries to ensure that the Lead Plaintiff that was ultimately appointed by the Court to represent the proposed Class and was fully qualified to do so.

55. **Pleadings:** This category consists primarily of the time incurred by my firm in drafting the Lead Plaintiff's successively more detailed complaints, including (i) the initial Consolidated Amended Complaint; (ii) the Second Amended Complaint, and (iii) the Third Amended Complaint, including associated legal research.

56. **Discovery:** This category reflects the time incurred by my firm in reviewing and analyzing documents that Lead Plaintiff requested and obtained from Precigen in the summer of 2022, as part of its agreement with it to proceed with a mediation process, as well as the time spent reviewing the significantly larger volume of material produced by Defendants in early winter 2022, as part of confirmatory discovery, which included roughly 83,000 pages of documents.

57. **Case Management/Client Communication:** This category includes time spent (i) communicating with Lead Plaintiff and his counsel regarding lead plaintiff matters and the case developments and status, and (ii) general case management matters.

58. **Motions and Legal Research:** This category includes time incurred by my firm in researching and preparing various motion papers over the course of this litigation, including

1    comprehensive briefs and accompanying declarations and exhibits (i) in support of Mr. Shah's

2    motion to be appointed, along with Scott+Scott, as lead plaintiff and lead counsel respectively; (ii)

3    in opposition to Defendants' muti-faceted motion to dismiss; and (iii) in support of Lead Plaintiff's

4    Motion for Preliminary Approval.  As previously noted, however, my firm's submitted time and

5    lodestar *excludes* all time on Lead Plaintiff's pending Motion for Final Approval of the Settlement

6    and on Plaintiff's Counsel's motion to approve the Fee and Expense Application.

7         59.    **Court Appearances/Preparation**: This consists primarily of the time incurred by

8    my firm in preparing for (i) the hearing on Defendants' Motion to Dismiss and (ii) Lead Plaintiff's

9    motion for preliminary approval.

10        60.    **Expert Work and Consultations:** This category reflects the time my firm spent

11   working with its consulting expert to thoroughly analyze and understand damages and loss

12   causation matters.

13        61.    **Mediation & Settlement:** This category includes all time incurred by my firm in

14   (i) engaging in preliminary discussions with Defendants about the possibility of mediating; (ii)

15   working out details regarding the time and manner of the eventual mediation, including the

16   selection and retention of the Hon. Layn Phillips as mediator; (iii) preparing extensive mediation

17   briefs and related submissions materials as directed by Judge Phillips, which also included

18   preparing responses to both Defendants' mediation brief and the additional arguments raised in

19   Defendants' draft papers in support of their planned motion to dismiss the TAC (and which

20   Defendants stated that they would promptly file in the event that mediation efforts broke down);

21   (iv) attending the full day, face-to-face mediation session conducted in November 2022, under the

22   auspices of Judge Phillips; (v) negotiating and preparing the initial term sheet reflecting the terms

23   of the proposed Settlement; (vi) negotiating the nature and scope of the confirmatory discovery to

24   be produced by Defendants as a pre-condition of any final settlement; and (vii) the drafting and

25   negotiation of the Stipulation of Settlement, and the exhibits and ancillary documents thereto.

26        62.    **Litigation Strategy/Analysis:** This category includes time incurred by my firm on

27   overall case strategy and analysis that is not otherwise reflected in the preceding categories.

28

**B.      The Requested Percentage-Based 25% Fee Is Fair and Reasonable Under the Factors Considered by Courts in This Circuit**

63.      As discussed in the accompanying Fee Memorandum, the Ninth Circuit has evinced a strong preference for awarding fees based on "percentage-of-the-recovery" method, rather than on the traditional (but far more laborious) "lodestar" method.  Addressed in the subsections below are the various factors – in addition to simply hours spent – that courts in this District and Circuit routinely consider in determining whether a requested percentage-based fee is fair and reasonable, namely (i) the recovery achieved; (ii) the risks of continued litigation; (iii) the skill required and quality of the work performed; (iv) the contingent nature of the representation, (v) awards in similar cases (including a "lodestar crosscheck"); and (vi) the reaction of the class.  *See., e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).  As further detailed in the Fee Memorandum, Lead Counsel respectfully submits that each of these factors supports a finding that the requested 25% benchmark fee award is fair and reasonable, and should be approved.

### 1.      The Result Achieved

64.      For the reasons summarized above at ¶¶41-42 above and further discussed in both the Final Approval and the Fee Brief, Lead Counsel respectfully submit that the recovery achieved is not merely adequate, but in fact represents, based on objective published data, a superior result when compared to the average or median securities class action settlement.  Accordingly, Lead Counsel respectfully submit that this important factor weighs strongly in favor of awarding the requested "benchmark" 25% fee.

### 2.      Litigation Risk

65.      As summarized at ¶¶36-40 above and further discussed in both the Final Approval and the Fee Brief, Lead Counsel respectfully submit that, for multiple reasons, this was a decidedly high-risk case.

66.      Moreover, my firm's prosecution of these claims was undertaken on a fully contingent-fee basis, leaving Lead Counsel fully exposed to the risk that they would recover little or nothing if they were unable to bring this Action to a successful result for the Class.

67.     In sum, from the outset, Lead Counsel understood that it was embarking on complex and expensive litigation that would be hard-fought litigation, all with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that prosecuting the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and expert consultants and the kinds of additional and significant out-of-pocket costs that a case such as this typically demands.  Because complex shareholder litigation often proceeds for several years before reaching any resolution, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel has received no compensation during the course of this Action, nor has it received any reimbursement for the $88,688.02 in expenses they have incurred to date in prosecuting this matters for the benefit of the Class.

68.     Having achieved a commendable result in the face of the kind of multiple and very significant risks that were present here, Lead Counsel respectfully submit that the litigation risk factor also weighs strongly in favor of the requested fee.

### 3.     The Skill Required and Quality of Work Performed

69.     Securities fraud class actions are notoriously complex and difficult to litigate and require a high level of professional skill and experience.  A copy of Scott+Scott's firm resume, which includes information about the standing of my firm and brief biographical summaries for the principal attorneys who worked on this case is attached in Exhibit D filed herewith.  Lead Counsel also hopes that the Court will agree based on its own role in overseeing this litigation that Scott+Scott has demonstrated its experience and a high level of skill in this matter.

70.     Given that some courts also consider the caliber of defendants' counsel under this factor, it should be noted that Defendants were represented in the Action by a team of extremely able counsel from Wilson Sonsini Goodrich & Rosati and Norton Rose Fulbright – two firms with a well-known (and well deserved) reputation for skill and for vigorously defending securities class actions.  In other words, given that Lead Counsel was able to develop a sufficiently strong case to

1  persuade Defendants to agree to the $13 million Settlement – notwithstanding the caliber of

2  Defendants' counsel – further supports the requested fee award.

### 4.    The Fully Contingent of the Representation

4  71.    From inception, Lead Counsel has undertaken to represent Plaintiff and the Class

5  on a *fully* contingent basis and to advance all litigation costs, such that my firm would recover

6  neither any attorneys' fees nor any expense reimbursements absent a recovery for the Class.  As

7  also noted at ¶67 above, this factor also strongly supports the requested fee.

### 5.    Awards in Similar Cases and Lodestar Cross-Check

9  72.    The accompanying Fee Memorandum more fully discusses relevant case law and

10  data concerning awards of attorneys' fees in similar cases.  Lead Counsel note, however, that in

11  addition to the case law in that brief, published research also confirms that, in securities class

12  actions involving (as here) a recovery in the range of $10-$25 million, the median court-approved

13  attorneys fee award for such cases has remained in a fairly consistent range of 28% to 30% over

14  the last 25 years, dating back to the start of the post-PSLRA era in 1996.  *See*  NERA Report, *supra*

15  at ¶42, at p. 27.

16  73.    Moreover, a "lodestar cross-check" analysis further confirms that the requested

17  25% here is fully consistent with awards in similar cases.  In performing a lodestar "cross-check,"

18  courts consider the total value of the legal services provided, based on (i) the number of hours

19  billed by each professional or paraprofessional timekeeper, multiplied by (ii) that timekeeper's

20  reasonable hourly rate.  Here, after combining my firm's hours and lodestar with those of the only

21  other Plaintiff's Counsel firm (*see* the accompany Declaration of Brian Schall on behalf of the

22  Schall Law Firm), in total the two Plaintiff's Counsel here (i) devoted 2,328.70 hours to the

23  investigation, litigation and ultimate resolution of this Action over the course of roughly three

24  years, resulting in (ii) a combined total lodestar of $2,000,279.00.

| LAW FIRM | HOURS BILLED | LODESTAR |
|---|---|---|
| Scott+Scott | 2,279.70 | $1,967,554.00 |
| Schall Law Firm | 49.00 | $32,725.00 |

| TOTAL | 2,328.70 | $2,000,279.00 |
|---|---|---|

74.     Significantly, the resulting "lodestar cross-check" results in only an unexceptional 1.62 multiplier here.  In other words, the requested 25% fee equates to roughly $3.25 million, and the resulting ratio between the requested 25% fee ($3.25 million) and Plaintiff Counsel's total lodestar ($2,000,279.00) is 1.62.  Given that multipliers between 2 and 4 are commonly awarded in complex securities class actions with substantial contingency risk (*see* accompanying brief), Lead Counsel respectfully submit that the unexceptional multiplier requested here further confirms the reasonableness of the requested fee.

### 6.     Reaction of the Class

75.     Finally, although 72,491 Notice Packets have been sent to potential Class Members and Nominees advising them that Plaintiff's Counsel would apply for attorneys' fees equal to 25% of the Settlement Fund (*see* Walter Decl. ¶8).  To date, no objections to the requested fee request for attorneys' fees have been filed or received, either by A.B. Data (Walter Decl. at ¶16) or, to Lead Counsel's knowledge, by any of Plaintiff's or Defendant's attorneys.  Should any objections be filed or received before the Fairness Hearing, Lead Counsel will address them in reply papers.

76.     In sum, for the reasons set forth above and in the accompanying Fee Memorandum, it is respectfully submitted that the requested 25% fee should be approved as fair and reasonable.

### C.     The Expense Application

77.     Scott+Scott also respectfully seeks reimbursement of litigation expenses from the Settlement Fund in the amount of $88,688.02, for expenses that were reasonably incurred in connection with the prosecution of this Action.  From the outset, my firm has understood that it might not recover any of the expenses it incurred and that, even assuming that the case were ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of the funds they had advanced to prosecute the Action. Consequently, my firm was motivated to, and did, take steps to avoid incurring unnecessary expenses when, without jeopardizing the vigorous and efficient prosecution of the case, it was practicable to do so.

78.    My firm's $88,688.02 in unreimbursed litigation expenses in connection with prosecuting this Action are summarized in Exhibit C, which identifies each category of expense (*e.g.,* experts and consultants, online legal and factual research, court fees, copying costs) and the amount incurred for each category.  These expenses are reflected in the books and records maintained by my firm, which are prepared from expense vouchers, check records, and other source materials, and which are an accurate record of the expenses incurred.  In my experience the categories of expenses at issue here are routinely submitted to courts for separate reimbursement by my firm in contingent cases and are not duplicated by my firms' billing rates.

### D.    Lead Plaintiff's Requested Award Under 15 U.S.C. §78u-4(a)(4) Is Reasonable

79.    As set forth Plaintiff's Counsel's accompanying Fee Memorandum, 15 U.S.C. §78u-4(a)(4), permits a court to award lead plaintiffs reasonable costs and expenses (including lost wages) incurred as a result of serving as a representative of a plaintiff class.  Here, the sole Lead Plaintiff, Mr. Shah, has requested an award of $3,000 for his time and effort prosecuting the Action to date on behalf of the Settlement Class.  As detailed in his accompanying affirmation, Mr. Shah has fulfilled his fiduciary obligations to the Settlement Class, and particularly in light of his professional experience and competence as a corporate controller.  Shah Decl. at ¶¶3-9.

80.    The Notice advised Class Members of Lead Plaintiff's intent to request a PSLRA awards of up to $5,000, and to date there have also been no objections to this request.

## VII.    CONCLUSION

81.    Lead Counsel respectfully submit that (a) the Settlement and the proposed Plan of Allocation should be approved as fair, reasonable, and adequate; and (b) Plaintiff's Counsel's request for a 25% attorneys' fee award and payment of $88,688.02 in expenses, as well as Lead Plaintiff's request for an award of $3,000 under 15 U.S.C. §78u-4(a)(4), should also be approved as fair and reasonable.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: September 14, 2023                              Respectfully submitted,

                                                                            s/ *William C. Fredericks*

1

_____
William C. Fredericks

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on September 14, 2023, I caused the foregoing to be electronically

3   filed with the Clerk of the Court using the CM/ECF system, which will send notification of such

4   filing to the email addresses denoted on the Electronic Mail Notice List.

5

6                                           s/ *William C. Fredericks*

7                                        William C. Fredericks

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28